MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*Pro Hac Vice to be filed*)
phughes@mwe.com
Michael B. Kimberly (*Pro Hac Vice to be filed*)
mkimberly@mwe.com
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

MCDERMOTT WILL & EMERY LLP
William G. Gaede, III (136184)
wgaede@mwe.com
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Attorneys for *Plaintiffs*

[Additional Counsel Listed on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, NATIONAL RETAIL FEDERATION, TECHNET, and INTRAX, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and, MICHAEL R. POMPEO, in his official capacity as Secretary of State, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

*MCDERMOTT WILL & EMERY LLP*
*ATTORNEYS AT LAW*
*MENLO PARK*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     Presidential Proclamation 10052, issued on June 22, 2020, banned the entry into the United States of workers in several key nonimmigrant visa categories, purportedly in response to the COVID-19 pandemic. 85 Fed. Reg. 38263 (June 25, 2020) (attached as Exhibit A). The Proclamation—which will last at least six months, if not longer, and which is expressly intended to bar hundreds of thousands of workers from entering the country—is inflicting severe economic harm on a wide range of American businesses across all economic sectors. The Proclamation is unlawful: It exceeds the statutory and constitutional authority of the Executive, and thus the federal departments and officials involved may not lawfully implement or enforce it. Plaintiffs bring this complaint requesting, among other things, prompt injunctive and declaratory relief.

## INTRODUCTION

2.     The United States economy has long been the envy of the world, and American innovation is the engine of this success. By developing groundbreaking new products and services, American businesses stand at the vanguard of virtually every industry, supplying infrastructure, goods, and knowhow to the global marketplace. America as a whole reaps the benefits: Innovative companies create high-paying jobs; they improve the quality of everyday life; and they drive the financial markets, securing the retirements of millions of Americans.

3.     Today, innovation permeates every sector of the economy. Retailers, agricultural producers, and manufacturers thrive by advancing their operations with novel improvements.

4.     American innovation rests on having the best and brightest working here. Over the past century, the United States has benefited immensely from courageous individuals who have left their homes, accepting an invitation to travel to America for temporary work. These individuals' talents, experience, and special skills have propelled their employers' growth—and enriched their broader communities.

5.     Some of these individuals later make America their permanent home, often advancing to leadership positions in their companies. Some become entrepreneurs themselves, creating substantial new businesses—indeed, 101 of the Fortune 500 companies were founded by

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

immigrants.[1] Yet others go on to work for American companies abroad, expanding the Nation's economic leadership.

6.      Attracting these high-skilled individuals to America is net-positive for the employment of American citizens. As study after study has shown, immigration expands our Nation's economic pie, benefiting domestic workers. That is why the United States has long embraced skilled immigration programs: They advantage all participants in the economy.

7.      Recognizing the benefits that temporary workers bring to the United States, Congress has long established certain visa categories to allow these individuals to enter the country and work here. In doing so, Congress was well aware that American economic growth is not always spread evenly, and it balanced the visa categories with calibrated protections for the domestic labor market.

8.      Accordingly, while creating certain temporary worker visa categories, Congress accounted for economic conditions and domestic labor markets. Congress did so through a variety of tools, including annual caps on the numbers of certain visas available, labor certification requirements, and restrictions on the duration of nonimmigrant visas.

9.      Putatively invoking presidential authority bestowed by 8 U.S.C. § 1182(f) (INA § 212(f)), the Proclamation effectively repeals entire visa categories for temporary workers. In issuing the Proclamation, administration officials noted that its purpose is to "clear out this workspace for Americans"—that is, to substantially alter the behavior of domestic employers— by banning entry of more than 500,000 individuals this year alone.

10.      In this way, the Proclamation takes a sledgehammer to the statutes Congress enacted with respect to high-skilled and temporary worker immigration. While the President's powers under Section 212(f) are broad, they do not authorize the President to nullify duly enacted statutory provisions.

11.      No matter the reach of the President's discretionary power, moreover, the executive may not take actions that are facially arbitrary or that lack a rational connection to the

---

[1]    *See New American Fortune 500 in 2019: Top American Companies and Their Immigrant Roots*, New American Economy (July 22, 2019), perma.cc/MS5P-SV23.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

problem identified. And, when acting, the departments and their officials must take into account central facets of the problem at hand and address crucial factual evidence. The Proclamation flunks these basic requirements.

12.     There is no doubt that the COVID-19 pandemic has caused an economic crisis, testing our Nation's resilience. But the policy established by the Proclamation does not bear a rational relationship to this problem.

13.     The pandemic has not impacted all sectors of the economy equally. Some areas of the economy—including communication technology and healthcare—have never been more critical, and demand for labor has remained extremely high. Federal statistics show, for example, that the unemployment rate in computer-related occupations has remained historically low.[2] One of the visa categories impacted, H-1B, is used predominantly by employers seeking to hire and retain individuals working in these fields, and in computer-related roles. Banning these individuals from entering the United States is thus not a remedy to current unemployment levels.

14.     What is more, the Proclamation on its face bans individuals who are ineligible to work in the United States, including children and certain spouses of temporary workers currently in the United States. Banning the entry of individuals who cannot work, but nevertheless will demand products and services produced by American businesses and American workers, is not a rational response to an unemployment problem.[3]

15.     Denying American businesses access to international labor markets is inflicting swift and severe harms. Companies are unable to move employees who have developed special expertise outside the United States into domestic roles, where they would otherwise help expand operations, develop new products, and contribute to the hiring of domestic workers. The Proclamation stunts the ability of businesses to identify the best talent for a position; indeed, it

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

---

[2]     Nat'l Foundation for American Policy, *Updated Analysis of Employment Data for Computer Occupations* (June 2020), perma.cc/F9K6-ST3D.

[3]     Perhaps recognizing the irrationality of this ban, a recent communication by the State Department asserts that dependents "may be provided" discretionary waivers. But the mere possibility of a discretionary waiver does not remedy the Proclamation's irrational and unexplained action of banning the entry of individuals from the United States who cannot work.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

causes many important positions to go unfilled entirely, stalling projects that would otherwise create jobs.

16.     Some companies—especially small and medium-size companies—depend mightily on workers in covered visa categories. These companies (including plaintiff Intrax, as well as many members of the Plaintiff associations) are suffering significantly as a result of the Proclamation. Companies have been forced to furlough or layoff numerous *domestic* workers because operations that depend on temporary workers from abroad have been wholly suspended. Some companies will go out of business as a result of the Proclamation, unless it is swiftly enjoined.

17.     Not only does denying access to nonimmigrant workers deprive American businesses of the talent they need, but it has far-reaching repercussions in today's competitive market for talent. For decades, American economic leadership faced little external competition. That is no longer true. Countries across the globe vie to challenge America's economic might— and, taking a page from our playbook, they do so by seeking to attract the world's best talent to their homegrown businesses. Shutting the door to leading talent has direct economic consequences: Not only does it stifle American businesses, but it works to the advantage of foreign nations.

**PARTIES**

18.     Plaintiff National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12 million men and women, contributes roughly $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly three-quarters of private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States. The NAM is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

19.     Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. The U.S. Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

20.     Plaintiff National Retail Federation (NRF) is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and internet retailers from the United States and more than 45 countries. The NRF is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

21.     Plaintiff Technology Network (TechNet) is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American companies ranging from startups to the most iconic companies on the planet, and represents over three million employees and countless customers in the fields of information technology, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance. TechNet is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

22.     Plaintiff Intrax, Inc. (Intrax) is a premier cultural exchange company that operates multiple Department of State-designated exchange programs that bring participants to the United States on J-1 visas. Intrax is incorporated under the laws of the State of California and has its principal place of business in San Francisco, California.

23.     Defendant United States Department of Homeland Security is the federal department with substantial responsibility for immigration policy and enforcement. The Proclamation charges the Department of Homeland Security with certain aspects of its implementation. The Department of Homeland Security is integral to execution of the Proclamation's directive barring large categories of individuals from entering the United States.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

24.     Defendant United States Department of State is the federal department charged with conducting foreign relations, including by issuing visas to noncitizens. The Proclamation charges the Department of State with certain aspects of its implementation. The Department of State is integral to execution of the Proclamation's directive barring large categories of individuals from entering the United States.

25.     Defendant Chad F. Wolf is the Acting United States Secretary of Homeland Security. He is sued in his official capacity.

26.     Defendant Michael R. Pompeo is the United States Secretary of State. He is sued in his official capacity.

## JURISDICTION AND VENUE

27.     Plaintiffs bring this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, the U.S. Constitution, including but not limited to Article I, Article II, and the Fifth Amendment, and this Court's inherent equitable power.

28.     It is within this Court's inherent equitable power to enjoin actions by federal officers in excess of their lawful authority. Indeed, "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) (citing, among others, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)).

29.     The court's jurisdiction is invoked under 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States.

30.     Venue is proper in this district under 28 U.S.C. § 1391(e) because plaintiff Intrax maintains its principal place of business in this district, and no real property is involved in this action.

## INTRADISTRICT ASSIGNMENT

31.     Assignment to the San Francisco division of this Court is proper because venue is based on plaintiff Intrax's residence in the City and County of San Francisco. As to Intrax, a

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

substantial part of the events giving rise to this lawsuit—including the immediate harm to Intrax's business—are occurring in the City and County of San Francisco.

## LEGAL BACKGROUND

### A.   VISA CATEGORIES

32.   The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184. Nonimmigrant visas are distinct from immigrant visas, which are issued to those intending to become permanent residents of the United States.

33.   At issue here are several nonimmigrant visa categories.[4]

#### 1.   L Visa Category

34.   The L-1 visa is used for intracompany transfers. It is issued to a noncitizen who "has been employed continuously for one year by a firm or corporation . . . and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge." 8 U.S.C. § 1101(a)(15)(L). When it created the L visa in 1970, Congress recognized that "intracompany transfers have contributed immeasurably to the growth of American enterprise throughout the world and to the international trade of the United States."[5]

35.   L-1A visas are provided to transfer existing employees performing a "managerial" or an "executive" function.

36.   An L-1A visa provides an individual a duration of stay in the United States of up to three years, which may be twice renewed in two-year increments. Thus, an individual admitted to the country via an L-1A visa may work in the United States for a maximum duration of seven years.

---

[4]   The visa categories are designated according to the subsection of 8 U.S.C. § 1101(a)(15) in which each category is defined. *See* 8 C.F.R. § 214.1(a)(2) (table of designations for nonimmigrant visas).
[5]   H.R. Rep. 91-851, at 5-6 (1970).

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

37.     L-1B visas are provided to transfer existing employees with "specialized knowledge." Per statute, "an alien is considered to be serving in a capacity involving specialized knowledge with respect to a company if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company." 8 U.S.C. § 1184(c)(2)(B).

38.     An L-1B visa provides an individual a duration of stay in the United States of up to three years, which may be renewed once for an additional two-year period. Thus, an individual admitted to the country via an L-1B visa may work in the United States for a maximum duration of five years.

39.     L-2 visas are issued to "the alien spouse and minor children of any such alien if accompanying him or following to join him." 8 U.S.C. § 1101(a)(15)(L).

40.     In 2004, Congress specifically addressed appropriate limitations on the L-1 visa category via the L-1 Visa Reform Act of 2004. 118 Stat. 2809, 3351-53 §§ 411-417.   In particular, it provided that an L-1B individual may be "stationed primarily at the worksite of an employer other than the petitioning employer or its affiliate, subsidiary, or parent" only in certain circumstances, barring labor-for-hire arrangements and circumstances in which a third party supervises the individual.

### 2.     H Visa Category

41.     The H-1B visa is issued to highly skilled workers with expertise in one or more specialty fields. This visa is available to a noncitizen "who is coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b).[6] A "specialty occupation" is one that requires "theoretical and practical application of a body of highly specialized knowledge, and . . . attainment of a bachelor's or higher degree in the specific specialty (or its equivalent)." *Id.* § 1184(i)(1).

42.     Before hiring an H-1B nonimmigrant, a company must make various certifications to the Department of Labor regarding prevailing labor conditions. *See* 8 U.S.C. § 1182(n)(1)(A)-

---

[6]     The visa category is also available for fashion models.

(D). An employer must attest, among other things, that the position is paying prevailing wages, that the position will not adversely impact other workers, and that the employer has provided certain forms of notice regarding the position. These certification requirements are backed up by monetary fines and bans on further visa applications. 8 U.S.C. § 1182(n)(2)(C).

43.     A subset of employers—those with a history of willful certification violations, and those with a large percentage of workers already on H-1B visas—must additionally certify that the company has tried and failed to fill the position with a domestic worker, and that it has not and will not displace a U.S. worker within the 180-day period surrounding the date of the application. 8 U.S.C. § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A); *see also* 20 C.F.R. § 655.736.

44.     The maximum number of new individuals who may be provided H-1B nonimmigrant status is strictly limited to 65,000 per year, with an additional 20,000 visas per year available to individuals with an advanced degree from a U.S. higher education institution (other than those that are cap-exempt).

45.     The H-2B visa is issued to a noncitizen "who is coming temporarily to the United States to perform [non-agricultural] temporary service or labor." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

46.     This visa may be issued only "if unemployed persons capable of performing [the needed] service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see also* 8 C.F.R. § 214.2(h)(6)(iv)(A) ("An H-2B petition for temporary employment in the United States . . . shall be accompanied by an approved temporary labor certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers."); 20 C.F.R. §§ 655.1-655.73 (procedures for Department of Labor's labor certification).

47.     H-2B visas are limited to 66,000 per year.

48.     The H-4 visa is available to "the alien spouse and minor children" of any noncitizen described by one of the other H visa categories (such as H-1B or H-2B) "if accompanying . . . or following to join" the primary visa-holder. 8 U.S.C. § 1101(a)(15)(H); *see* 8 C.F.R. § 214.1(a)(2). Most individuals who enter the United States pursuant to an H-4 visa are

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ineligible for employment, because only a subset of H-4 spouses—those who are married to H-1B principals that have been sponsored for lawful permanent resident status—may seek employment.

49.     Congress has carefully calibrated the H visa system with the needs of the domestic economy.

50.     The Immigration Act of 1990 included revisions to the H-1 visa category that had existed since 1952 without any annual numerical limit or other labor protection mechanism, by adding the annual 65,000 cap and a Labor Condition Application. At the same time, the legislation was explicitly aimed at addressing "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found and the need for other workers to meet specific labor shortages."[7] And its passage was based on the conviction "that immigration can and should be incorporated into an overall strategy that promotes the creation of the type of workforce needed in an increasingly competitive global economy without adversely impacting on the wages and working conditions of American workers."[8]

51.     That these provisions struck an intentional balance between the hiring needs of businesses and protection for American workers was immediately clear, including to the government itself: "The Department believes that the broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers."[9]

52.     Congress's repeated adjustments to the visa programs involved—without changing their essential nature—stand as reaffirmations of this fundamental principle.

53.     In making one such statutory adjustment, the Senate's Report accompanying the American Competitiveness in the Twenty-First Century Act expressly noted that H-1B visas are essential to *growing* the number of American jobs:

---

[7]   H.R. Rep. 101-723, pt. 1, at 41 (Sept. 19, 1990).
[8]   *Id.*
[9]   *Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706-11,707 (Mar. 20, 1991).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

Critics of H–1B visas claim that they result in taking away jobs from Americans and giving them to foreigners. In fact, however, failure to raise the H–1B ceiling is what will deprive Americans of jobs. This is because artificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs.

. . .

Many of the concerns about H–1B visas revolve around the fear that individuals entering on H–1B visas will ''take'' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.][10]

54.      In 2004, Congress specifically addressed appropriate limitations on the H-1B visa category via the H-1B Visa Reform Act of 2004. 118 Stat. 2809, 3353-61 §§ 421-430. This Act, among other things, revised prevailing wage requirements, adjusted the number of visas available by adding a set-aside for individuals completing U.S. graduate degrees, and otherwise calibrated the program to meet the needs of the domestic economy.

### 3.      J Visa Category

55.      The J-1 visa is used for exchange visitors, a category that encompasses participants in a wide variety of programs, from professors and research scholars, to trainees and interns, to international medical graduates completing residencies.[11]

56.      The exchange visitor program was established by Congress in the Mutual Educational and Cultural Exchange Act of 1961 "to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world." 22 U.S.C. § 2451.

57.      By statute, the J-1 visa is available to a noncitizen "having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a

---

[10]   S. Rep. 106-260, at 11-12 (Apr. 11, 2000).
[11]   *See generally* U.S. Dep't of State, Bureau of Educational and Cultural Affairs, *The United States Department of State Exchange Visitor Program*, perma.cc/3PXF-RURD.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

participant in a program designated by" the U.S. Department of State, "for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training." 8 U.S.C. § 1101(a)(15)(J).

58.    The State Department has established individual programs within the overall exchange visitor framework. Those programs include the summer work travel program (*see* 22 C.F.R. § 62.32); the au pair program (*id.* § 62.31); the trainee and intern programs (*id.* § 62.22); and the camp counselor program (*id.* § 62.30).

59.    The governing regulations provide, among other things, that participants in the summer work travel, trainee, and intern programs in particular may not displace domestic U.S. workers. *See* 22 C.F.R. §§ 62.32(n)(3)(ii); 62.22(b)(1)(ii), (f)(2)(v). Further, positions under the summer work travel program must be truly seasonal or temporary; the program may not be used to place a participant temporarily in a permanent position. *Id.* §§ 62.32(b), (g)(4)(i). As to the au pair program, Congress considered and rejected claims that it adversely impacted U.S. labor markets. *See* Eisenhower Exchange Fellowship Act of 1990, Pub. L. 101-454 § 8, 104 Stat. 1063, 1065.

60.    The J-2 visa is issued to "the alien spouse and minor children of any such alien if accompanying him or following to join him." 8 U.S.C. § 1101(a)(15)(J).

61.    The INA sets out extensive procedures, requirements, and other provisions regarding the admission of noncitizens in these and other nonimmigrant visa categories, and these statutory requirements are further implemented through exhaustive regulations. *See generally* 8 U.S.C. § 1184; 8 C.F.R. §§ 214.1, 214.2.

62.    Congress has thus comprehensively identified the scope of appropriate labor-market protections for each visa category, deciding under what circumstances and to what extent domestic labor considerations should affect the issuance of these visas.

B.    **THE PRESIDENT'S STATUTORY AUTHORITY**

63.    The INA authorizes the President to "suspend" or "impose . . . restrictions" on the entry of noncitizens under certain circumstances. Section 212(f) of the INA provides:

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

64.     Section 215(a) of the INA provides that it is unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). Any policymaking authority stemming from this provision "substantially overlap[s]" with the President's authority under Section 212(f). *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 n.1 (2018).

## FACTUAL BACKGROUND

### A.     CONTRIBUTIONS OF FOREIGN NONIMMIGRANT WORKERS

65.     The visa categories at issue in this case are critical to the success and growth of American businesses.

66.     United States Citizenship and Immigration Services estimated that, as of September 30, 2019 (the most recent statistics), the H-1B visa population of foreign workers in specialized occupations was approximately 580,000.[12] Nearly 160,000 L visas were issued in FY 2019 for transfers of executives, managers, or those with special experience within companies and their dependents.[13] Roughly 300,000 exchange visitors enter the United States each year on J visas.[14]

67.     These workers contribute enormously to American productivity, prosperity, and innovation. Temporary foreign workers boost innovation at U.S. firms—as measured by proxies

---

[12]   U.S. Citizenship & Immigration Services, Office of Policy & Strategy, Policy Research Division, *H-1B Authorized-to-Work Population Estimate* 1, perma.cc/N9R4-XNQM.

[13]   U.S. Dep't of State, *Classes of Nonimmigrants Issued Visas (Including Border Crossing Cards) Fiscal Years 2015-2019*, perma.cc/BE3T-9PR4.

[14]   U.S. Dep't of State, Bureau of Educational and Cultural Affairs, *The United States Department of State Exchange Visitor Program*, perma.cc/86D7-ACCC.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

such as patenting activity—driving the economy and helping to ensure American competitiveness on the global stage.[15]

68.    American firms, particularly in manufacturing and certain STEM fields, face a structural shortage of domestic workers qualified and available to fill the roles needed for the companies to perform.[16] And "having the workers to fill such jobs"—through nonimmigrant visa programs like H-1B—"allows American employers to continue basing individual operations or offices in the United States, a move that creates jobs at all levels—from the engineers and computer programmers based in American offices to the secretaries, HR staff, and mailroom employees that support them."[17]

69.    Economists and other scholars therefore agree that, far from taking jobs from Americans, the employment of temporary workers from abroad actually has the net effect of *creating* jobs for American-born workers.

70.    A study jointly authored by the American Enterprise Institute and the Partnership for a New American Economy, titled *Immigration and American Jobs*, concluded that "[o]verall, when looking at the effect of all immigrants on employment among US natives, there is no evidence that immigrants take jobs from US-born workers."[18]

---

[15] *See, e.g.*, U.S. Dep't of Homeland Security, *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*, 81 Fed. Reg. 13,040, 13,048 (Mar. 11, 2016) (collecting authorities).

[16] *See, e.g.*, Deloitte & The Manufacturing Institute, *The jobs are here, but where are the people?: Key findings from the 2018 Deloitte and The Manufacturing Institute skills gap and future of work study* 2 (2018) ("[R]esearch reveals an unprecedented majority (89 percent) of executives agree there is a talent shortage in the US manufacturing sector."), *available at* perma.cc/W2ND-RRLB; *id.* at 3 fig. 2 ("[The p]ersistent skills shortage could risk US$2.5 trillion [in] economic output over the next decade."); New American Economy Research Fund, *Sizing Up the Gap in our Supply of STEM Workers: Data & Analysis* (Mar. 29, 2017) (noting that in 2016, "13 STEM jobs were posted online for each unemployed worker that year—or roughly 3 million more jobs than the number of available, trained professionals who could potentially fill them."), perma.cc/4BZR-ED9S. Indeed, because there are substantial costs involved with the hiring of new temporary worker employees—including all the legal fees and costs associated with the immigration process—employers have financial incentives to avoid hiring temporary workers where possible.

[17] Partnership for a New American Economy, *The H-1B Employment Effect: H-1Bs awarded between 2010-2013 will create more than 700,000 jobs for U.S.-born workers by 2020* 1-2 (2015), perma.cc/C6T2-6TKZ.

[18] Madeline Zavodny, American Enterprise Institute for Public Policy Research & the Partnership for a New American Economy, *Immigration and American Jobs* 11 (2011), perma.cc/66K3-NZDQ.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

71.     That study showed that "states with greater numbers of temporary workers in the H-1B program for skilled workers and H-2B program for less-skilled nonagricultural workers had higher employment among US natives."[19] Specifically, "[a]dding 100 H-1B workers results in an additional 183 jobs among US natives."[20] And "[a]dding 100 H-2B workers results in an additional 464 jobs for US natives."[21] In sum, "[t]he results give clear evidence that both the H-1B and H-2B programs for temporary workers correspond to greater job opportunities for US-born workers."[22]

72.     In a seminal 2015 economic evaluation of H-1B visas and productivity in 219 American cities, economists concluded that, per their simulations, an increased number of H-1B visa holders in a city resulted in productivity gains. Specifically, the economists found that "foreign STEM growth explained between one-third and one-half of the average [Total Factor Productivity] growth during the period" 1990 to 2010.[23]

73.     An economic study in 2018 on the relationship between H-1B visa petitions and the entry of new products and exit of outdated products (product reallocation) concluded that firm-level analysis shows H-1B visa petitions are associated with higher rates of product reallocation. Generating product reallocation is one measure to identify where smaller, incremental innovations are occurring.[24]

74.     As described in a July 2019 economic study on the impact of highly-skilled STEM immigration on the U.S. economy, the foreign-born share of STEM professionals in the United States over the period 2000 to 2015 created an estimated benefit of $103 billion for American workers. This was almost all "attributed to the generation of ideas associated with high-skilled

---

[19]  *Id*. at 4.
[20]  *Id*.
[21]  *Id*.
[22]  *Id*. at 11.
[23]  Giovanni Peri, Kevin Shih, Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in U.S. Cities* (July 2015), perma.cc/N4GV-YJJ6.
[24]  Gaurav Khanna, Munseob Lee, *High-Skill Immigration, Innovation, and Creative Destruction*, Nat'l Bureau of Economic Research (2018), perma.cc/QE87-KDAC.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

STEM immigration which promotes the development of new technologies that increase the productivity and wages of U.S.-born workers."[25]

75.     A literature review by the National Academies of Sciences, Engineering, and Medicine likewise concludes that:

> Importantly, immigration is integral to the nation's economic growth. Immigration supplies workers who have helped the United States to avoid the problems facing stagnant economies created by unfavorable demographics—in particular, an aging (and, in the case of Japan, a shrinking) workforce. Moreover, the infusion by high-skilled immigration of human capital has boosted the nation's capacity for innovation, entrepreneurship, and technological change. The literature on immigrants and innovation suggests that immigrants raise patenting per capita, which ultimately contributes to productivity growth. The prospects for long-run economic growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants. [26]

76.     At least three factors account for the link between robust high-skilled immigration and economic growth—*first*, those individuals who are motivated to leave home, and who are selected by U.S. colleges or companies for opportunities here, have an overabundance of entrepreneurship and innovative talent; *second*, high-skilled temporary workers tend to focus in "quantitative skills and STEM fields," which are specialties that fuel growth; and *third*, high-skilled temporary workers are often instrumental in the creation of new technologies.[27]

77.     The H-1B visa category has profound implications for innovation. The Cato Institute recently summarized many of the latest economic analyses, and explained that:

> H-1B workers have an especially big impact on American innovation. New technology and knowledge allow for more efficient machines and production processes that increase nationwide productivity. Highly skilled migrants on H-1B visa[s] … directly increase the production of knowledge through patents, innovation, and entrepreneurship. These effects are localized and diffuse throughout the country.[28]

---

[25]  Christian Gunadi, *An inquiry on the impact of highly-skilled STEM immigration on the U.S. economy*, 61 Labour Economics (2019), perma.cc/U39W-P2SZ.

[26]  National Academies of Sciences, Engineering, and Medicine, *The Economic and Fiscal Consequences of Immigration*, The National Academies Press 6-7 (2017), perma.cc/JU7U-LVJ2.

[27]  Giovanni Peri & Chad Sparber, *Presidential Executive Actions Halting High Skilled Immigration Hurt the U.S. Economy* 2 (July 2020), perma.cc/3B6B-25YU.

[28]  Alex Nowrasteh, *Don't Ban H-1B Workers: They Are Worth Their Weight in Innovation*, Cato at Liberty (May 14, 2020) (summarizing and linking to several leading studies), perma.cc/SMW4-UUJT.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

78.     The L-1 visa program is especially important for companies as it involves the transfer of an existing employee to the United States. These jobs often have significant impact for the employer because the individual already possesses familiarity with the company's products, services, organization, methods, or research.

79.     The Congressional Research Service has thus described the L-1 visa as "essential to retaining and expanding international businesses in the United States."[29] And an investigation by DHS's Office of Inspector General concluded that "the claims that appear in the media about L-1 workers displacing American workers . . . do not seem to represent a significant national trend."[30]

80.     Cultural exchange visitors travel to the United States on J visas, allowing a broad range of experiences in this country. That program has long been a key tool for diplomacy: Individuals from across the world, often where governments may be antagonistic to the United States, travel here to experience firsthand the American way of life. Not only do those individuals enrich themselves and their communities while here, but they return home with positive visions of America. Indeed, 1 in 3 current world leaders are alumni of State Department cultural exchange programs, to the considerable benefit of our foreign relations.[31] Ultimately, J-1 exchange visitors "assist the Department of State in furthering the foreign policy objectives of the United States."[32]

81.     The J-1 exchange visitor program is a profoundly effective public diplomacy tool, showcasing the best America has to offer to thousands of young people who will go on to shape the perception of the United States in their home countries: "Exchange Visitor Program participants take home positive impressions of America—9 out of 10 report a more favorable view of the U.S. These university students and young professionals move into a broad range of professions in their home countries where they are likely to be influencers. Their exchange

---

[29]  Cong. Research Serv., *Temporary Professional, Managerial, and Skilled Foreign Workers: Policy and Trends* 5 (Jan. 13, 2016), perma.cc/9VHJ-J3SE.
[30]  U.S. Dep't of Homeland Security, Office of Inspector General, *Review of Vulnerabilities and Potential Abuses of the L-1 Visa Program* 10 (Jan. 2006), perma.cc/Y88X-3JBP.
[31]  U.S. Dep't of State, Bureau of Educational & Cultural Affairs, *Moving People to Move Ideas*, https://perma.cc/5XPX-EADR.
[32]  *See* 22 C.F.R. § 62.1.

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

experiences create a foundation for positive relationships and trust with our country, equipping these future leaders with favorable impressions of America, firsthand experience with American business practices and American families, and improved English skills."[33]

82.    J-1 participants also help grow local economies, contributing net jobs to the domestic labor market. For summer work travel programs, 97% of U.S. employers report that they have more seasonal jobs available than workers available to fill them.[34] For camp counselors, 99% of camps participating in a J-1 program offer equally available opportunities to Americans, and 78% would have to reduce services in the absence of J-1 international counselors.[35] For the intern and trainee programs, the vast majority of employers report that positions are equally or more available to Americans; additionally, J-1 interns and trainees contribute $662.6 million annually to the U.S. economy.[36] And the au pair program is principally used by families that would otherwise lack live-in childcare.[37] That resource is especially critical now, with children forced to stay home by the pandemic rather than attend school in person: Without childcare, many parents will be unable to work, decreasing productivity and deepening the Nation's economic issues.

### B.    COVID-19 AND UNEMPLOYMENT

83.    The first confirmed cases of COVID-19 in the United States were identified in January 2020, and state and local governments began shutting down parts of the economy in mid-March.

---

[33]   Americans for Cultural Exchange, *Benefits* (2019), https://perma.cc/Y6PR-AGVY.

[34]   *See* Alliance for International Exchange, *EurekaFacts Study: Impact of SWT Program* 2, perma.cc/7L99-MZ38.

[35]   *See* Alliance for International Exchange, *EurekaFacts Study: Impact of Camp Counselor Program* 2, perma.cc/MJK2-SYWH.

[36]   *See* Alliance for International Exchange, *EurekaFacts Study: Impact of Intern and Trainee Programs* 1-2, perma.cc/4WH2-5DWY.

[37]   *See* Alliance for International Exchange, *EurekaFacts, Au Pair Program: 2020 Executive Summary Report* 7 (July 16, 2020) (two-thirds of families employing an au pair through the J-1 program "would likely not be able to find suitable care for the children" without the program), perma.cc/EB2T-WL7C.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

84.     As a result, unemployment increased dramatically. The last two weeks of March saw record numbers of new unemployment filings,[38] and the Bureau of Labor Statistics reported a 14.7% total unemployment rate in April.[39]

85.     That spike in unemployment was not distributed evenly across occupations. While certain jobs in tourism, hospitality, and related service industries were hit hardest, an analysis of Bureau of Labor Statistics data shows that the unemployment rate in computer occupations decreased—from 3.0% in January 2020 (before the economic impacts of the virus were felt) to 2.8% in April 2020, and to 2.5% in May 2020.[40]

86.     Nearly two-thirds of approved H-1B visa petitions are for jobs in "computer-related occupations," according to DHS data.[41]

87.     According to a June 2020 analysis by the Federal Reserve, the lowest rate of unemployment the economy can sustain is likely between 3.5% and 4.5%.[42] The exceedingly low unemployment rate in computer-related jobs indicates that there is significant unmet demand for individuals in these occupations.

88.     Moreover, during the 30 days ending June 9, 2020, there were over 630,000 active job vacancy postings advertised online for jobs in common computer occupations—including over 260,000 postings for "software developers (applications)" alone—indicating that overall demand for high-skilled workers in these occupations still exceeds the domestic supply.[43]

---

[38]   *See, e.g.*, Heather Long, *Over 10 Million Americans Applied for Unemployment Benefits in March as Economy Collapsed*, Wash. Post (Apr. 2, 2020), perma.cc/J6LY-R7HM.

[39]   *See* U.S. Bureau of Labor Statistics, *Graphics for Economic News Releases: Civilian Unemployment Rate*, perma.cc/AX44-WCWW.

[40]   Nat'l Foundation for American Policy, *Updated Analysis of Employment Data for Computer Occupations* (June 2020), perma.cc/P7JB-NFBQ. *See also* Stuart Anderson, *Unemployment Rate For Computer Occupations Fell In May*, Forbes (June 11, 2020), https://perma.cc/JRX9-BJ79.

[41]   U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Services, *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2019 Annual Report to Congress* 12 & tbl 8A (Mar. 5, 2020), perma.cc/VL4G-FVNN.

[42]   Bd. of Governors of the Federal Reserve System, *What is the lowest level of unemployment that the U.S. economy can sustain*? (June 10, 2020), perma.cc/R79F-QVFE; *see also id.* ("Even in good times, a healthy, dynamic economy will have at least some unemployment as workers switch jobs, and as new workers enter the labor market and other workers leave it.").

[43] Nat'l Foundation for American Policy, *Updated Analysis of Employment Data for Computer Occupations* 1 (June 2020), perma.cc/P7JB-NFBQ.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

### C.   THE PROCLAMATION

89.   The President issued the Proclamation on June 22, 2020. The Proclamation's preamble cites the "extensive disruptions" faced by "United States businesses and their workers . . . while undertaking certain public health measures necessary to flatten the curve of COVID-19," along with unemployment statistics: "While the May [unemployment] rate of 13.3 percent reflects a marked decline from April, millions of Americans remain out of work." Ex. A, 85 Fed. Reg. at 38,263.

90.   The Proclamation acknowledges that, "[u]nder ordinary circumstances, properly administered temporary worker programs can provide benefits to the economy." Ex. A, 85 Fed. Reg. at 38,263. But it asserts that "under the extraordinary circumstances of the economic contraction resulting from the COVID-19 outbreak, certain nonimmigrant visa programs authorizing such employment pose an unusual threat to the employment of American workers." *Id.*

91.   As support for its conclusion that "[t]he entry of additional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs . . . presents a significant threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the COVID-19 outbreak," the Proclamation cites three supposed data points. Ex. A, 85 Fed. Reg. at 38,264. First, "between February and April of 2020, more than 17 million United States jobs were lost in industries in which employers are seeking to fill worker positions tied to H-2B nonimmigrant visas." *Id.* at 38,263-38,264. Second, "[d]uring this same period, more than 20 million United States workers lost their jobs in key industries where employers are currently requesting H-1B and L workers to fill positions." *Id.* at 38,264. Finally, "the May unemployment rate for young Americans, who compete with certain J nonimmigrant visa applicants, has been particularly high—29.9 percent for 16-19 year olds, and 23.2 percent for the 20-24 year old group." *Id.*

92.   Citing Sections 212(f) and 215(a) of the INA, the President asserted that "the entry into the United States of . . . persons described in section 2 of this proclamation, except as provided for in section 3 of this proclamation, would be detrimental to the interests of the United

States, and that their entry should be subject to certain restrictions, limitations, and exceptions." Ex. A, 85 Fed. Reg. at 38,264.

93.     Section 2 of the Proclamation therefore barred "the entry into the United States of any alien seeking entry pursuant to":

(a) an H-1B or H-2B visa, and any alien accompanying or following to join such alien;

(b) a J visa, to the extent the alien is participating in an intern, trainee, teacher, camp counselor, au pair, or summer work travel program, and any alien accompanying or following to join such alien; and

(c) an L visa, and any alien accompanying or following to join such alien.

Ex. A, § 2.

94.     The ban does not apply to noncitizens who were in the United States or held a valid nonimmigrant visa or other valid travel authorization document as of the Proclamation's June 24, 2020 effective date. Ex. A, § 3(a).

95.     The Proclamation also exempts lawful permanent residents; spouses and children of U.S. citizens; "any alien seeking to enter the United States to provide temporary labor or services essential to the United States food supply chain"; and "any alien whose entry would be in the national interest as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." Ex. A, § 3(b).

96.     The Proclamation's travel ban "shall expire on December 31, 2020," but "may be continued as necessary." Ex. A, § 6.

**D.     THE PROCLAMATION'S IMMEDIATE, HARMFUL EFFECTS ON AMERICAN BUSINESS**

97.     The purpose of the Proclamation is to radically alter the hiring behavior of America's employers. The effects of this policy are immediate, and—if not enjoined—will result in irreparable changes to U.S. labor markets. The Proclamation will inflict substantial harm on many American businesses of all sizes and across all economic sectors. Many of these businesses are members of the Plaintiff associations.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

98.     On June 22, 2020, the White House held a "background press call." A transcript of that call indicates that an individual, who the White House described as a "senior administration official," stated that "the sum total of what these actions will do in terms of freeing up jobs over the course of the rest of 2020 is about 525,000 jobs. Quite a significant number."[44]

99.     The official reiterated that, "[t]aken together, the green card pause, along with the pausing of the H-1Bs, the H-4s, the H-2Bs, Js, and Ls, it will open up about 525,000 jobs."[45]

100.     The official described that the desired purpose and effect of the policy is to "clear out this workspace for Americans."[46]

101.     On June 22, 2020, Acting Deputy Secretary of Homeland Security Ken Cuccinelli appeared on Fox News, Lou Dobbs Tonight, stating that "just the temporary pieces of this . . . are over 500,000 job openings for Americans in the latter half of this year. That is a very big deal. Unprecedented level of effort by a president to clear the American job market of competition like this."[47]

102.     The Migration Policy Institute, a nonpartisan think tank, provided an estimate of the impacts of the Proclamation based on historic trends. It estimates that the Proclamation will block a total of 167,000 nonimmigrants from entering the country between July and December 2020.[48] This number includes 29,000 H-1B workers, 23,000 H-2B workers, 72,000 J-1 exchange visitors, and 6,000 L-1 intracompany transfers, along with their dependents.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

---

[44]     Transcript of White House Background Press Call Concerning the June 22 Presidential Proclamation Suspending Entry of Certain Nonimmigrants, *available at* perma.cc/Z9YU-MUZK.
[45]     *Id*.
[46]     *Id.*
[47]     *See* Ken Cuccinelli (@HomelandKen), Twitter (June 22, 2020), https://twitter.com/HomelandKen/status/1275201179920760839.
[48]     Migration Policy Institute (@MigrationPolicy), Twitter (June 22, 2020), https://twitter.com/MigrationPolicy/status/1275193001401344000.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

| Migration Policy Institute Estimates of Total Temporary Visas Blocked during July – December 2020 Period Covered by June 22, 2020 Proclamation | |
|---|---|
| H-1B visa | 29,000 |
| H-4 (H-1B dependents) | 19,000 |
| H-2B | 23,000 |
| J-1 | 72,000 |
| J-2 (J-1 dependents) | 11,000 |
| L-1 | 6,000 |
| L-2 (L-1 dependents) | 7,000 |
| **TOTAL** | **167,000** |

Note: These estimates are derived from visa levels recorded during fiscal year 2019 and do not reflect changes occurring as a result of suspension of visa processing during the pandemic or changed economic circumstances.
Source: Migration Policy Institute analysis of administrative data from the State Department and Department of Homeland Security.

103.    These numbers, however, likely greatly underestimate the total impact. As the note to the analysis explains, it does not account for pent-up demand that occurred due to delays occasioned by the COVID-19 pandemic.

104.    The stated purpose of this policy is to alter the hiring practices of American employers as it relates to hundreds of thousands of jobs in the next few months. This is achieved by, in the Administration's words, "clear[ing] out" temporary foreign workers, and targeting the "high-tech" sector, among many others.

105.    Plaintiffs represent a broad cross-section of the American economy that, in the aggregate, employs tens of millions of Americans. The U.S. Chamber alone has 300,000 business members.

106.    The express purpose of the Proclamation is to forcibly change hiring practices across a wide swath of Plaintiffs' members. As the Administration has expressly stated, the purpose of the Proclamation is to create an enormous change in job hiring patterns in the United States for, at minimum, the second half of 2020.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

107.    That is, for at least the last two quarters of 2020, the Administration has told American businesses that they may not hire most workers who would normally enter the United States on an H-1B, H-2B, L-1, and J-1 visa.

108.    To accomplish this end, and to implement the Proclamation, Defendant Department of State has announced that it will not issue visas in the impacted categories. The "Travel – State Dept" Twitter account (@TravelGov) is the "Official Twitter for U.S. Department of State Bureau of Consular Affairs." On June 30, 2020, in response to a question from a Twitter user, the Department of State announced via this Twitter account that "We will not be issuing H-1B, H-2B, L, or certain J visas, and their derivatives through December 31, 2020, unless an exception applies. *See* Proclamation for exceptions."[49] Elsewhere, the Twitter account confirmed that the Department of State is not currently "processing" the "L1" "visa category."[50]

109.    For decades, many of Plaintiffs' members have collectively hired tens of thousands of individuals who are reliant upon the H-1B, H-2B, L-1, or J-1 visa categories to enter and work in the United States. For example, for 50 years the L-1 visa has been a central implement in the toolbox of Plaintiffs' multinational company members to assign and transfer their organization's professional talent around the globe without regard to national borders.

110.    The Proclamation forecloses these important, established patterns of hiring in the international labor markets, directly harming companies that rely on access to leading talent from around the globe.

---

[49]   U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), Twitter (June 30, 2020), https://twitter.com/TravelGov/status/1277938802259042304. This Tweet is one of many. From the same account, *see* Tweets published on June 25, 2020 ("Suspension of entry applies to those who do not have a valid nonimmigrant visa as of June 24, 2020. We will not be issuing H-1B, H-2B, L, or certain J visas, and their derivatives through December 31, 2020, unless an exception applies."), https://twitter.com/TravelGov/status/1276130798719184896, and June 26, 2020 ("We will not be issuing H-1B, H-2B, L, certain J visas, or their derivatives through December 31, 2020, unless an exception applies. See the link for exceptions."), https://twitter.com/TravelGov/status/1276502018815692802.

[50]   U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), Twitter (July 16, 2020) (in response to the question—"Hi - I had an interview appointment for L1 scheduled in March. This was rescheduled multiple times and finally now stands cancelled after the EO. When the EO is lifted and visas issued, can we expect priority for cases where appointments were cancelled due to the pandemic?"—the State Department responded "Hello - Please refer to the information published by the embassy or consulate where you intend to apply once processing of this visa category resumes.").

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

111.   This massive shift, which the Administration calls "[u]nprecedented" and "a very big deal," causes immediate and irreparable injury to American businesses of all sizes and shapes.

112.   As a result of the Proclamation, American businesses—including the members of the NAM, the U.S. Chamber, the NRF, and TechNet—are unable to fill necessary positions. There is a shortage of high-skilled American workers in certain fields, and the Proclamation bars American companies from turning to the international labor market to fill these positions. As a result, many of those openings will go unfilled entirely.

113.   These changes to the labor market cause irreparable injury. When a job sits vacant because a company cannot hire an individual with the proper qualifications, the result is a direct loss of productivity. That lost productivity is an opportunity cost that is permanent and cannot later be remedied.

114.   Because employment is durable, the employment decisions made during this period will have lasting and irreparable effects.

115.   When some intracompany transfer workers are unable to enter the United States via an L visa due to the Proclamation to pursue what amounts to a promotion or an expanded job portfolio, they will choose to take positions with a competitor abroad. Once employees are lost, U.S. businesses will not regain those individuals. Because many employees—often the best employees—stay with their companies for many years, employment decisions made today have tangible implications for years to come.

116.   By barring individuals who would enter the country on an H category visa, the Proclamation will cause many of the individuals recruited to join American firms to secure employment outside the U.S., erasing the value of the time and money spent recruiting talent to fill U.S.-based jobs, obtaining certification of compliance with labor market protections, and preparing and filing immigration petitions. Because companies cannot recoup the time and money spent recruiting this talent, the loss is irreparable.

117.   Many of those individuals who would enter the United States via a J visa will now choose to engage in similar programs in other nations that will accept them. This will cause direct

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

and irreparable loss to the companies that serve as program sponsors, as well as the companies and individuals that employ individuals who enter on J visas.

118.    The Proclamation, moreover, upends countless investment-backed reliance interests. For example, in today's global economy, companies often have several options as to the country in which they will build critical facilities, such as research-and-development laboratories, manufacturing plants, and leadership hubs. Countries compete mightily for this infrastructure. In choosing to site facilities in the United States, many businesses—including Plaintiffs' members— did so with the understanding that they could bring foreign talent to work at those locations, including the flexibility to transfer current employees from a location outside the United States to a new, domestic operation. The Proclamation undermines the ability of businesses to engage in this activity, frustrating the investments already made and ultimately harming these companies' global competitiveness.

119.    For example, one of Plaintiffs' members has foreign employees already based in the U.S. who happened to be overseas on short-term travel when the pandemic hit. These employees did not anticipate or prepare for the need to situate their U.S.-based teams for their unavailability. Their absence from the U.S. has fundamentally impacted the speed, agility, and efficiency of the company's work in many sectors, including core engineering, research and development, ensuring stability and reliability of critical technological infrastructure for customers, and in developing new business strategies to increase growth. As U.S. consulates begin to reopen, the Proclamation's restrictions have become in many cases the sole reason why this impediment to the company's business planning will continue for another six months. The resulting inefficiency will cause irreparable harm. Products will be delayed, services will become less resilient, and technological advancement will not happen as quickly.

120.    Multinational companies, including members of the Plaintiff associations, rely on the ability to transfer high-performing employees from subsidiaries outside the U.S. to growth-producing jobs located at U.S.-based headquarters. Multinational companies constantly engage in forward-looking global workforce planning, including the integration of skill development within the workforce with forecasted business needs. The experience and technical depth employees gain

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

while working on teams in one region of the world are often essential components for advancing work on different teams and for different products or services in the U.S.

121.    For example, one of Plaintiffs' members in the software and network engineering business has built its U.S.-based business in reliance on the ability to identify top managerial talent throughout its global operations and bring those individuals to the United States through the L-1 visa program to grow the company's business. The Proclamation, however, leaves the company unable to do so. This has had a detrimental impact on the company's business operations. For instance, the company built a team of full-time employees at its U.S.-based headquarters to manage network engineering for clients. An Indian national currently located in India, and employed by the company since 2013, was slated to transfer to the U.S. on an L-1 visa to lead that team. Due to COVID-19, he was unable to get a visa appointment at the U.S. consulate before the consular posts closed—and he is now subject to the Proclamation, preventing his entry into the U.S. at least until 2021. In the meantime, he has been leading the team from a time zone 13 hours ahead of his colleagues. This has created a strain on the team's ability to service their customers, which could lead those customers to look elsewhere for these network engineering services—including, potentially, to non-U.S. based competitors.

122.    Another of the company's employees is also an Indian national currently in India, employed by the company since 2006. The employee currently manages 18 global business programs in the Indian market. He was slated to transfer to the U.S. on an L-1 visa to manage a $1.2 billion business portfolio that works with more than 4,000 businesses across the United States. Due to COVID-19, he was unable to get a visa appointment at the U.S. consulate before the consular posts closed, and now he is subject to the Proclamation. The time zone difference between India and the U.S.-based headquarters has made it difficult for him to manage his new team.[51]

---

[51] That companies have responded to the Proclamation by having employees work overseas further confirms that the Proclamation is arbitrary and capricious and not rationally tied to its stated goal. There is no basis to conclude that exempting this wide swath of workers from the United States will have a material impact on unemployment rates of U.S. citizens.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

123.    Now aware that temporary workers are barred from entering the United States, many companies will decide against expanding operations here. If, for example, a company needs the leadership of an employee who has worked abroad to open a new production line, the Proclamation will preclude this form of investment into U.S. infrastructure. And if a company chooses to make that investment outside the United States, the loss to the domestic economy is irrecoverable.[52] Not only does this harm the country as a whole, but it is to direct the detriment of many members of the Plaintiff associations, as those companies would provide goods and services to those facilities based domestically.

124.    For example, one of Plaintiffs' members had planned to use the L-visa program to transfer an employee currently in France to the United States. The employee was slated to lead a new team in the U.S. tasked with building a new business analytics product. Initially, the new team would have consisted of 25 software engineers, and the company's goal was to grow that team to 50 by early 2021. The company anticipates significant opportunity for growth in this new product line over the next three to four years. While the transfer was understandably delayed as a result of the consular post closures due to COVID, the Proclamation now bars this transfer and this employee cannot come to the United States. The company has hired a team of 10 software engineers in France to get the project started, and by the time the Proclamation expires, that project will be well underway. Because of the team leader's inability to enter the United States, the employment opportunities created by the project will largely end up being filled overseas.

125.    Moreover, there is no guarantee that the Proclamation will terminate at the end of the year, further deepening the planning uncertainty it imposes on businesses. Although the Proclamation states that it is to end on December 31, 2020, the Proclamation provides that it "may be continued as necessary." Indeed, the Proclamation also extended a prior entry ban, relating to immigrant visas, that had been set to expire, providing that it would continue as well

---

[52]    Economists Peri and Sparber have observed that "[t]he world competes for global talent. Lost technological and productivity growth in the US could mean increased growth elsewhere. For example, Glennon (2020) argues that H-1B restrictions cause firms to increase their offshore operations, particularly in Canada, India, and China." Peri & Sparber, *supra*, at 2.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

through at least December 31, 2020. Ex. A, § 1.[53] Not only have companies' existing reliance interests been upended, but businesses cannot engage in any prospective planning, because no one knows if or when the Proclamation's bar will ever be lifted. Companies that require access to their international talent now lack any assurance of when such access will become possible again.[54]

126.    America's loss will be other countries' gain. "Rather than protect U.S. jobs," the Administration's "restrictions on visas for foreign workers will encourage companies to move highly skilled roles to Canada, executives and immigration advisers on both sides of the border predict."[55] As one Fortune 100 CEO put it, "[t]his may be a Canadian Jobs Creation Act. You can go to Toronto and hire people there and work quite effectively."[56]

127.    In all, the Proclamation constitutes a massive upheaval of immigration programs that have functioned for decades. This drastically upsets settled reliance interests, as businesses depend on the access to talent that these visa categories provide.

128.    Leading economists have thus explained, in response to the Proclamation, that "[t]he continued reduction of opportunities for legal immigration produced by this administration's executive orders will likely have no positive short-run effects but will risk dire long run implications." [57] This policy is especially destructive in light of COVID-19: "The restrictive policies of the last three years, culminating with the halt of H-1B processing in this

---

[53]   *See* Proclamation 10014 of April 22, 2020, *Suspension of Entry of Immigrants Who Present a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak*, 85 Fed. Reg. 23,441 (Apr. 22, 2020).

[54]   The State Department has repeatedly underscored that the Proclamation may not expire on December 31, 2020. For example, a State Department Tweet issued on July 21, 2020, by the @TravelGov account states that "An approved petition is not a valid US visa. If you did not have a valid visa on June 24, 2020, and you were not present in the US on that date, you are subject to the Proclamation. The Proclamation's restrictions expire on Dec. 31, 2020, unless extended." U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), Twitter (July 21, 2020), twitter.com/TravelGov/status/1285567720910618624. *See also* U.S. Dep't of State, Bureau of Consular Affairs (@TravelGov), Twitter (July 21, 2020), twitter.com/TravelGov/status/1285565730679816194 ("The Proclamation's restrictions are set to expire on Dec. 31, 2020, unless extended by the President.").

[55]   Andrew Edgecliffe-Johnson, *U.S. Companies Say Visa Rules Are Jobs Boon for Canada*, Financial Times (June 26, 2020), perma.cc/MP7G-ZSKB.

[56]   *Id.*

[57]   Peri & Sparber, *supra*, at 2.

latest Executive Order, will deprive the US of skills and talents that would have helped the economic recovery."[58]

129.    The Department of State's suspension of visa processing is causing harm to members of the Plaintiff associations separate and in addition to the entry bar issued in the Proclamation. By suspending the processing and issuance of H-1B, H-2B, L-1, and J-1 visas now, the Department of State is creating a massive backlog of visa petitions. The net effect will be to create very substantial delay if and when the travel entry implemented by the Proclamation lifts. This delay creates yet more uncertainty for businesses, gutting advance planning, and precluding companies from arranging for global talent to enter the United States to perform important functions.

130.    Plaintiff Intrax, which is a member of Plaintiff U.S. Chamber, is directly harmed by the bans contained in the Proclamation. Intrax operates six exchange programs, five of which—summer work travel, au pair, intern, trainee, and camp counselor—are entirely shut down by the Proclamation.

131.    The inability to plan for the future is causing Intrax enormous harm.  Intrax is currently working to attract participants for next year after the ban supposedly ends, but potential participants are understandably unwilling to sign up without assurances that the Proclamation actually will be lifted and the programs will go forward.

132.    As a result of the Proclamation, Intrax has already had to furlough a significant percentage of its staff members, and the remaining staff have taken large pay cuts. The Proclamation is thus directly causing a loss of U.S. jobs at Intrax and other J-1 sponsors across the Nation.

133.    If the Proclamation is enjoined, Intrax's currently-shuttered programs would resume. Accordingly, if the Proclamation is enjoined, Intrax would promptly rehire these staff members. In this way, an injunction would redress the harm that the Proclamation is inflicting on

---

[58] *Id.*

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

Intrax. For Intrax—and its employees—time is of the essence, as every day that elapses with the Proclamation in place causes yet more, irreparable economic injury to the company.

134.    Intrax is far from alone. Many small businesses—including members of the Plaintiff associations—operate J-1 cultural exchange programs. Because of the Proclamation, many of these companies have seen their businesses substantially—if not entirely—shut down by virtue of the entry bar. Many companies, including members of the Plaintiff associations, are being forced to suspend operations and furlough or lay off staff as a direct result of the Proclamation.

135.    For operators of J-1 programs, the Proclamation is an existential crisis. Loss of these small companies will only exacerbate current unemployment rates.

136.    Enjoining the Proclamation would have the immediate, short-term effect of saving U.S. jobs.

137.    H-2B workers, meanwhile, undertake jobs in circumstances where there is a lack of sufficient domestic labor available, as confirmed by a rigorous labor certification process. Many small businesses are dependent upon their H-2B workers, relying on the invaluable contributions of these foreign employees. Without H-2B workers, many small companies would diminish operations or go out of business entirely. The Proclamation's restrictions on H-2B's entry into the United States will thus cost American citizens jobs.

138.    As just one example, a landscaping business, which is a member of a Plaintiff association, has long hired H-2B employees because there have not been sufficient domestic workers available to fill open positions. Currently, because of the Proclamation, this business is unable to fill its labor needs via H-2B workers. And, as long been the case for this business, there is vastly insufficient domestic labor filling a number of open jobs. The inability to fill these open positions is causing the company substantial and irreparable economic harm. An order enjoining the Proclamation would redress the substantial harm presently being suffered by this company.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1.      **National Interest Exceptions**

139.    The Proclamation purports to provide a discretionary "national interest" exception. Ex. A, § 3(b). This does not cure the irreparable harms faced by Intrax and members of the Plaintiff associations.

140.    Notwithstanding the theoretical existence of national interest waivers, five of Intrax's programs have been entirely shuttered, causing enormous injury to the company. And, notwithstanding these exceptions, Intrax has furloughed a substantial portion of its staff, remaining employees have taken significant pay cuts, and it faces grave fiscal harm. If the Proclamation is enjoined, Intrax's programs would resume, its staff would be removed from furlough, and it would reverse the pay cuts to remaining staff.

141.    Any waivers, moreover, fail to account for the full range of individuals in the impacted visa categories. For example, as to H-1B visas, State Department guidance asserts that waivers are available only for those working to alleviate the COVID-19 pandemic, or those working on behalf of the U.S. government, to meet U.S. foreign policy objectives, or to satisfy a treaty or contractual obligation.[59] This leaves the vast majority of those who would enter the United States pursuant to an H-1B visa subject to the Proclamation, thus inflicting substantial harm on numerous businesses who are members of the Plaintiff associations.

142.    Similarly, for L-1 visas, the State Department guidance asserts that a waiver may be available for "[t]ravel as a public health or healthcare professional, or researcher to alleviate the effects of the COVID-19 pandemic, or to conduct ongoing medical research in an area with a substantial public health benefit. This includes those traveling to alleviate effects of the COVID-19 pandemic that may be a secondary effect of the pandemic."[60] Once more, this narrow waiver accounts for only a small fraction of individuals who would otherwise enter the United States via an L-1 visa.

---

[59] U.S. Dep't of State, Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak (July 17, 2020), perma.cc/9MYA-2SNR.
[60] *Id.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

143. Given that the Administration has stated that the purpose of the Proclamation is to fundamentally alter the labor markets, the putative exceptions to the Proclamation cannot alleviate the harm imposed on American businesses by the intentional disruption of settled, historic hiring practices.

144. That is, the Administration has represented that the Proclamation, because it (along with related measures) will impact 500,000 or more jobs this year, it is a "very big deal" and "[u]nprecedented."[61] It is this fundamental reworking of the labor markets that causes plaintiffs serious and irreparable harm. The narrow national interest waivers do not alleviate the fundamental purpose and effect of the Proclamation, and thus they do not remedy the harm that the Proclamation is currently inflicting on the plaintiffs and their members.

145. Additionally, businesses are unable to plan their affairs around the exception, which is vague and lacks any content to guide discretionary determinations. The process for applying, the standard under which applications will be reviewed, the type of proof required, the potential for reconsideration of an adverse decision, and the timeline for a decision all remain unknown. Given the volume of disruptions happening for businesses across the Nation, a case-by-case adjudication of exceptions likely would be inefficient and administered inconsistently from one applicant to the next, and from one consular post to the next.

146. Indeed, H-1B *doctors* are reportedly being denied entry under the Administration's new edict,[62] despite the Proclamation's explicit direction that noncitizens "involved with the provision of medical care to individuals who have contracted COVID-19 and are currently hospitalized," or related research, should be exempted under the exception. Ex A, § 4(a)(i).

147. Businesses cannot make necessary hiring or promotion decisions if they are ultimately dependent on the unknown result of a lengthy, discretionary administrative process.

148. For these reasons, the prospect of applying for a "national interest" exception to the Proclamation for a particular employee does not cure the harm that the Proclamation causes to

---

[61] *See* Ken Cuccinelli (@HomelandKen), Twitter (June 22, 2020), https://twitter.com/HomelandKen/status/1275201179920760839.

[62] Dara Lind, *Hospitals Are Suddenly Short of Young Doctors—Because of Trump's Visa Ban*, ProPublica (July 17, 2020), perma.cc/2QDW-ZENU.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

companies' business planning. The exception thus does not resolve the difficulties imposed by the Proclamation on business that must plan for their workforce needs.

149.    Ultimately, given that the Proclamation is specifically designed to fundamentally disrupt hiring practices of many American businesses, including many members of the Plaintiff associations, the stated exception is categorically unable to remedy the substantial and immediate harm the Proclamation inflicts on plaintiffs and their members.

**E.    THE PROCLAMATION IS ARBITRARY AND CAPRICIOUS, IT FAILS TO ADDRESS SEVERAL CRITICAL ASPECTS OF THE PROBLEM AT ISSUE, AND IT FAILS TO TAKE ACCOUNT OF ESSENTIAL EVIDENCE**

150.    The Proclamation is vastly overbroad because it applies to individuals who are not authorized to work, and thus cannot have any meaningful impact on unemployment rates. The Proclamation fails to account for why it is substantially more broad than the problem it allegedly addresses.

151.    The entry ban applies not only to H-1B, H-2B, J, and L-1 visa-holders, but also to their dependents: "any alien accompanying or following to join such alien." Ex. A, § 2. Many of these dependents, who are in the H-4, J-2, and L-2 visa categories, are not authorized to work at all.[63] These individuals, accordingly, cannot have any impact on the unemployment rate of domestic workers. Rather, they increase consumer demand, indirectly lowering unemployment.[64]

152.    A seven-year-old boy, for example—the dependent of a skilled nonimmigrant worker—is now barred from returning to Texas for second grade because he happened to be visiting his sick grandmother in India when the Proclamation was issued.[65] Neither second-graders nor any other dependents ineligible for work authorization can logically "pose[] a risk of

---

[63]   For example, only those H-4 spouses whose H-1B spouse has an approved Form I-140, Immigrant Petition for Alien Workers, is eligible for an employment authorization document. Likewise, juveniles who enter the United States via H-4, J-2, and L-2 visas are ineligible for work authorization.

[64]   The existence of potential waivers—which appear at odds with the text of the Proclamation—cannot *ex post* render the *Proclamation* lawful. Nor, for reasons we have described, is the mere possibility of a waiver sufficient to solve the harms of the Proclamation.

[65]   *See* Catherine Rampell, *Opinion: Trump's Visa Suspensions May Permanently Damage America's Reputation*, Wash. Post (June 29, 2020), perma.cc/D5QS-7ANC.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1 | displacing and disadvantaging United States workers during the current recovery." Ex. A, 85 Fed.
2 | Reg. at 38,263.

3 | 153. Moreover, the areas of the economy that have suffered the worst unemployment as
4 | a result of COVID-19 do not significantly overlap with the occupations in which many
5 | individuals on impacted visa categories work.

6 | 154. The Bureau of Labor Statistics (BLS) calculated the overall unemployment rate in
7 | May 2020 (the latest available numbers when the Proclamation issued) as 13.3%.[66]

8 | 155. The May jobs report, however, showed that the unemployment rate *fell* during this
9 | period of time. While the unemployment rate in computer-related professions was 3.0% in
10 | January 2020, it had dropped to 2.8% in April 2020, and 2.5% in May 2020.[67] Indeed,
11 | unemployed workers in such occupations make up less than 1.5% of the 18 million total
12 | unemployed workers in this country. And companies are still posting hundreds of thousands of
13 | job openings for computer-related occupations, even in the teeth of the pandemic.[68]

14 | 156. Almost two-thirds of H-1Bs work in computer occupations.[69]

15 | 157. L-1A visa-holders by definition work in "managerial" or "executive" positions (8
16 | U.S.C. § 1101(a)(15)(L)), and unemployment in "[m]anagement occupations" currently stands at
17 | 4.8%, accounting for a miniscule fraction of the Nation's overall 11.2% unemployment rate.
18 | Again, of the 18 million currently unemployed workers, only about 5% of them work in
19 | management occupations. Moreover, the managers and executives being transferred via the L-1A
20 | visa category could not be replaced by domestic workers without knowledge and expertise with

[66] U.S. Bureau of Labor Statistics, *The Employment Situation—May 2020* 1 (June 5, 2020), perma.cc/A9GM-ABJZ.
[67] Nat'l Foundation for American Policy, *Updated Analysis of Employment Data for Computer Occupations* (June 2020), perma.cc/P7JB-NFBQ. *See also* Stuart Anderson, *Unemployment Rate For Computer Occupations Fell In May*, Forbes (June 11, 2020), perma.cc/JRX9-BJ79; Stuart Anderson, *Unemployment Rate For Computer Occupations Fell In May*, perma.cc/2NU6-FNRQ.
[68] Nat'l Foundation for American Policy, *Updated Analysis of Employment Data for Computer Occupations* (June 2020), perma.cc/P7JB-NFBQ.
[69] USCIS, *Characteristics of H-1B Specialty Occupation Workers* 11 ("The category of computer-related occupations was the largest occupational category in 2019 and 2018; its share of total petitions approved was 66.1 percent in FY 2019."), perma.cc/LFN7-DY95.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

the products, services, organization, methods, or research of the multinational company in question.

158.    "Service occupations" have been hardest hit by the pandemic. But nonimmigrant workers play a vital role in helping maintain jobs in service occupations and other professions impacted by COVID-19. Today, virtually all companies feature a technology component, and that technology is often what drives growth. Retailers use innovative technologies to better improve customer experiences and purchasing decisions; thriving retail is crucial for the service-oriented employees that it employs. Hotels too have significant technology functions, to enhance guest stays, provide new options for services, and retain customer loyalty. These operations—which rely on computer-related professions and other workers—inure to the benefit of all employees across occupations, including those most adversely impacted by COVID-19.

159.    The current Administration's desire to suspend temporary foreign workers long predates the COVID-19 crisis.[70] And certain organizations have long urged the imposition of bans described as "temporary," but that are in fact intended to result in permanent cuts to immigration.[71]

160.    Accordingly, the Proclamation's invocation of the COVID-19 pandemic is pretext for preexisting (and extra-statutory) policy preferences.[72]

[70]  *See, e.g.*, Michael D. Shear & Miriam Jordan, *Trump Suspends Visas Allowing Hundreds of Thousands of Foreigners to Work in the U.S.*, N.Y. Times (June 22, 2020) (noting that "Stephen Miller, the White House aide and the architect of Mr. Trump's immigration policy, has pushed for years to limit or eliminate the [H-1B] worker visas, arguing that they harm employment prospects for Americans."), perma.cc/HUY3-QH2R; Ron Nixon, *Donald Trump Wants to Cut Visa Program He Used for His Own Models*, N.Y. Times (Aug. 16, 2016) (reporting 2016 statement from then-Candidate Trump: "I will end forever the use of the H-1B as a cheap labor program, and institute an absolute requirement to hire American workers first for every visa and immigration program. No exceptions."), perma.cc/6Z7M-WH46.

[71]  *See, e.g.*, Federation for American Immigration Reform (FAIR), *Oral History Project: Daniel Stein* 57 (August 1994) (comments of Dan Stein, now the president of FAIR, that a "moratorium . . . shifts the burden of proof onto the opposition, the proponents of immigration, to prove why it's needed at all. From going suddenly from a position of having to disprove the status quo, the opposition now has to explain why it is in the national interest to keep immigration going."), perma.cc/LNR6-L5ST.

[72]  *See, e.g.*, Michael D. Shear & Maggie Haberman, *Trump's Temporary Halt to Immigration Is Part of Broader Plan, Stephen Miller Says*, N.Y. Times (Apr. 24, 2020) (reporting "a private conference call with the president's supporters," in which Stephen Miller "pledged" that the Administration's April 22, 2020 proclamation suspending entry on immigrant visas, also purportedly justified by the COVID-19 pandemic, "was only a first step in the administration's

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

161.   The Department of State's suspension of the issuance and processing of H-1B, H-2B, L-1, and J-1 visas cannot be justified by the Proclamation or the Executive's Section 212(f) authority. Section 212(f) authorizes the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants."[73] It does not authorize the Executive—or the Department of State—to suspend the processing or issuance of visas. The Department of State's conduct lacks legal justification, it conflicts with federal law obligating the processing of visas, and it fails to account for important aspects of the issue, including those identified in this Complaint.

162.   The Proclamation fails to explain how it is consistent with the robust labor protections incorporated in the visa categories, including the regulatory structure. Nor does it demonstrate why those protections are insufficient to address the problem allegedly motivating the Proclamation.

163.   The Proclamation does not account for several very serious aspects of the issue at hand. For example, the Proclamation does not address the broad research and economic studies proving that temporary foreign workers create net new jobs, contributing to economic growth of the Nation as a whole. The Proclamation does not account for the substantial reliance interests that companies have placed when choosing where to site their facilities and structure their operations. Nor does it account for the reliance interests of individual employees, who have accepted jobs with companies in the United States, and who are reliant on an operational nonimmigrant visa system for both themselves and their family members. The Proclamation does not consider the impact to the nation's public diplomacy goals. The Proclamation does not consider the implications it has on U.S. companies that have been forced to fire or furlough domestic workers because of the inability for nonimmigrant visa holders to enter the United States.

_____

longer-term goal of shrinking legal immigration"), perma.cc/C5SG-LT9L; Nick Miroff & Josh Dawsey, *Stephen Miller has long-term vision for Trump's 'temporary' immigration order, according to private call with supporters*, Wash. Post (Apr. 24, 2020) ("Miller indicated that the strategy is part of a long-term vision and not seen only as a stopgap."), perma.cc/NJ2E-JJGN.
[73]   8 U.S.C. § 1182(f).

- 37 -

**CLAIMS FOR RELIEF**

**COUNT I**
**The Proclamation Exceeds the Authority**
**of the Executive Branch (Ultra Vires Conduct**

164.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

165.    The Proclamation is in excess of the President's authority under Sections 212(f) and 215(a) of the INA (8 U.S.C. §§ 1182(f), 1185(a)).

166.    The Proclamation is inconsistent with duly enacted statutes, including those that calibrate the labor market protections in connection with nonimmigrant visas. The President may not "nullify[] Congress's considered judgments on matters of immigration." *Hawaii v. Trump*, 878 F.3d 662, 685 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *see Doe #1*, 957 F.3d at 1067 (proclamation at issue "rais[es] serious questions as to whether the President has effectively rewritten provisions of the INA."); *cf. Hawaii*, 138 S. Ct. at 2411 ("We may assume that § 1182(f) does not allow the President to expressly override particular provisions of the INA.").

167.    The Proclamation suspends the entry of noncitizens in response to a purely domestic economic policy problem, but Congress has already struck the policy balance in the area at issue. The INA does not authorize the President to enter such an order. *See Doe #1 v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020); *cf. Hawaii*, 138 S. Ct. at 2415 (discussing "the President's flexible authority to suspend entry based on foreign policy interests").

168.    The Proclamation further exceeds the scope of Section 212(f) because it directs Defendant departments and secretaries to refuse to issue, process, receive, or adjudicate requests for visas in the categories at issue, including H-1B, H-2B, H-4, L-1, L-2, J-1, and J-2. This exceeds the scope of Section 212(f), which authorizes the President solely to suspend entry of non-citizens into the United States. Section 212(f) does not authorize the President to suspend the issuance or processing of visas.

169.    The entry ban contained in the Proclamation is not plausibly or rationally related to its stated purpose of addressing the temporary spike in U.S.-worker unemployment caused by

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

COVID-19, as required by law. Indeed, Section 212(f) requires, as a "prerequisite" to any suspension of entry (*Hawaii*, 138 S. Ct. at 2408), that the President make a "find[ing] that the entry of" the affected noncitizens "would be detrimental to the interests of the United States" (8 U.S.C. § 1182(f)). The Proclamation fails this requirement because, among other reasons, it does not take account of several crucial aspects of the issues at hand, it does not address important reliance interests, it does not consider evidence that bears on the judgments made, and it does not reflect a rational fit between the problem identified and the action taken.

170. The foregoing limitations to the scope of the President's authority—including that the Executive may not use Section 212(f) to invalidate duly enacted statutes, that the Executive may not use Section 212(f) in response to a purely domestic economic concern, especially where Congress has addressed the issue, and that the Executive's use of Section 212(f) must be accompanied by rational "find[ings]"—ensure that authority Congress has bestowed on the President in Section 212(f) is constitutional. *See generally Gundy v. United States*, 139 S. Ct. 2116 (2019); *id.* at 2131-2148 (Gorsuch, J., dissenting). If, by contrast, Section 212(f) contains no such limits on the scope of Executive authority, then the Proclamation is *ultra vires* because Section 212(f) effects an unconstitutional delegation of "the Legislative Power" in Article I, and thus cannot confer lawful authority upon the President. Properly construing the INA as limiting the President's ability to impose the Proclamation, however, avoids the grave constitutional doubts otherwise raised by the non-delegation doctrine. *See, e.g.*, *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014) ("[A] 'statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.'") (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998)).

171. The Court has inherent equitable power to enjoin actions by federal officers in excess of their lawful authority. *See, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("The Supreme Court has 'long held that federal courts may in some circumstances grant injunctive relief against' federal officials violating federal law.") (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015)); *E.V. v. Robinson*, 906 F.3d 1082, 1090-1091 (9th Cir. 2018) (acknowledging freestanding cause of action for "suits alleging that a

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

federal official acted ultra vires of statutorily delegated authority" or "violated the Constitution"); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 189-190 (D.C. Cir. 2006) ("[J]udicial review is available when an agency acts *ultra vires*, even if a statutory cause of action is lacking.") (quotation marks omitted).

## COUNT II
## Violation of the Administrative Procedure Act

172.    Plaintiffs incorporate and re-allege the foregoing paragraphs as though fully set forth herein.

173.    The Administrative Procedure Act (APA) empowers courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

174.    It likewise authorizes courts to set aside agency action that is "without observance of procedure required by law." *Id.* § 706(2)(D).

175.    The implementation of the Proclamation by the Defendant departments and secretaries violates the requirements of the APA.

176.    In implementing the Proclamation, Defendant departments have refused to issue, process, receive, or adjudicate requests for visas in the categories at issue, including H-1B, H-2B, H-4, L-1, L-2, J-1, and J-2. This constitutes final agency action subject to review under the APA.

177.    This implementation of the Proclamation is in excess of statutory authority because Section 212(f) does not authorize the President to suspend the issuance, processing, receipt, or adjudication of requests or petitions for visas in the categories at issue.

178.    Implementation of the Proclamation is inconsistent with duly enacted statutes, including those that calibrate the labor market protections in connection to nonimmigrant visas.

179.    Implementation of the Proclamation's entry ban (and related provisions, including the suspension of visa processing) is arbitrary and capricious because it is not rationally related to the problem—domestic unemployment caused by COVID-19—it is purportedly aimed at addressing. Among other arbitrary and capricious aspects, visa categories in question (a) are not used in sectors where unemployment is high; (b) are issued to family members who lack work

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

authorization entirely; or (c) result in the net creation of jobs for domestic workers. *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (APA review entails determining whether the government has "articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

180.    Implementation of the Proclamation reflects a change in position that disregards without reasoned explanation the substantial economic and other reliance interests in the status quo ante. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (setting aside agency action because it "was issued without the reasoned explanation that was required in light of the Department's change in position and the significant reliance interests involved"); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (same).

181.    Implementation of the Proclamation fails to take into account several critically important considerations that are necessarily part of the issue addressed. For example, neither the Proclamation nor its implementation addresses the robust evidence that nonimmigrant temporary workers increase net employment, that the job occupations currently experiencing high unemployment rates do not correspond to the occupations most frequently performed by those entering the United States on nonimmigrant visas, that companies have invested considerable resources in reliance on their ability to hire global talent and move employees from abroad to work at U.S. facilities, and that individual employees and their families have relied on nonimmigrant visa programs in structuring their lives.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor, and that the Court:

(a)    issue a declaratory judgment establishing that the Proclamation is in excess of the Executive Branch's lawful authority;

(b)    enjoin Defendants from implementing, enforcing, or otherwise carrying out the provisions of the Proclamation;

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

(c)    vacate and set aside the Proclamation and any actions taken to implement the Proclamation;

(d)    award Plaintiffs reasonable attorney's fees and costs; and

(e)    award Plaintiffs such other and further relief as the Court may deem just and proper.

**MCDERMOTT WILL & EMERY LLP**

DATED:   July 21, 2020      By:       */s/ William G. Gaede, III*

Paul W. Hughes (*Pro Hac Vice to be filed*)
phughes@mwe.com
Michael B. Kimberly (*Pro Hac Vice to be filed*)
mkimberly@mwe.com
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

William G. Gaede, III (136184)
wgaede@mwe.com
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Attorneys for *Plaintiffs*

MANUFACTURERS' CENTER FOR LEGAL ACTION
Linda E. Kelly (*Pro Hac Vice to be filed*)
Patrick D. Hedren (*Pro Hac Vice to be filed*)
Erica T. Klenicki (*Pro Hac Vice to be filed*)
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of Manufacturers*

U.S. CHAMBER LITIGATION CENTER
Steven P. Lehotsky (*Pro Hac Vice to be filed*)
Michael B. Schon (*Pro Hac Vice to be filed*)
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce
of the United States of America*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF