1    MCDERMOTT WILL & EMERY LLP
2    Paul W. Hughes (*Pro Hac Vice*)
     phughes@mwe.com
3    Michael B. Kimberly (*Pro Hac Vice pending*)
     mkimberly@mwe.com
4    Sarah P. Hogarth (*Pro Hac Vice to be filed*)
     shogarth@mwe.com
5    500 North Capitol Street NW
     Washington, DC 20001
6    (202) 756-8000

7    MCDERMOTT WILL & EMERY LLP
8    William G. Gaede, III (136184)
     wgaede@mwe.com
9    275 Middlefield Road, Suite 100
     Menlo Park, CA 94025
10   (650) 815-7400

11   *Counsel for Plaintiffs*

12   [Additional Counsel Listed on Signature Page]

13

14              **IN THE UNITED STATES DISTRICT COURT**

15        **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

16   NATIONAL ASSOCIATION OF                Case No. 4:20-cv-4887-JSW
     MANUFACTURERS, CHAMBER OF
17   COMMERCE OF THE UNITED STATES          **PLAINTIFFS' NOTICE OF MOTION
     OF AMERICA, NATIONAL RETAIL            AND MOTION FOR
18   FEDERATION, TECHNET, and INTRAX,       PRELIMINARY INJUNCTION**
     INC.,
19
                    Plaintiffs,            Date:      September 11, 2020
20                                          Time:      9:00 a.m.
            v.                              Judge:     Hon. Jeffrey S. White
21                                          Ctrm.:     5
     UNITED STATES DEPARTMENT
22   OF HOMELAND SECURITY,
     UNITED STATES DEPARTMENT
23   OF STATE; CHAD F. WOLF,
     in his official capacity as Acting Secretary of
24   Homeland Security; and, MICHAEL R.
     POMPEO, in his official capacity as Secretary
25   of State,

26                  Defendants.

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... ii

Summary of Argument................................................................................................. vi

Notice of Motion and Motion for Preliminary Injunction ........................................... 1

Memorandum of Points and Authorities...................................................................... 1

Background .................................................................................................................. 1

    A.   Visa categories. ........................................................................................ 1

    B.   INA Section 212(f)................................................................................... 2

    C.   The Proclamation. ................................................................................... 3

    D.   Plaintiffs and their members. .................................................................. 4

Argument ..................................................................................................................... 4

I.   Plaintiffs are likely to succeed on the merits. ...................................................... 4

    A.   The Proclamation is beyond the President's lawful authority. ................... 4

        1.   The Proclamation unlawfully eviscerates vast portions of the INA. ................. 6

        2.   The Proclamation lacks a reasonable relationship to its stated goals. .............. 11

        3.   The nondelegation doctrine requires a reading of Section 212(f) that imposes meaningful limitations on the President's authority. ........................... 15

        4.   There is no alternative authority for the Proclamation. ................................... 17

    B.   For the same reasons, the implementation of the Proclamation is invalid under the APA. ..................................................................................... 17

    C.   Defendants' moratorium on visa processing and issuance is unlawful, wholly apart from the Proclamation's own failings.................................. 18

II.   The Proclamation causes direct and irreparable injuries. .................................... 20

III.   The balance of the equities and the public interest favor an injunction............................. 24

Conclusion .................................................................................................................. 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry v. United States*,
    295 U.S. 495 (1935)....................................................................................16

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998)....................................................................................15

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946)......................................................................................16

*Arizona v. United States*,
    567 U.S. 387 (2012)......................................................................................6

*Armstrong v. Exceptional Child Ctr.*,
    135 S. Ct. 1378 (2015) .................................................................................6

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018).......................................................................25

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) .....................................................................................6

*City of L.A. v. Barr*,
    941 F.3d 931 (9th Cir. 2019).........................................................................5

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)................................................................................18

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020)................................................................................18

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020).......................................................... *passim*

*Doe #1 v. Trump*,
    No. 19-36020 (Feb. 6, 2020).........................................................................5

*Doe v. Trump*,
    418 F. Supp. 3d 573 (D. Or. 2019)..............................................................16

*E.V. v. Robinson*,
    906 F.3d 1082 (9th Cir. 2018).......................................................................6

*East Bay Sanctuary Covenant v. Barr*,
    964 F.3d 832 (9th Cir. 2020).........................................................................4

*East Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020)...............................................18, 20, 23, 25

*Erringer v. Thompson*,
    371 F.3d 625 (9th Cir. 2004).......................................................................20

*Fiallo v. Bell*,
    430 U.S. 787 (1977)....................................................................................17

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893)....................................................................................17

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)................................................................................6, 18

**Cases—continued**

*Galvan v. Press,*
    347 U.S. 522 (1954) .................................................................................17

*Gundy v. United States,*
    139 S. Ct. 2116 (2019) ............................................................................16

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017) (*Hawaii I*) ...........................................4, 11

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017) (*Hawaii II*) ................................... *passim*

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Institute,*
    448 U.S. 607 (1980) .................................................................................15

*INS v. Chadha,*
    462 U.S. 919 (1983) .................................................................................17

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ...................................................................................6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) .................................................................................18

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ............................................................................15

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016) ...............................................................15

*Mistretta v. United States,*
    488 U.S. 361 (1989) .................................................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................24

*Oregon Advocacy Center v. Mink,*
    322 F.3d 1101 (9th Cir. 2003) ...............................................................20

*Pub. Citizen v. U.S. Trade Rep.,*
    5 F.3d 549 (D.C. Cir. 1993) ...................................................................18

*Sierra Club v. Trump,*
    929 F.3d 670 (9th Cir. 2019) ........................................................6, 11, 25

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ............................................................................20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001) ...................................................................22

*Tin Cup LLC v. U.S. Army Corps of Eng'rs,*
    904 F.3d 1068 (9th Cir. 2018) ...............................................................12

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) (*Hawaii III*) ......................................... *passim*

*Trump v. Hawaii,*
    138 S. Ct. 377 (2017) ................................................................................4

*United States v. Castleman,*
    572 U.S. 157 (2014) .................................................................................12

**PLAINTIFFS' MOTION FOR PRELIMINARY**
**INJUNCTION (NO. 4:20-CV-4887-JSW)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Cases—continued**

*Youngstown Sheet & Tube Co. v. Sawyer,*
     343 U.S. 579 (1952) ....................................................................................................25

**Statutes, Rules, and Regulations**

8 C.F.R.
     § 214.1(a)(2) ..................................................................................................................2
     § 214.2(h)(6)(iv)(A) ......................................................................................................7
     § 214.2(h)(9)(iv) ..........................................................................................................13
     § 274a.12 ......................................................................................................................13

20 C.F.R.
     § 655.16 ..........................................................................................................................8
     § 655.20(t) ..............................................................................................................8, 13
     § 655.43 ..........................................................................................................................8
     § 655.45 ..........................................................................................................................8
     § 655.46 ..........................................................................................................................8
     § 655.50 ........................................................................................................................13
     § 655.50(b) ....................................................................................................................8

22 C.F.R.
     § 41.121(a) ..............................................................................................................19, 20
     § 62.22 ............................................................................................................................2
     § 62.31 ............................................................................................................................2
     § 62.32 ............................................................................................................................2

5 U.S.C.
     § 553(b) ........................................................................................................................20
     § 705 ......................................................................................................................18, 19
     § 706 ..............................................................................................................................18
     § 706(2)(D) ..................................................................................................................20

8 U.S.C.
     § 1101(a)(13) ................................................................................................................19
     § 1101(a)(15) ..................................................................................................................1
     § 1101(a)(15)(H) ............................................................................................................2
     § 1101(a)(15)(H)(i)(b) ................................................................................................2, 8
     § 1101(a)(15)(H)(ii)(b) ........................................................................................2, 7, 13
     § 1101(a)(15)(J) ..............................................................................................................2
     § 1101(a)(15)(L) ......................................................................................................2, 10
     § 1101(a)(26) ................................................................................................................19
     § 1184 ..............................................................................................................................1
     § 1184(c)(2)(B) ..............................................................................................................2
     § 1184(c)(2)(F) ............................................................................................................10
     § 1184(g)(1)(B) ..............................................................................................................8
     § 1184(i)(1) ....................................................................................................................2
     § 1185(a)(1) ............................................................................................................3, 17
     § 1201(a)(1)(B) ............................................................................................................19
     § 1182(n)(1)(A)-(C) ......................................................................................................8
     § 1182(n)(1)(A)-(D) ......................................................................................................2

**Statutes, Rules, and Regulations—continued**

8 U.S.C.
  § 1182(n)(1)(E) ................................................................................8
  § 1182(n)(1)(G) ................................................................................8
  § 1182(n)(3)(A) ................................................................................8

Eisenhower Exchange Fellowship Act of 1990, Pub. L. 101-454 § 8, 104 Stat. 1063 ...................10

H-1B Visa Reform Act of 2004, Pub. L. 108-447, 118 Stat. 3353 ............................................9, 10

Pub. L. 82-414, § 101(a)(13), 66 Stat. 163 (1952) ......................................................19

Pub. L. 104-208, § 301(a), 110 Stat. 3009 ...................................................................19

*Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705
  (Mar. 20, 1991) .....................................................................................9

85 Fed. Reg. 38,263 (June 25, 2020) ........................................................................3

**Other Authorities**

87 Cong. Rec. 5051 (1941) ..................................................................................12

*Black's Law Dictionary* (11th ed. 2019) ............................................................11, 12

H.R. Rep. 91-851 (1970) .....................................................................................10

H.R. Rep. 101-723, pt. 1 (1990) ..............................................................................9

S. Rep. 106-260 (Apr. 11, 2000) ..............................................................................9

## SUMMARY OF ARGUMENT

On June 22, 2020, President Trump issued Presidential Proclamation 10052. A putative exercise of INA Section 212(f) (8 U.S.C. § 1182(f)), the Proclamation suspends entire visa categories for at least six months. The stated purpose of the Proclamation, according to administration officials, is to "free[] up" "about 525,000 jobs" in 2020 alone. Hughes Decl. Ex. 2.

Because the Proclamation is unlawful and is causing substantial, irreparable injury to countless businesses and the workers they employ, the Court should promptly enjoin it.

**I.** The Proclamation rests on Section 212(f), which authorizes the President to suspend the entry of noncitizens for reasons of foreign affairs and national security. The Ninth Circuit recently held that, if Section 212(f) supplies any authority to act with respect to domestic policy, that power is limited. The Proclamation here severely transgresses the scope of Section 212(f) authority.

*First*, in exercising Section 212(f) powers, the President may not direct actions that conflict with other statutory provisions. Yet that is precisely what the Proclamation does—deleting wholesale visa categories used by hundreds of thousands of individuals each year.

*Second*, Section 212(f) requires the President to "find" that the action serves the "interests of the United States." Here, however, the Proclamation's findings fail to meet the required standard because there is a fundamental mismatch between the problem identified and the action taken, there is a failure to address crucial evidence, and there is disregard of reliance interests.

*Third*, these limits on Section 212(f) ensure that it constitutes a lawful delegation of authority from Congress to the Executive. Absent such limits, the Proclamation is unlawful.

**II.** An injunction is necessary to prevent irreparable injury. The purpose of the Proclamation is to fundamentally disrupt how companies may hire employees for at least the next six months. The Plaintiff associations represent, in the aggregate, hundreds of thousands of American businesses. Accordingly, and by design, the Proclamation inflicts on Plaintiffs and their members—including Microsoft Corporation, Amazon.com, Inc., Gentle Giant Moving, Singing Hills Landscape, Intrax, Alliance Abroad, and more—specific, acute, and irremediable harms.

**III.** The balance of equities and the public interest favor an injunction for multiple reasons, including that adherence to congressional judgments necessarily serves the public interest.

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on September 11, 2020, at 9:00 a.m. in Courtroom 5 of the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Jeffrey S. White, Plaintiffs the National Association of Manufacturers, the Chamber of Commerce of the United States of America, the National Retail Federation, TechNet, and Intrax, Inc. will and hereby do move for a preliminary injunction against Defendants the United States Department of Homeland Security, the United States Department of State, Chad F. Wolf, and Michael R. Pompeo pursuant to Federal Rule of Civil Procedure 65(a).

Plaintiffs seek a preliminary injunction enjoining Defendants, their agents, servants, employees, and all others in active concert or participation with them from, pending final judgment:

- implementing, enforcing, or otherwise carrying out Section 2 of Proclamation 10052 with respect to Plaintiffs and, with respect to the association Plaintiffs, their members; and

- with respect to the Plaintiffs and the members of the association Plaintiffs, engaging in any action that results in the non-processing or non-issuance of applications or petitions for visas in the H, J, and L categories which, but for Presidential Proclamation 10052, would be eligible for processing and issuance.

### MEMORANDUM OF POINTS AND AUTHORITIES

### BACKGROUND

**A.    Visa categories.**

The Immigration and Nationality Act (INA) governs the admission of noncitizens into the United States. *See generally* 8 U.S.C. §§ 1101 *et seq.* Among other things, the INA provides for various categories of nonimmigrant visas for noncitizens planning to enter the United States temporarily and for a specific purpose. *See id.* §§ 1101(a)(15), 1184.

Pertinent here are three nonimmigrant visa categories: L visas, H visas, and J visas.

**L Visa Category**. L visas provide for intra-company transfers. They are issued to noncitizens who have "been employed continuously for one year by a firm or corporation . . . and who seek[] to enter the United States temporarily in order to continue to render [their] services to the same employer" and will perform a "managerial" or "executive" function (L-1A visas) or have

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   "specialized knowledge" about the company's product or processes and procedures (L-1B visas).

2   *See* 8 U.S.C. § 1101(a)(15)(L); *id.* § 1184(c)(2)(B) (defining "specialized knowledge"). L-2 visas

3   are available for accompanying spouses and minor children. *Id.* § 1101(a)(15)(L).

4           **H Visa Category**. H-1B visas are issued to highly skilled workers "coming temporarily to

5   the United States to perform services … in a specialty occupation" (8 U.S.C.

6   § 1101(a)(15)(H)(i)(b)), which involves "application of a body of highly specialized knowledge"

7   and "attainment of a bachelor's or higher degree in the specific specialty" (*id.* § 1184(i)(1)). Be-

8   fore hiring an H-1B nonimmigrant, a company must attest, among other things, that the position

9   pays prevailing wages, that the position will not adversely impact other workers, and that the em-

10  ployer has provided certain forms of notice regarding the position. *Id.* § 1182(n)(1)(A)-(D). New

11  H-1B visas are capped at 65,000 per year with an additional 20,000 available to individuals with

12  an advanced degree from a U.S. higher-education institution.

13          H-2B visas are issued to noncitizens "coming temporarily to the United States to perform

14  [non-agricultural] temporary service or labor." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). An H-2B visa

15  may be issued only "if unemployed persons capable of performing [the needed] service or labor

16  cannot be found in this country." *Id.* H-2B visas are limited to 66,000 per year.

17          H-4 visas are available to "the alien spouse and minor children" of a noncitizen entering

18  under one of the other H visa categories. 8 U.S.C. § 1101(a)(15)(H); 8 C.F.R. § 214.1(a)(2).

19          **J Visa Category**. The J visa category—a mainstay of U.S. diplomatic efforts for dec-

20  ades—provides for cultural exchange visitors in a variety of programs. 8 U.S.C. § 1101(a)(15)(J).

21  Relevant here, J-1 programs include the summer work travel program (22 C.F.R. § 62.32); the au

22  pair program (*id.* § 62.31); and the trainee and intern programs (*id.* § 62.22). The J-2 visa is avail-

23  able to the spouse and children of an individual entering on a J-1 visa. 8 U.S.C. § 1101(a)(15)(J).

24          **B.      INA Section 212(f).**

25      INA Section 212(f) provides:

26          Whenever the President finds that the entry of any aliens or of any class of aliens
            into the United States would be detrimental to the interests of the United States, he
27          may by proclamation, and for such period as he shall deem necessary, suspend the
            entry of all aliens or any class of aliens as immigrants or nonimmigrants, or im-
28          pose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). INA Section 215(a) makes it unlawful "for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

**C.     The Proclamation.**

The Presidential Proclamation 10052, issued on June 22, 2020, asserts that "[t]he entry of additional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs . . . presents a significant threat to employment opportunities for Americans affected by the extraordinary economic disruptions caused by the COVID-19 outbreak." 85 Fed. Reg. 38,263, 38,264 (June 25, 2020) (Hughes Decl. Ex. 1). Subject to limited exceptions, Section 2 of the Proclamation bars "[t]he entry into the United States of any alien seeking entry pursuant to":

> (a)     an H-1B or H-2B visa, and any alien accompanying or following to join such alien;
>
> (b)     a J visa, to the extent the alien is participating in an intern, trainee, teacher, camp counselor, au pair, or summer work travel program, and any alien accompanying or following to join such alien; and
>
> (c)     an L visa, and any alien accompanying or following to join such alien.

*Id.* § 2. The Proclamation's entry ban "shall expire on December 31, 2020" but "may be continued as necessary." *Id.* § 6. In putative implementation of the Proclamation, the Department of State has announced that it will not issue visas in the impacted categories. Hughes Decl. Exs. 5-7. For its part, DHS similarly announced it would "temporarily pause the issuance of certain new nonimmigrant visas until December 31, 2020." Hughes Decl. Ex. 3.

The Proclamation's purpose is clear: It is intended to radically alter the U.S. labor market on a massive scale. Baselice Decl. ¶ 8. On June 22, 2020, the White House held a "background press call" during which a "senior administration official" stated that, taking the Proclamation together with an accompanying bar on immigrant visas, "the sum total of what these actions will do in terms of freeing up jobs over the course of the rest of 2020 is about 525,000 jobs. Quite a significant number." Hughes Decl. Ex. 2. The official described the purpose and effect of the policy as to "clear out this workspace for Americans." *Id.* The same day, DHS official Ken Cuccinelli stated on television that "just the temporary pieces of this . . . are over 500,000 job openings for Americans in the latter half of this year. That is a very big deal. Unprecedented level of effort

by a president to clear the American job market of competition like this." Hughes Decl. Ex. 4.

### D.     Plaintiffs and their members.

Plaintiff associations—the National Association of Manufacturers, the U.S. Chamber of Commerce, the National Retail Federation, and TechNet—represent hundreds of thousands of American businesses of all sizes and across all economic sectors. Baselice Decl. ¶ 2; Hall Decl. ¶¶ 2, 4, 7. Plaintiff Intrax is one of the Nation's leading operators of State Department regulated cultural exchange programs. The Proclamation's unprecedented reconfiguration of the U.S. labor market immediately and irreparably harms Plaintiffs and their respective members.

## ARGUMENT

"On a motion for a preliminary injunction, plaintiffs must make a 'threshold showing' … that (1) they are likely to succeed on the merits, (2) they are likely to 'suffer irreparable harm' without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020) (citations omitted).

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The Proclamation is beyond the President's lawful authority.

Plaintiffs are likely to succeed on their claim that the Proclamation and its implementation exceeds the authority conferred on the President by Section 212(f).

At the outset, there is no doubt that, when the President acts with respect to foreign affairs and national security, his authority pursuant to Section 212(f) is broad. In *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (*Hawaii III*),[1] the Court observed that Section 212(f) "exudes deference to the President." *See id.* at 2415 (noting "the President's flexible authority [under Section 212(f)] to suspend entry based on *foreign policy* interests.") (emphasis added). More recently, however,

---

[1]   A brief recap of the *Hawaii* litigation: In *Hawaii I*, the Ninth Circuit affirmed a preliminary injunction against an executive order imposing a version of the President's so-called travel ban. *See Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (*Hawaii I*). That opinion was vacated as moot by the Supreme Court after the executive order in question "expired by [its] own terms." *Trump v. Hawaii*, 138 S. Ct. 377 (2017). The President then issued a presidential proclamation with similar provisions; the Ninth Circuit in *Hawaii II* largely affirmed a preliminary injunction against the enforcement of that proclamation. *See Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017) (*Hawaii II*). That decision was reversed by the Supreme Court on its merits—although as discussed below, the Court did not disagree with several of the premises underlying the Ninth Circuit's analysis, many of which are applicable here. *See Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (*Hawaii III*).

1     the Ninth Circuit held that the calculus changes when the President purports to exercise this au-

2     thority to accomplish domestic policy. While *Hawaii III* considered the president's Section 212(f)

3     authority in "the context of international affairs and national security," "his power is more cir-

4     cumscribed when he addresses a purely domestic economic issue." *Doe #1 v. Trump*, 957 F.3d

5     1050, 1067 (9th Cir. 2020). Thus, "in domestic economic matters, the national security and for-

6     eign affairs justifications for policy implementations disappear, and the normal policy-making

7     channels remain the default rules of the game." *Id*.

8         Indeed, a straightforward reading of Section 212(f)—which requires the President to act in

9     "the interests of the United States" (8 U.S.C. § 1182(f))—demonstrates that this power is tied,

10    inherently, to foreign relations and national security. That operative phrase is a term of art refer-

11    encing (in the context of immigration) the external-facing, national-security and foreign-affairs

12    interests of "the United States" as an international actor, rather than the more general "public in-

13    terest."[2] Section 212(f) "does not provide the President with limitless power to deny visas to im-

14    migrants based on purely long-term economic concerns" or "purely domestic economic prob-

15    lem[s]." *Doe #1*, 957 F.3d at 1065, 1067.

16        Even if the President may employ Section 212(f) authority to achieve a domestic end, the

17    deference due in that context is substantially lessened—and it markedly distinguishes this case

18    from *Hawaii III*. As we will show, the Proclamation transgresses the limits of Section 212(f)

19    power for several reasons.

20        Defendants therefore may not lawfully implement the Proclamation's provisions, because

21    there is no other source of authority that could authorize them to suspend the operation of the

22    INA's visa provisions and impose an entry ban. *See, e.g.*, *City of L.A. v. Barr*, 941 F.3d 931, 938

23    _____

24    [2]    This interpretation is confirmed by unbroken executive practice. As a group of over thirty
      immigration-law scholars explained in an *amicus* brief before the Ninth Circuit, "[i]n every case
25    out of the over forty proclamations and executive orders issued under § 1182(f) or related statuto-
      ry authority, presidential action has shown a specific nexus with the conduct of foreign govern-
26    ments." Br. of Immigration Law Professors 7, *Doe #1 v. Trump*, No. 19-36020 (Feb. 6, 2020),
      Dkt. 40; *see also id.* ("[E]very single example the [Supreme] Court cited [in *Hawaii III*] con-
27    cerned foreign policy—because no counterexamples exist."); *id.* at 20-36 (comprehensive chart of
      Section 212(f) entry suspensions; "[n]one address a purely domestic issue."). Because domestic
28    unemployment is not such a "foreign policy interest[]" (*Hawaii III*, 138 S. Ct. at 2415), the Proc-
      lamation exceeds the scope of Section 212(f).

1    (9th Cir. 2019) ("When an agency is charged with administering a congressional statute, 'both its

2    power to act and how it is to act are authoritatively prescribed by Congress.' An agency 'literally

3    has no power to act . . . unless and until Congress confers power upon it.'") (quoting *City of Ar-*

4    *lington v. FCC*, 569 U.S. 290, 297 (2013); and *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374

5    (1986)) (alterations incorporated).[3] And it is established that "the officers who attempt to enforce

6    the President's directive" may be "enjoin[ed]." *Hawaii II*, 878 F.3d at 680 (quoting *Franklin v.*

7    *Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring)).

8                     **1.    The Proclamation unlawfully eviscerates vast portions of the INA.**

9            First, the Proclamation nullifies significant swaths of the INA, declaring statutorily estab-

10   lished visa categories invalid for the remainder of the year. Section 212(f) may provide the Presi-

11   dent broad authority, but it does not allow him to "nullify[] Congress's considered judgments on

12   matters of immigration." *Hawaii II*, 878 F.3d at 685; *see also id.* ("[T]he Executive may not exer-

13   cise [its Section 212(f)] power in a manner that conflicts with the INA[].''). While the Supreme

14   Court ultimately held that the proclamation in *Hawaii* did not conflict, it acknowledged the

15   "premise" that Section 212(f) "does not give the President authority to countermand Congress's

16   considered policy judgments." *Hawaii III*, 138 S. Ct. at 2410-2411 ("We may assume that

17   § 1182(f) does not allow the President to expressly override particular provisions of the INA.").

18          That is just what the Proclamation attempts here. The INA, and in particular the provi-

19   sions governing the work-related visas, sets out a "finely reticulated regulatory scheme governing

20   the admission of foreign nationals." *Hawaii II*, 878 F.3d at 685; *cf. Arizona v. United States*, 567

21   U.S. 387, 395 (2012) ("Federal governance of immigration and alien status is extensive and com-

22   plex"). The statute provides in great detail which noncitizens may enter the country, for what pur-

23   poses, and under what circumstances. The Proclamation takes a sledgehammer to that carefully

24   crafted system, declaring by executive fiat that four entire visa categories are no longer operative.

25   _____

26   [3]   *See also Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("The Supreme Court has
     'long held that federal courts may in some circumstances grant injunctive relief against' federal
27   officials violating federal law.") (quoting *Armstrong v. Exceptional Child Ctr.*, 135 S. Ct. 1378,
     1384 (2015)); *E.V. v. Robinson*, 906 F.3d 1082, 1090-1091 (9th Cir. 2018) (acknowledging free-
28   standing cause of action for "suits alleging that a federal official acted ultra vires of statutorily
     delegated authority").

A comparison to the Supreme Court's decision in *Hawaii III* is instructive here. The presidential proclamation at issue in *Hawaii III* barred entry to nationals of a list of enumerated countries, on the basis that those countries provided insufficient information to the United States for the proper vetting of their citizens, harming national security. *Hawaii III*, 138 S. Ct. at 2404-2405. The Supreme Court upheld that proclamation against a challenge that it conflicted with the INA, essentially because that proclamation was additive in nature: it did not actually "*conflict*" with any existing INA provisions; rather, it "impose[d] *additional* limitations on entry beyond the grounds for exclusion set forth in the INA." *Id.* at 2411-2412 (emphases added).

This Proclamation is quite different. Rather than simply "supplement[ing]" the INA's existing national-security provisions (*Hawaii III*, 138 S. Ct. at 2412), it would wipe whole categories of legislatively created visas from the statute books. Until the end of the year, the Proclamation announces, there simply *is no more* H-1B visa—and no H-2B, L-1, or J-1 visas either—and the statutes creating those visas are without effect. Such an attempt to nakedly "nullify[] Congress's considered judgments on matters of immigration," as embodied in the INA, is not within the power conferred by Section 212(f). *Hawaii II*, 878 F.3d at 685; *see also Doe #1*, 957 F.3d at 1067 (rejecting reliance on Section 212(f) due to "serious questions as to whether the President has effectively rewritten provisions of the INA").

That alone is enough to render the Proclamation *ultra vires*. But even more strikingly, the particular visa provisions that the Proclamation "effectively rewrit[es]" (*Doe #1*, 957 F.3d at 1067) already strike a conscious balance—fine-tuned over decades of statutory amendments—between the very interests at stake here: American businesses' need for skilled, specialized, and temporary workers, on the one hand; and protections for domestic workers on the other. By purporting to strike a different balance than that enacted into law by Congress, the Proclamation further exceeds the President's power under Section 212(f).

Perhaps most obviously, the H-2B visa category is already subject to an incredibly stringent protection for domestic workers: By statute, the visa may only be issued "if unemployed persons capable of performing [the needed temporary] service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *see also* 8 C.F.R. § 214.2(h)(6)(iv)(A).

1    That assurance is achieved through a robust labor certification process overseen by the

2    Department of Labor, under which an employer with a temporary job opening must provide a job

3    order to the relevant State Workforce Agencies for posting and recruitment of domestic workers

4    (20 C.F.R. § 655.16); contact former workers and "solicit their return to the job" (*id.* § 655.43);

5    provide notice of the opening to any relevant union or post the opening at the job site or online

6    (*id.* § 655.45); and conduct any other domestic recruitment deemed necessary by the Department

7    of Labor personnel reviewing the application (*id.* § 655.46). Only if these (and other) steps are

8    taken without filling the position will the Department of Labor "certify . . . that there is an insuffi-

9    cient number of U.S. workers who are qualified and who will be available for the job opportuni-

10   ty" (*id.* § 655.50(b))—and even after certification, the employer has a "[c]ontinuing requirement"

11   to "provide employment to any qualified U.S. worker who applies" (*id.* § 655.20(t)). Existing law

12   thus guarantees that the issuance of an H-2B visa will not disadvantage American workers[4]—yet

13   the Proclamation writes the entire visa category out of the INA anyway.

14   Congress also struck a conscious balance between the needs of American business and

15   American labor with the H-1B visa, which is available to skilled foreign workers in "specialty

16   occupation[s]." 8 U.S.C. § 1101(a)(15)(H)(i)(b). Recognizing the struggles of American compa-

17   nies to fill all their skilled specialty positions with domestic workers, Congress tailored the labor

18   protections for H-1B visas slightly differently than for unskilled H-2B workers. For example, all

19   sponsoring employers must attest that wages paid to H-1B workers will not undercut wages paid

20   to U.S. workers; that H-1B employees' working conditions will not adversely affect those of U.S.

21   workers; and that the employer has provided notice of its plan to hire H-1B employees to any rel-

22   evant domestic union representative, or otherwise posted conspicuous notice. *Id.* § 1182(n)(1)(A)-

23   (C). A subset of employers—those with a history of willful certification violations, and those with

24   a large percentage of workers already on H-1B visas—must make additional certifications, in-

25   cluding that the company has tried and failed to fill the position with a domestic worker. *Id.*

26   § 1182(n)(1)(E), (n)(1)(G), (n)(3)(A).[5]

27   _____

[4]   H-2B visas are also capped at 66,000 per year. *See* 8 U.S.C. § 1184(g)(1)(B).

28   [5]   The H visa category dates to the INA of 1952, and the current H-1B statute was enacted in

The availability of H-1B visas—and the associated labor protections—have been further titrated over the decades since 1990. The Senate Report accompanying a 2000 law that temporarily raised the numerical caps on H-1B visas identified Congress's policy judgment:

> Many of the concerns about H-1B visas revolve around the fear that individuals entering on H-1B visas will 'take' a job from an American worker. This fear arises from the premise that there is a fixed number of jobs for which competition is a zero-sum game. But this premise is plainly flawed[.]

S. Rep. 106-260, at 12 (Apr. 11, 2000); *see also id.* (noting the "general principle that labor markets have demonstrated time and time again: additional people entering the labor force, whether native-born students out of school, immigrants, or nonimmigrants, expand job opportunities and create other jobs through innovation, entrepreneurship, and money spent on consumer items"). Congress has continued to refine H-1B conditions since, including through legislation that adjusted the number of visas available by adding a set-aside for individuals completing U.S. graduate degrees; and otherwise calibrated the program to meet the needs of the domestic economy. *See* H-1B Visa Reform Act of 2004, Pub. L. 108-447, Div. J, Subtitle B, 118 Stat. 3353. Indeed, the annual cap, revised over the years, is clear congressional judgment on the scope of the H-1B program, and its interrelation with domestic labor.

This "finely reticulated regulatory scheme" (*Hawaii II*, 878 F.3d at 685)—arrived at through decades of intentional balancing by Congress—reflects a final legislative judgment that the entry of international workers is in the national interest when they arrive under the terms and conditions set by the statute. Unlike the proclamation upheld in *Hawaii*, the Proclamation here goes far beyond "supplement[ing]" that legislative judgment; rather, it "supplant[s] it," refusing admission to entire classes of people that Congress has affirmatively said should be admitted. *Hawaii III*, 138 S. Ct. at 2410. And this overruling of Congress was based not on some national

---

roughly its current form in 1990. That law was explicitly aimed at addressing "the need of American business for highly skilled, specially trained personnel to fill increasingly sophisticated jobs for which domestic personnel cannot be found." H.R. Rep. 101-723, pt. 1, at 41 (1990). As such, the statutory scheme was immediately recognized by the government as the result of an intentional balancing of interests: "The Department believes that the broad intent of the Act is clear. . . . [It] seeks to make the immigration system more efficient and responsive to the needs of employers experiencing labor shortages, while at the same time providing greater safeguards and protections for both U.S. and alien workers." *Alien Temporary Employment Labor Certification Process*, 56 Fed. Reg. 11,705, 11,706-11,707 (Mar. 20, 1991).

PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO. 4:20-CV-4887-JSW)

security threat or interstitial rulemaking—it is not simply an "additional limitation[] on entry be-yond the grounds for exclusion set forth in the INA" (*id.* at 2412)—but on an executive rebalanc-ing of the precise domestic policy factors Congress already considered and enacted into law. *Ha-waii III* lends no support for the Proclamation's evisceration of careful congressional judgment.

Congress's chosen approach to labor protections for L-1 visas, used for intra-company transfers, reflects the same kind of purposeful balancing. In creating the category in 1970, Con-gress acted "to meet the objective of American industry which has been seriously hampered in transferring personnel"; the House Report observed that "[s]uch intracompany transfers have con-tributed immeasurably to the growth of American enterprise throughout the world and to the in-ternational trade of the United States." H.R. Rep. 91-851, at 5-6 (1970). In recognition that L-1 employees possess irreplaceable experience—L-1 nonimmigrants have at least a year of compa-ny-specific experience by definition (*see* 8 U.S.C. § 1101(a)(15)(L))—the L-1 category does not require the same labor certifications as H-1B or H-2B. But Congress has nonetheless been vigi-lant in responding to perceived abuses of the L-1 visa; in 2004, Congress prohibited the use of L-1 visas in so-called work-for-hire arrangements, in which companies would bring workers to the country on L visas and then hire them out to other domestic employers. L-1 Visa Reform Act of 2004, Pub. L. 108-447, Div. J, Subtitle A, 118 Stat. 3351-3353; *see* 8 U.S.C. § 1184(c)(2)(F).[6]

In all, Congress enacted specific labor-market protections for each of the tailored visa cat-egories at issue and fine-tuned those statutory protections over time, making unmistakably clear the legislative judgment about the circumstances under which the Nation should admit foreign workers. These are precisely the sorts of "considered judgments" that the President may not simp-ly discard under Section 212(f) because he would balance the relevant interests differently. *Ha-waii II*, 878 F.3d at 685; *see also Doe #1*, 957 F.3d at 1067. Because it purports to "rewrit[e]" (*id.*) and "nullify[]" (*Hawaii II*, 878 F.3d at 685) those statutory enactments, the Proclamation is

---

[6]   Congress has been similarly attentive to perceived abuses of J visas, responding to criticism that the au pair program was primarily a source of labor (rather than cultural exchange) by explic-itly reaffirming the program. *See* Eisenhower Exchange Fellowship Act of 1990, Pub. L. 101-454 § 8, 104 Stat. 1063, 1065.

1  beyond the President's Section 212(f) authority. This court should therefore enjoin Defendants

2  from carrying it out. *Sierra Club*, 929 F.3d at 694.

3        **2.   The Proclamation lacks a reasonable relationship to its stated goals.**

4       The Proclamation is also exceeds the authority conferred in Section 212(f) because it does

5  not comport with the one procedural prerequisite contained in that section: a presidential

6  "find[ing]" that "the entry of" the excluded class of noncitizens "would be detrimental to the in-

7  terests of the United States." 8 U.S.C. § 1182(f).

8       Section 212(f)'s finding requirement calls for more than just the President's *ipse dixit*. Ra-

9  ther, as the Ninth Circuit has explained, the statutory language "requires that the President's find-

10  ings *support* the conclusion" that the admission of the excluded noncitizens "would be harmful to

11  the national interest." *Hawaii I*, 859 F.3d at 770 (emphasis added); *see also Hawaii II*, 878 F.3d at

12  692-693. Although the Supreme Court cast some doubt on this standard in the foreign-affairs con-

13  text at issue in *Hawaii III* (138 S. Ct. at 2409), the Ninth Circuit subsequently made clear that

14  more searching review of the President's findings *is* warranted when he uses his Section 212(f)

15  power to solve a *domestic* problem: "[W]hile the 'President may adopt a preventive measure in

16  the context of international affairs and national security,' and he is then 'not required to conclu-

17  sively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions,'

18  his power is more circumscribed when he addresses a purely domestic economic issue." *Doe #1*,

19  957 F.3d at 1067 (quoting *Hawaii III*, 138 S. Ct. at 2409) (citations omitted; alterations incorpo-

20  rated); *see also id.* ("We reject the government's argument that the Proclamation implicates the

21  President's foreign affairs powers simply because the Proclamation affects immigrants.").

22       It is thus the law of this Circuit that Section 212(f) requires "'find[ings]' that support the

23  conclusion that admission of the excluded aliens would be 'detrimental,'" and that courts are

24  competent to adjudicate whether the President's findings satisfy that requirement. *Hawaii II*, 878

25  F.3d at 693 (quoting 8 U.S.C. § 1182(f)); *see also Doe #1*, 957 F.3d at 1066-1067.[7]

26  _____

27  [7]   That is also the natural reading of Section 212(f)'s text. Congress has required that the Presi-
dent "find" that entry would be detrimental, a common-law term invoking the weighing of evi-

28  dence by a factfinder. *See* Finding of Fact, *Black's Law Dictionary* (11th ed. 2019) ("A determi-
nation by a judge, jury, or administrative agency of a fact supported by the evidence in the rec-

The Proclamation flunks that test. That is because there is no reasonable relationship be-tween the problem identified and the action taken.

*First*, because there is a significant mismatch between the unemployment caused by the COVID-19 pandemic and the classes of noncitizens barred by the Proclamation, its "find[ings]" do not "support the conclusion that admission of the excluded aliens would be 'detrimental.'" *Hawaii II*, 878 F.3d at 693. Pandemic-related unemployment is concentrated in service occupa-tions; by contrast, an analysis of the federal government's unemployment statistics reveals that unemployment in "computer occupations" has remained low, and actually *decreased* from 3.0% in January 2020 to 2.8% in April 2020, and 2.5% in May 2020.[8] That rate is actually lower than what the Federal Reserve believes to be the lowest unemployment rate the economy can sustain.[9] And during the 30 days ending June 9, 2020, there were over 630,000 active job vacancy postings advertised online for jobs in common computer occupations, indicating that overall demand for high-skilled workers in these occupations still exceeds the domestic supply.[10]

These computer-related jobs, with low unemployment and great demand, are precisely the ones that H-1B workers seek to fill: 66% of approved H-1B visa petitions are for jobs in "com-puter-related occupations," according to DHS data.[11] This information was also presented to the

---

ord."). And "[i]t is a settled principle of interpretation that, absent other indication, Congress in-tends to incorporate the well-settled meaning of the common-law terms it uses." *United States v. Castleman*, 572 U.S. 157, 162 (2014). Moreover, the fact that Congress chose to employ more deferential phrasing elsewhere in the same section—permitting a suspension to last "for such pe-riod as [the President] shall *deem* necessary" (8 U.S.C. § 1182(f) (emphasis added))—"demonstrates that Congress intended to convey a different meaning for those words." *Tin Cup LLC v. U.S. Army Corps of Eng'rs*, 904 F.3d 1068, 1074 (9th Cir. 2018); *see* Deem, *Black's Law Dictionary* (11th ed. 2019) ("To consider, think, or judge."). Indeed, the legislative history con-firms as much. *See Hawaii II*, 878 F.3d at 692-693 ("The use of the word 'find' was deliberate. Congress used 'find' rather than 'deem' in the immediate predecessor to § 1182(f) so that the President would be required to 'base his [decision] on some fact,' not on mere 'opinion' or 'guesses.'") (quoting 87 Cong. Rec. 5051 (1941)).

[8]  Hughes Decl. Ex. 31, Nat'l Foundation for American Policy 1, *Updated Analysis of Employ-ment Data for Computer Occupations* (June 2020), perma.cc/P7JB-NFBQ.

[9]  Hughes Decl. Ex. 10. Bd. of Governors of the Federal Reserve System, *What is the lowest level of unemployment that the U.S. economy can sustain?* (June 10, 2020), perma.cc/R79F-QVFE; *see also id.* ("Even in good times, a healthy, dynamic economy will have at least some unemployment as workers switch jobs, and as new workers enter the labor market and other workers leave it.").

[10]  Hughes Decl. Ex. 31, Nat'l Foundation for American Policy, *supra*.

[11]  Hughes Decl. Ex. 14, at ii.

Administration—but the Proclamation failed to consider it. Corley Decl. ¶ 5 & Ex. 1. Instead, the Proclamation cites statistics regarding unemployment in (unnamed) "*industries*" in which employers are currently seeking (an unspecified number of) work-related visas. *See* Proclamation, preamble. But unemployment in an "industr[y]" is not probative of whether there are qualified workers available to fill open *positions*—a retailer, for example, cannot hire unemployed retail clerks to work in its IT department as software engineers.

Yet more strange, the Proclamation bars the entry of categories of noncitizens who are already prevented, by statute, from competing for jobs with United States workers. H-2B visas *already* may be issued only "if unemployed persons capable of performing [the needed] service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). As discussed above, this prohibition is implemented through an extensive labor certification process that culminates in a visa only if the Department of Labor makes an affirmative finding, based on the specifics of a particular employer's application, that "there is an insufficient number of U.S. workers who are qualified and who will be available for the job opportunity" 20 C.F.R. § 655.50.[12] The Proclamation has the remarkable effect of barring temporary seasonal labor *even when* an employer is unable to fill open positions during the COVID-19 pandemic. *See* Leman Decl. ¶ 9; O'Gorman Decl. ¶ 12. Existing law thus guarantees that H-2B workers will not "pose[] a risk of displacing and disadvantaging United States workers during the current recovery" (Proclamation, preamble)— meaning that the Proclamation's "find[ings]" do not actually "support the conclusion that admission of the excluded aliens would be 'detrimental.'" *Hawaii II*, 878 F.3d at 693.

The same is true for the dependents of H-1B and H-2B workers, who enter the country on H-4 visas. *Cf.* Proclamation § 2(a). With one cabined exception (*see* 8 C.F.R. § 214.2(h)(9)(iv)), such dependents are not authorized to work in the United States in the first place. *Id.* § 274a.12. These dependents, too, are prevented by existing law from competing with domestic workers for jobs, and their entry similarly cannot be "detrimental to the interests of the United States" (8

---

[12] Even after the Department of Labor issues the certification, the employer is subject to a "[c]ontinuing requirement" to "provide employment to any qualified U.S. worker who applies to the employer for the job opportunity" in preference to H-2B workers. 20 C.F.R. § 655.20(t).

1    U.S.C. § 1182(f)) for the reasons stated in the Proclamation.[13]

2        **Second**, the Proclamation fails to support the conclusion reached because it declined to

3    address substantial evidence relevant to the problem at issue. Again, not only was the data availa-

4    ble to the Administration, but was actively presented to decisionmakers by a coalition of compa-

5    nies and business groups in the run-up to the Proclamation. *See* Corley Decl. ¶ 5 & Ex. 1.

6        That is, the Proclamation utterly disregards the clear economic consensus that the pres-

7    ence of international workers in this country boosts productivity and innovation, and has the net

8    result of *creating* jobs for domestic workers. An exhaustive 2015 empirical study of state-level

9    employment data conducted by the American Enterprise Institute and the Partnership for a New

10    American Economy found that, "[o]verall, when looking at the effect of all immigrants on em-

11    ployment among US natives, *there is no evidence that immigrants take jobs from US-born work-*

12    *ers.*"[14] To the contrary, "[t]he results give clear evidence that both the H-1B and H-2B programs

13    for temporary workers correspond to *greater* job opportunities for US-born workers."[15] In short,

14    foreign workers tend to complement native workers, not compete with them.[16]

15        **Third**, the Proclamation abruptly changes the immigration policy of the United States

16    without any apparent consideration of the impact on American firms and their business planning.

17    *See* Chen Decl. ¶¶ 6, 14-19 (describing but a few examples of interests upset by the Proclama-

18

19    [13]   The State Department recently issued guidance asserting that certain dependents may apply
20    for discretionary national interest exceptions. *See* Compl. ¶ 141. Agency guidance—at odds with
the Proclamation's text, and issued a month later—cannot render the Proclamation itself lawful.
What is more, even if dependents were categorically eligible for exceptions, that would be all the
21    more proof that the Proclamation—which includes them facially—is overbroad.
[14]   Hughes Decl. Ex. 29, Madeline Zavodny, *Immigration and American Jobs* 11 (2011).
22    [15]   *Id.* Indeed, "[a]dding 100 H-1B workers results in an additional 183 jobs among US natives,"
and "[a]dding 100 H-2B workers results in an additional 464 jobs for US natives." *Id.* at 4.
23    [16]   This is not a controversial point among economists. A literature review conducted the Nation-
24    al Academies of Sciences, Engineering, and Medicine—authored by nearly 40 economists from
across the political spectrum—highlighted "several studies [that have] found a positive impact of
25    skilled immigration on the wages and employment of both college-educated and noncollege-
educated natives . . . consistent with the view that skilled immigrants are often complementary to
26    native-born workers." Hughes Decl. Ex. 32, National Academies of Sciences, Engineering, and
Medicine, *The Economic and Fiscal Consequences of Immigration, The National Academies*
27    *Press* 6 (2017), perma.cc/JU7U-LVJ2. The panel concluded that "immigration is integral to the
nation's economic growth," and that "[t]he prospects for long-run economic growth in the United
States would be considerably dimmed without the contributions of high-skilled immigrants." *Id.*
28    at 6-7. Many other analyses tell the same story. *See* Hughes Decl. Exs. 18-33.

**PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION (NO. 4:20-CV-4887-JSW)**

tion); Brown Decl. ¶ 14 ("Like other Fortune 100 companies, Amazon builds its business plans around short-term and long-term goals. Many L-1 transfers from overseas operations were planned prior to the COVID-19 pandemic, and the transferees were expected to help implement Amazon's operational growth plans."); Bell Decl. ¶ 9. Consideration of reliance interests is a fundamental requirement of reasoned decisionmaking when a policy is reversed.[17]

In the end, the Proclamation fails to offer a reasonable connection between the executive action in question and the policy interest it purports to serve. It is therefore insufficient under Section 212(f). *Hawaii II*, 878 F.3d at 693; *Doe #1*, 957 F.3d at 1066-1067.

### 3.    The nondelegation doctrine requires a reading of Section 212(f) that imposes meaningful limitations on the President's authority.

These limitations on the scope of Section 212(f) authority render it a lawful delegation of authority from Congress to the President. It is a basic principle that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Institute*, 448 U.S. 607, 646 (1980) ("If the Government was correct [about the scope of a provision], the statute would make such a sweeping delegation of legislative power that it might be unconstitutional. . . . A construction of the statute that avoids this kind of open-ended grant should certainly be favored.").

If the Court concludes that we are wrong about the scope of the President's power under Section 212(f), though—that is, if the statute actually *does* empower the President to simply delete entire sections of the INA with the stroke of a pen, or to act based on findings that do not reasonably support the proposed action, or to suspend entry to achieve domestic economic policy goals—then the Court would have to confront the serious constitutional question whether Section 212(f) amounts to an unconstitutional delegation of power to the executive branch.

---

[17]    That rule is an application of the general principle that "reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015); *see Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("[R]easoned decisionmaking requires assessing whether a proposed action would do more good than harm."). But the Proclamation considers neither.

"The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019) (plurality op. of Kagan, J.). As the law now stands, "a statutory delegation is constitutional as long as Congress 'lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform.'" *Id.* at 2123 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (alterations incorporated)); *see also id.* at 2129 ("[I]n a related formulation, the Court has stated that a delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of his authority'") (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)) (alteration incorporated).

If, contrary to our position, the President can invoke Section 212(f) for *any* conceivable policy end, then nothing in the statute supplies a limit to executive authority. Under that reading of Section 212(f), Congress has neither "made clear" any "general policy [the President] must pursue" nor set any "boundaries" on his "authority" (*Gundy*, 139 S. Ct. at 2129 (quoting *Am. Power & Light*, 329 U.S. at 105))—or, in other words, Congress would not have set out an "intelligible principle" to which the President "is directed to conform" (*id.* at 2123 (quoting *Mistretta*, 488 U.S. at 372)). If Section 212(f) authority is limitless, "[t]his is delegation running riot." *A.L.A. Schechter Poultry v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring).

Thus, another court in this Circuit recently held that, if Section 212(f) authorizes the President to engage in domestic policymaking, then, "[i]n this wholly domestic context, the delegation by Congress is without any intelligible principle and thus fails under the nondelegation doctrine." *Doe v. Trump*, 418 F. Supp. 3d 573, 592 (D. Or. 2019).

As we described above, Section 212(f) authority is most broad when invoked to advance foreign relations and national security interests. It does not provide the President limitless authority to make *domestic* policy judgments, it certainly does not permit the President to nullify statutes reflecting *congressional* determinations (including the decision to allow immigration for certain temporary work), and it does not license the President to rest on putative findings where the action taken bears no reasonable relationship to the problem addressed. Identifying these limits appropriately avoids the underlying and serious constitutional question.

1

### 4.   There is no alternative authority for the Proclamation.

The President has no alternative authority, apart from Section 212(f), that could inde-
pendently authorize the Proclamation. Although the Proclamation cites Section 215(a) of the INA
(8 U.S.C. § 1185(a)), the Ninth Circuit has rejected that provision as an independent source of
authority for actions beyond the scope of Section 212(f): "[T]he Government cannot justify the
Proclamation under § 1182(f) by using § 1185(a) as a backdoor." *Hawaii II*, 878 F.3d at 694; *cf.*
*Hawaii III*, 138 S. Ct. at 2407 n.1 ("Because [Section 215(a)] 'substantially overlap[s]' with [Sec-
tion 212(f)], . . . we need not resolve the precise relationship between the two."). And even if—
contrary to the Ninth Circuit—it could be viewed as providing the President authority, all the lim-
itations on Section 212(f) we have identified would apply, too. *See* pages 6-10, *supra*.

Nor is the Proclamation a proper exercise of any constitutional authority of the President.
As the Ninth Circuit held in *Hawaii II*, "the President lacks independent constitutional authority
to issue the Proclamation, as control over the entry of aliens is a power within the exclusive prov-
ince of Congress." *Hawaii II*, 878 F.3d at 697.[18] Indeed, "[p]olicies pertaining to the entry of al-
iens and their right to remain here are . . . entrusted exclusively to Congress." *Galvan v. Press*,
347 U.S. 522, 531 (1954).[19] As the Supreme Court long ago established, under our constitutional
system, "[t]he power to exclude or to expel aliens . . . is to be regulated by treaty or by act of con-
gress." *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893). The President's role is limited
to "execut[ing]" that power "according to the regulations so established" (*id.*)—that is, he has no
independent power to legislate general rules of exclusion in the first instance, and he certainly
may not do so in a manner that contradicts duly enacted statutes. *See* pages 4-6, *supra*.

### B.   For the same reasons, the implementation of the Proclamation is invalid un-
der the APA.

For these same reasons, Plaintiffs are likely to demonstrate that the Defendants' imple-

---

[18]   Because it ruled on other grounds, the Supreme Court had no occasion in *Hawaii III* to ad-
dress this holding.

[19]   *See also INS v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over
aliens under Art. I, § 8, cl. 4 is not open to question."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)
("This Court has repeatedly emphasized that over no conceivable subject is the legislative power
of Congress more complete than it is over the admission of aliens.") (quotation marks omitted).

1   mentation of the Proclamation violates the APA, as it is "arbitrary, capricious," and "not in ac-

2   cordance with law." 5 U.S.C. § 706.

3       While presidential action is ordinarily not "agency action" reviewable under the APA

4   (*Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)), that rule "is limited to those cases in

5   which the President has final constitutional or statutory responsibility for the final step necessary

6   for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549,

7   552 (D.C. Cir. 1993). The Ninth Circuit in *Hawaii* thus heard an APA challenge against a Section

8   212(f) proclamation that was implemented by agency officials, and the Supreme Court did not

9   disagree. *Hawaii II*, 878 F.3d at 680-681; *see also East Bay Sanctuary Covenant v. Trump*, 950

10  F.3d 1242, 1271 (9th Cir. 2020) (the "operative rule of decision" established by Section 212(f)

11  proclamation and agency's implementing actions "is reviewable by this court" under the APA).[20]

12      Thus, the same failings identified above—that the Proclamation is not authorized by Sec-

13  tion 212(f); that it disregards critical evidence and is not reasonably related to the unemployment

14  caused by COVID-19; and that it fails to account for reliance interests—are independently action-

15  able under the APA. The Court should therefore stay implementation of the Proclamation by De-

16  fendants under the APA as well. 5 U.S.C. § 705; *Dep't of Commerce v. New York*, 139 S. Ct.

17  2551, 2584 (2019); *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

18          **C.    Defendants' moratorium on visa processing and issuance is unlawful, wholly
19                 apart from the Proclamation's own failings.**

20      Plaintiffs are also likely to succeed in demonstrating that, apart from the validity of the

21  Proclamation itself, related steps Defendants have taken are *ultra vires* and also violate the APA.

22      Putatively relying on the Proclamation, the State Department has announced that it "will

23  not be issuing H-1B, H-2B, L, or certain J visas, and their derivatives through December 31,

24  2020, unless an exception applies." Hughes Decl. Ex. 5. DHS similarly announced that the Proc-

25  lamation "directs the Department of Homeland Security . . . to temporarily pause the issuance of

26  ────────────────────

27  [20]  Plaintiffs' interests also easily "fall within the zone of interests protected by" the INA.
    *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). American em-
28  ployers seeking to sponsor noncitizens for explicitly work-based visas are undoubtedly within the
    zone of interests that those work-based visa statutes are intended to protect.

certain new nonimmigrant visas until December 31, 2020," along with its intention to "begin im-plementing" that instruction. Hughes Decl. Ex. 3. Defendants have thus stopped the processing and issuance of visas and related paperwork for the affected visa categories. That is unlawful.

The Proclamation does not provide Defendants legal authority to adopt the policy of not processing visa applications or petitions. To the contrary, it "suspend[s]" "[t]he *entry* into the United States of any alien seeking entry pursuant to any of the [affected] nonimmigrant visas." Proclamation § 2 (emphasis added). Likewise, Section 212(f) does not speak to visa issuance at all—only to entry. Entry is distinct from issuance of a visa. *E.g.*, 8 U.S.C. § 1101(a)(13), (26).[21]

The Proclamation goes on to instruct the Secretary of State and the Secretary of Homeland Security to "implement this proclamation." Proclamation § 4(a). But a direction to "implement" a ban on the "entry" of noncitizens does not even purport to authorize Defendants to rescind the statutory authority of consular officers to "issue . . . to a nonimmigrant who has made proper ap-plication therefor, a nonimmigrant visa." 8 U.S.C. § 1201(a)(1)(B). Nor does it excuse consular officers from their nondiscretionary *duty* under the regulations to adjudicate visa applications by either issuing or refusing the visa. *See* 22 C.F.R. § 41.121(a) ("When a visa application has been properly completed and executed in accordance with the provisions of the INA and the imple-menting regulations, the consular officer *must* issue the visa, refuse the visa, or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.") (emphasis added).[22]

Defendants' policy of refusing to process applications and petitions for visas is therefore beyond their lawful authority. It should therefore be stayed under the APA (5 U.S.C. § 705) and enjoined as *ultra vires*, regardless of the lawfulness of the Proclamation itself.

That is, since the Proclamation does not—indeed, could not—order Defendants to stop processing visa applications, the only means through which Defendants could institute such a

---

[21]   Prior to 1996, "entry" was a defined term in the INA. *See* Pub. L. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952). In 1996, Congress substituted the concept of "admission" for "entry" in the INA's definition section (*see* Pub. L. 104-208, § 301(a), 110 Stat. 3009, 3009-575), but many INA provisions still speak of entry.

[22]   Nor *could* the Proclamation have directed the Departments of State and Homeland Security to stop processing visa applications and related paperwork—because Section 212(f) itself only au-thorizes the President to "suspend the *entry*" of specified noncitizens, not to cease processing visa applications according to applicable laws and regulations.

1    non-adjudication policy is notice-and-comment rulemaking: Whatever the government might call

2    it, agency action "that effectively amends a prior legislative rule is legislative and must be prom-

3    ulgated under notice and comment rulemaking." *Erringer v. Thompson*, 371 F.3d 625, 632 (9th

4    Cir. 2004). And by directing consular officers not to adjudicate visa applications, Defendants'

5    actions here "effectively amend[]" the State Department regulation mandating that consular offic-

6    ers "*must* issue the visa [or] refuse the visa" when an application "has been properly completed

7    and executed." 22 C.F.R. § 41.121(a) (emphasis added).[23] For this reason, as well, Defendants'

8    moratorium on processing visas is unlawful under the APA. *See* 5 U.S.C. §§ 553(b), 706(2)(D).

9    **II.      THE PROCLAMATION CAUSES DIRECT AND IRREPARABLE INJURIES.**

10           Plaintiffs and the members of the Plaintiff associations have suffered and will continue to

11   suffer injury if the implementation of the Proclamation is not enjoined. And these substantial inju-

12   ries are irreparable, requiring preliminary injunctive relief to protect Plaintiffs and their members

13   from devastating harms the implementation of the Proclamation will inflict before a final judg-

14   ment in this case.

15           For standing purposes, a plaintiff must have suffered an (1) injury in fact (2) fairly tracea-

16   ble to the challenged conduct and (3) likely to be redressed by a favorable decision. *Spokeo, Inc.*

17   *v. Robins*, 136 S. Ct. 1540, 1547 (2016). An association has standing to sue on behalf of its mem-

18   bers when "(a) its members would otherwise have standing to sue in their own right; (b) the inter-

19   ests it seeks to protect are germane to the organization's purpose; and (c) neither claim asserted

20   nor the relief requested requires the participation of individual members in the lawsuit." *Oregon*

21   *Advocacy Center v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003).[24] Irreparable harm, moreover, is

22   "harm for which there is no adequate legal remedy." *East Bay*, 950 F.3d at 1280.

23           **A.** The Proclamation, by purposeful design, injures the Plaintiff associations and their

24

---

25   [23]   Consular officers also may not "refuse" visas on the basis of the Proclamation's entry ban:
     "Nonimmigrant visa refusals must be based on legal grounds, such as one or more [of various
26   INA provisions], or other applicable law." 22 C.F.R. § 41.121(a).

27   [24]   In the paragraphs below, we demonstrate that members of the Plaintiff associations would
     have standing to sue in their own right. The associations seek to protect interests germane to their
     organizational purposes. *See* Baselice Decl. ¶¶ 3-8; Hall Decl. ¶ 5-7. The participation of individ-
28   ual members is not required; that said, Intrax is both a U.S. Chamber member and a plaintiff.

members. Approximately 300,000 businesses are direct members of the U.S. Chamber—many of which hire employees in H, J, and L visa categories. *See* Baselice Decl. ¶¶ 2, 4-7.[25] The purpose of the Proclamation is to disrupt these hiring practices. According to the White House, the Proclamation "open[s] up about 525,000 jobs" and "clear[s] out this workspace for Americans." Hughes Decl. Ex. 2. Per DHS official Ken Cuccinelli, the Proclamation is an "[u]nprecedented level of effort by a president to clear the American job market of competition." *Id.* Ex. 4.

The injury purposefully inflicted on businesses over the next six months at least—barring them from hiring employees from outside the United States via visa categories Congress established—is a quintessential irreparable harm, as its effects cannot possibly be undone. Unless the implementation of the Proclamation is enjoined now, businesses will forever lose opportunities and productivity. *See*, *e.g.*, Baselice Decl. ¶¶ 9-12. Further, because employment is durable, if a company foregoes hiring an individual in the third or fourth quarter of 2020—or locates employees and operations abroad—that decision will reverberate well beyond 2020. *Id.* ¶¶ 11-12.

**B.** While these categorical injuries suffice to establish standing and irreparable injury, specific, immediate, and irremediable harm is easy to identify across the impacted visa categories.

**L-1.** Microsoft Corporation, a member of plaintiffs the NAM, the U.S. Chamber, and TechNet (Chen Decl. ¶ 1), "utilizes L visas for key intracompany transfers." *Id.* ¶ 12. As one current example, Microsoft currently seeks to transfer a French national, who has worked for the company since 2011, from France to the United States. *Id.* ¶¶ 16-17. He was slated to lead a team of 25 new software engineers in 2020, with growth to 50 engineers in 2021. *Id.* ¶ 17. Because the Proclamation will bar his entry indefinitely, he remains in France, so Microsoft had to change course and hire 10 software engineers there instead. *Id.* ¶ 18 "This disruption to Microsoft's business planning will have lasting effects" because, "[o]nce a team is established overseas, it will be difficult and unduly disruptive to relocate the team's key personnel to the U.S., as Microsoft had hoped and planned." *Id.* ¶ 19. This example is far from unique—Microsoft details three other in-

---

[25]   *See also* Chen Decl. ¶¶ 1, 11-12 (a U.S. Chamber member, Microsoft hires employees via the H-1B and L-1 visa categories); Brown Decl. ¶¶ 1, 7-8 (same regarding Amazon); Brummel Decl. ¶¶ 2, 5 (Brummel Lawn & Landscape, a U.S. Chamber member, hires H-2B workers); O'Gorman Decl. ¶¶ 10, 13 (Gentle Giant, a U.S. Chamber member, hires H-2B workers and J visitors).

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (NO. 4:20-CV-4887-JSW)**

dividuals who, but for the Proclamation, would transfer to the United States now via L-1 visas. *Id.* ¶¶ 23-25, 26-27, 28. Only an immediate injunction can remedy these harms.

**H-1B.** Amazon.com, Inc., a member of the U.S. Chamber (Brown Decl. ¶ 1), hires certain workers on H-1B visas. *Id.* ¶¶ 4, 8-9. An Amazon employee, who is a senior manager with Amazon's Transportation Operations Management (TOM) team, traveled abroad to visit family prior to the Proclamation. Because he was abroad when the Proclamation issued, and because he requires a new H-1B stamp to reenter the country, he is now unable to return to his home and place of employment within the United States. *Id.* ¶¶ 10-12. This is disrupting Amazon's business operations, and an injunction would remedy this direct and otherwise irreparable harm. *Id.* ¶¶ 11-12.

Similarly, on June 10, 2020, Microsoft hired an individual, holding an approved Microsoft H-1B petition, to move to the U.S. to become a "Senior Program Manager." Chen Decl. ¶ 29. The Proclamation bars his relocation to the United States, and it substantially interferes with his work for the company. *Id.* ¶¶ 30-31. Another Microsoft employee has lived in the U.S. since 2009, and he joined Microsoft in 2015. *Id.* ¶ 33. He and his family were outside the United States, visiting family and holding cultural and religious ceremonies for a newborn child, when the Proclamation was announced. *Id.* ¶ 34. The family now cannot return to their home, resulting in medical complications for a child who is removed from established care in Washington. *Id.* ¶ 36.

**H-2B.** Singing Hills Landscape, a U.S. Chamber member (Leman Decl. ¶ 2), is currently petitioning for 25 H-2B laborers to enter the U.S. on October 1, 2020. *Id.* ¶ 14. But for the Proclamation, Singing Hills—which has a long history of hiring H-2B workers (*id.* ¶¶ 5-6)—would hire some or all of these 25 workers in two months. If Singing Hills cannot bring in these workers, the labor deficit will cause approximately $400,000 in 2020 revenue loss. *Id.* ¶ 15. This loss is irreparable. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("[T]hreatened loss of prospective customers … certainly supports a finding of the possibility of irreparable harm."). Because Singing Hills cannot obtain necessary labor, it has also foregone hiring domestic workers for three specific management positions. Leman Decl. ¶¶ 18-19.

Gentle Giant Moving Company, a premier moving company and a member of the U.S. Chamber (O'Gorman Decl. ¶¶ 2-4), currently has 83 approved but unfilled petitions for H-2B

seasonal workers. *Id.* ¶¶ 10, 15. The sole barrier to these trained employees entering the country is the Proclamation. *Id.* ¶ 11. Gentle Giant is currently losing business because it lacks the labor it needs; by foreclosing the hiring of these 83 workers, the Proclamation will cost Gentle Giant approximately $8 to $10 million in lost revenue for the remainder of the calendar year. *Id.* ¶ 16. It will also preclude Gentle Giant from hiring more domestic workers. *Id.* ¶ 17.

**J-1.** Plaintiff Intrax (also a member of the U.S. Chamber) is a leading sponsor of J-1 cultural exchange programs. The Proclamation has shut down five of Intrax's six programs—its programs for summer work travel, au pair, intern, trainee, and camp counselor. Schneider Decl. ¶ 6. Because of the Proclamation, Intrax has been precluded from bringing to the United States more than 8,200 participants in its programs who were scheduled to arrive between June 24 (the Proclamation's effective date) and today. *Id.* ¶ 7. The result is a loss of nearly all revenue. *Id.* ¶ 29. This ongoing economic devastation cannot later be remedied. *Id.* ¶ 30. *See East Bay*, 950 F.3d at 1280 ("[W]here parties cannot typically recover monetary damages flowing from their injury … economic harm can be considered irreparable"). Intrax has already furloughed or laid off 40 to 50% of its 300-person domestic staff, and the remaining staff have taken very substantial pay cuts. Schneider Decl. ¶ 31.

All of Alliance Abroad's J-1 cultural exchange programs have been shut down by the Proclamation. Bell Decl. ¶ 3; *see also id.* ¶ 1 (Alliance Abroad is a U.S. Chamber member). If the Proclamation remains through 2020, it will cost Alliance Abroad about $7.5 million in lost revenue—all of which is irremediable. *Id.* ¶ 5. Alliance Abroad has had to lay-off 87 of 115 staff members. *Id.* ¶ 7. The State Department's refusal to process or issue visas is causing additional harm, because it has rendered recruiting for 2021 virtually impossible. *Id.* ¶ 13. Alliance Abroad was founded in reliance on an operational J-1 program (*id.* ¶ 9), but if the Proclamation continues for more than a few months longer, it "will likely have to cease operations." *Id.* ¶ 17.[26]

The irreparable harms abound: Without L-1s and H-1Bs, Microsoft and Amazon cannot

---

[26]   Although the State Department has identified certain national interest exceptions for limited categories, none of these waivers apply to any of the harms documented here. *See, e.g.*, Bell Decl. ¶ 6; Schneider Decl. ¶ 34; Chen Decl. ¶¶ 40-41.

build planned development teams at their U.S. headquarters (Chen Decl. ¶¶ 6-9; Brown Decl. ¶¶ 8-15). Without H-2Bs, Gentle Giant cannot hire 83 experienced seasonal workers to generate substantial revenue during busy season (O'Gorman Decl. ¶¶ 16-19); Singing Hills cannot accept new business opportunities (Leman Decl. ¶¶ 15-18); and Brummel Lawn cannot make capital investments (Brummel Decl. ¶ 21). Without J-1s, Intrax and Alliance Abroad will not even have businesses to run (Schneider Decl. ¶ 43; Bell Decl. ¶ 17).

An injunction will redress each of these injuries: It would allow Microsoft and Amazon to move their employees to the United States via L-1 and H-1B visas. It would enable Gentle Giant to add 83 H-2B workers immediately to finish its busy season; Singing Hills to add H-2B workers around October 1 to fulfill its business opportunities; and Brummel Lawn to make capital investments. It would restart the J-1 programs by Intrax and Alliance Abroad, allowing them to resume revenue. And, most fundamentally, it will stop the massive reconfiguration of the labor market, which harms the Plaintiff associations' members as a whole. Baselice Decl. ¶¶ 4-7, 10-13.

**C.** Defendants' separate policy refusing to process and issue visas (*see* pages 18-20, *supra*) causes independent irreparable harm. For example, but for this separate action, Intrax would presently be lining up individuals on J-1 visas to enter the United States on January 1, 2021, it would enter agreements with partner businesses for these individuals, and it would earn revenue as a result. Schneider Decl. ¶ 39. The failure of defendants to process and issue visas before the end of 2020 precludes this conduct. *Id*. If the Court enjoins this independent unlawful behavior, this immediate harm would be remedied, regardless of the lawfulness of the Proclamation itself. *Id*.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The remaining equitable factors—the balance of equities and the public interest—merge where the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, they sharply favor preliminary injunctive relief.

*First*, respecting congressional judgments is in the public interest:

1
2
3

> [W]hen Congress chooses how to address a problem, "[i]t is quite impossible ... to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld," as doing so is "not merely to disregard in a particular instance the clear will of Congress," but "to disrespect the whole legislative process and the constitutional division of authority between President and Congress."

4   *Sierra Club*, 929 F.3d at 707 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

5   609 (1952) (Frankfurter, J., concurring). That is, "the public has an interest in ensuring that the

6   'statutes enacted by [their] representatives are not imperiled by executive fiat.'" *East Bay*, 950

7   F.3d at 1281. Congress has chosen how to balance the needs of American employers with protec-

8   tion for American labor. *See* pages 8-10, *supra*. Because Congress has not authorized a wholesale

9   repeal of the H, J, or L visa categories, "Congress presumably decided" that this entry ban "was

10  not in the public interest," which is a factor that weighs heavily here. *Sierra Club*, 929 F.3d at

11  707. That conclusion is especially appropriate in view of the aggressive actions Congress *has* tak-

12  en with respect to COVID-19's economic repercussions. Similarly, the "public interest is served

13  by compliance with the APA." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

14        *Second*, the Plaintiff associations represent the interests of their members, which consti-

15  tute a broad cross section of American business. The Plaintiff associations seek relief that is sub-

16  stantially in the public interest—it will ensure that businesses may recover, that they may expand

17  their operations, and that they may hire large numbers of domestic workers. *See*, *e.g.*, Chen Decl.

18  ¶¶ 10-31; Brown Decl. ¶ 14; Brummel Decl. ¶¶ 8, 20; Leman Decl. ¶¶ 18-19; Schneider Decl. ¶¶

19  29-33; Bell Decl. ¶ 7; O'Gorman Decl. ¶ 17. These interests, which will accrue to the public as a

20  whole, substantially favor the grant of injunctive relief. Baselice Decl. ¶¶ 13-14; Hall Decl. ¶ 7.

21        *Third*, as is "often" the case, the public interest favors preservation of the status quo ante;

22  "a stable immigration system" benefits the Nation, including the myriad stakeholders who rely on

23  operation of the system that Congress created. *Doe #1*, 957 F.3d at 1068.

24                                    **CONCLUSION**

25        The Court should grant the motion for a preliminary injunction.

26

27

28

**Plaintiffs' Motion for Preliminary Injunction (No. 4:20-cv-4887-JSW)**

Respectfully submitted,

MCDERMOTT WILL & EMERY LLP

DATED:      July 31, 2020          By:      /s/ Paul W. Hughes
                                            Paul W. Hughes (*Pro Hac Vice*)
                                            phughes@mwe.com
                                            Michael B. Kimberly (*Pro Hac Vice pend-
                                            ing*)
                                            mkimberly@mwe.com
                                            Sarah P. Hogarth (*Pro Hac Vice to be filed*)
                                            shogarth@mwe.com
                                            500 North Capitol Street NW
                                            Washington, DC 20001
                                            (202) 756-8000

                                            William G. Gaede, III (136184)
                                            wgaede@mwe.com
                                            275 Middlefield Road, Suite 100
                                            Menlo Park, CA 94025
                                            (650) 815-7400

                                            *Counsel for Plaintiffs*

MANUFACTURERS' CENTER FOR LEGAL ACTION
Linda E. Kelly (*Pro Hac Vice to be filed*)
Patrick D. Hedren (*Pro Hac Vice to be filed*)
Erica T. Klenicki (*Pro Hac Vice to be filed*)
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of Manufacturers*

U.S. CHAMBER LITIGATION CENTER
Steven P. Lehotsky (*Pro Hac Vice to be filed*)
Michael B. Schon (*Pro Hac Vice to be filed*)
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce
of the United States of America*