Lawrence J. Joseph
Cal. S.B. No. 154908
Law Office of Lawrence J. Joseph
1250 Connecticut Ave., NW, Ste. 700-1A
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

Counsel for Movant U.S. Tech Workers

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Nat'l Ass'n of Mfrs., *et al.*,
   *Plaintiffs*,

v.

U.S. Dep't of Homeland Sec., *et al.*,
   *Defendants.*

**Civil Action No. 4:20-cv-04887-JSW**

***AMICUS CURIAE* BRIEF OF U.S. TECH WORKERS IN SUPPORT OF FEDERAL DEFENDANTS IN OPPOSITION TO INTERIM RELIEF**

Date:  September 11, 2020
Time:  9:00 a.m.
Judge:  Hon. Jeffrey S. White
Ctrm:  5

---

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................................. i
Memorandum of Ponts and Authorites ........................................................................................... 1
Identify and Interests of *Amicus Curiae* ....................................................................................... 1
Introduction ...................................................................................................................................... 1
Legal Standard ................................................................................................................................. 3
Argument .......................................................................................................................................... 3
I.      Plaintiffs' claims fail on the merits. ................................................................................... 3
II.     Plaintiffs' economic arguments defy common sense. ..................................................... 5
III.    An injunction is overwhelmingly contrary to the public interest. ................................ 11
Conclusion ..................................................................................................................................... 12

**TABLE OF AUTHORITIES**

**CASES**

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
    397 U.S. 150 (1970) ............................................................................................................ 11

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
    861 F.3d 944 (9th Cir. 2017) ........................................................................................ 11-12

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) .............................................................................................................. 4

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ............................................................................................................ 11

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ................................................................................................... 1-2, 5

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) .................................................................................................................. 3

**STATUTES**

8 U.S.C. § 1182(f) ..................................................................................................................... 1-5

Immigration and Nationality Act of 1952,
    PUB. L. NO. 82–414, 66 Stat. 163 ...................................................................................... 1

**LEGISLATIVE HISTORY**

S. REP. NO. 82-1072 1952) ........................................................................................................... 1

98 CONG. REC. 4423 (Apr. 25, 1952) ..................................................................................... 2, 4

98 CONG. REC. 4427 (Apr. 25, 1952) ...........................................................................................2

**RULES AND REGULATIONS**

Proclamation 9,994, 85 Fed. Reg. 15,337 (Mar. 18, 2020) .........................................................2

Proclamation 10,044, 85 Fed. Reg. 23,441 (Apr. 22, 2020).........................................................2

Proclamation 10,052, 85 Fed. Reg. 38,263 (June 22, 2020)................................................. 2-3, 11

**OTHER AUTHORITIES**

Daniel Costa and Ron Hira, *H-1B visas and prevailing wage levels*,
    Economic Policy Institute, May 4, 2020 ..........................................................................5

Reed Davis, *Analysis of "Immigration and American Jobs,"*
    (http://econdataus.com/amerjobs.htm, online-only publication). ......................................10

Kirk Doran, *et al*., *The Effects of High-Skilled Immigration Policy on Firms:
    Evidence from Visa Lotteries*, National Bureau of Economic Research,
    Feb. 2016 .....................................................................................................................5, 10

Dave Flessner, *TVA outsources more IT jobs*, Chattanooga Times Free Press,
    June 30, 2020 ................................................................................................................ 9-10

Michael Hiltzik, *How the University of California exploited a visa loophole
    to move tech jobs to India*, Los Angeles Times, Jan 6, 2017 .............................................9

Steven Mufson, *TVA backtracks after Trump's demand that it rehire some
    of its dismissed tech workers*, Washington Post, Aug. 6 2020 ..........................................9

Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements,*
    New York Times, June 4, 2015 .........................................................................................9

Patrick Thibodeaux, *Fired IT workers file lawsuit claiming H-1B workers
    replaced them*, ComputerWorld, July 12, 2011 .................................................................9

Patrick Thibodeaux, *Southern California Edison layoffs get U.S. Senate attention*,
    ComputerWorld, Feb. 6, 2015 ...........................................................................................9

TYLER VIGEN, SPURIOUS CORRELATIONS (Hachette Books 2015) .................................................11

ii

**U.S. TECH WORKERS' *AMICUS CURIAE* BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

## MEMORANDUM OF PONTS AND AUTHORITES

*Amicus curiae* U.S. Tech Workers submits this memorandum of points and authorities in support of the federal defendants' opposition to the plaintiffs' motion for interim relief (ECF #31) and the plaintiffs' accompanying memorandum ("Pls.' Memo.") pursuant to U.S. Tech Workers' accompanying motion for leave to file.

## IDENTIFY AND INTERESTS OF *AMICUS CURIAE*

U.S. Tech Workers is a 501(c)(3) nonprofit representing the interests of American workers in technology fields. The use of non-immigrant guestworker visas to displace American workers and lower wages in the industry is a key concern of U.S. Tech Workers. For example, the President of the United States acknowledged that U.S. Tech Workers played a key role in bringing a halt to the Tennessee Valley Authority's use of H-1B non-immigrants to replace American workers. Remarks by President Trump in a Meeting with U.S. Tech Workers and Signing of an Executive Order on Hiring American, The White House, Aug. 3, 2020.

## INTRODUCTION

The Immigration and Nationality Act of 1952, PUB. L. NO. 82–414, 66 Stat. 163 (INA) was a complete revision of the nation's immigration laws and remains the basis of the immigration system today. S. REP. NO. 82-1072 at 1 (1952). Section 202 of the INA provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

66 Stat. at 188, *codified at* 8 U.S.C. § 1182(f). As the Supreme Court has held, the power this provision confers on the President is so vast that it even permits the President to suspend the entry of "'all aliens'" into the United States. *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018) (quoting

1

**U.S. TECH WORKERS' *AMICUS CURIAE* BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

§ 1182(f)). Congress recognized as much when it enacted § 1182(f). During floor debate, Representative Emanuel Celler of New York raised objection to the provision, stating that "[u]nder [it], as proposed, the President is given an untrammeled right, an uninhibited right to suspend immigration entirely. That is very broad power." 98 CONG. REC. 4423 (Apr. 25, 1952).

Attempts by opponents to restrict that power failed. Representative Abraham Multer of New York introduced an amendment that would have limited the President's power under the provision to times of war and national emergency. *Id*. Opposing that amendment, Representative Francis Walter of Pennsylvania defended the provision as reported, calling it "absolutely essential" because there could be situations in which "it is impossible for Congress to act." *Id*. As examples, Representative Walter cited "an outbreak of an epidemic in some country" and "a period of great unemployment." *Id*. Representative Multer's amendment was rejected, 98 CONG. REC. 4427 (Apr. 25, 1952), and the provision was enacted unaltered. *See also Trump v. Hawaii*, 138 S. Ct. 2392, 2412–13 (2018) (discussing the legislative history of § 1182(f)). Consequently, the President has the power to suspend any or all immigration if he makes a finding that the admission of the covered aliens is detrimental to the interest of the United States, *Trump*, 138 S. Ct. at 2408—a power that, of course, is not limited to situations, such as the present one, that were contemplated by Congress at the time of enactment.

As a result of the COVID-19 pandemic, the President issued a series of proclamations and executive orders designed to protect American workers. The first of these was Proclamation 9,994, 85 Fed. Reg. 15,337 (Mar. 18, 2020), in which the President declared that the COVID-19 pandemic had created a national emergency starting on March 1, 2020. Pursuant to 8 U.S.C. § 1182(f), the President issued Proclamation 10,044, 85 Fed. Reg. 23,441 (Apr. 22, 2020). In this Proclamation, the President noted that, as a result of the COVID-19 pandemic, 22 million Americans had applied

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

for unemployment compensation. *Id*. The President found that the admission of aliens during this economic emergency would have a detrimental effect on the labor market, and also would put a strain on the healthcare system. *Id*. at 23,441-42. Accordingly, the Proclamation temporarily suspended the admission of aliens on immigrant visas, *id*. at 23,442, exempting certain classes of aliens, including those already in the United State and those engaged in health care. *Id*. On June 22, 2020, the President issued Proclamation 10,052, which suspended the admission of non-immigrants on H-1B, H-2B, J, and L visas for the purpose of protecting jobs for Americans. 85 Fed. Reg. 38,263.

Plaintiffs, representatives of business groups, seek a preliminary injunction against Proclamation 10,052 and its protections for American workers. *See* Pls.' Proposed Order (ECF #31-46).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [2] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). To avoid repeating the arguments of the parties, *Amicus* only addresses the first and fourth factors.

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS FAIL ON THE MERITS.**

Congress has conferred on the President the authority to "suspend the entry of all aliens" or "any class of aliens as immigrants or nonimmigrants" into the United States if the President determines that the admission of such aliens would not be in the national interest. 8 U.S.C. § 1182(f). Thus, the President has the power to suspend all immigration if the need arises.

3

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

98 CONG. REC. at 4,423 ("the President is given [] an uninhibited right to suspend immigration entirely") (statement of Rep. Celler). Plaintiffs' arguments to the contrary fly in the face of the statute. The question before this Court is whether, in the midst of a national emergency caused by a pandemic resulting in massive unemployment, the President can use this power to protect Americans workers from displacement and competition from foreign labor.

Plaintiffs are correct that Congress has set up an elaborate scheme for admitting foreign labor. (Pls.' Memo.6). In doing so, however, it did not repeal § 1182(f) by implication. As the Supreme Court recently explained, courts will not find repeal "unless the intention of the legislature to repeal is clear and manifest" and "unless the later statute expressly contradicts the original act or ... such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (interior alterations, citations, and quotation marks omitted). Needless to say, these conditions are not met here.

Plaintiffs also argue that the president has more power under § 1182(f) when it comes to "foreign relations and national security interests" than he has to make "*domestic* policy judgments." Pls.' Memo.16. Plaintiffs even go so far as to say that the "power [under § 1182(f)] is tied, inherently, to foreign relations and national security." Pls.' Memo.5. Yet this was not the understanding of Congress during the debate over the enactment of § 1182(f). Epidemics and great unemployment were specifically raised as conditions for the President to invoke § 1182(g). 98 CONG. REC. at 4,423. While Congress gave the President broad powers under § 1182(f) in case of unexpected circumstances, the conditions under which Proclamation 10,052 was issued were specifically identified as the kind of situation in which Congress *expected* that the power would be used. *Id*.

4

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

## II. PLAINTIFFS' ECONOMIC ARGUMENTS DEFY COMMON SENSE.

At most, the President's suspensions of entry pursuant to § 1182(f) may be accorded rational-basis review under the Constitution. *Trump v. Hawaii*, 138 S. Ct. 2392, 2409, 2420 (2018). Here, however, plaintiffs make no constitutional claims that might trigger such review. In any event, even if the President's findings were reviewable here, Plaintiffs' arguments against them would still be nonsensical.

It is obvious why business groups would object to protecting American workers as the President has done. Under the law of supply and demand, more workers result in lower wages. Thus, because of the H-1B non-immigrant visa program, employers pay workers well below what otherwise would be market wages. Daniel Costa and Ron Hira, *H-1B visas and prevailing wage levels*, Economic Policy Institute, May 4, 2020, p. 1.[1] Such low wages allow greater profits. Kirk Doran, *et al.*, *The Effects of High-Skilled Immigration Policy on Firms: Evidence from Visa Lotteries*, National Bureau of Economic Research, Feb. 2016, p. 1 ("H-1Bs lead to lower average employee earnings and higher firm profits").[2]

Plaintiffs never mention the lower costs and increased profits that flow from the supply of foreign workers. Instead, plaintiffs claim that the "clear economic consensus" is that foreign workers create jobs for domestic workers. Pls.' Memo.14; *contra* Doran, *supra* (finding "H-1Bs substantially crowd out firms' employment of other workers."). In reality, there are dueling economic consensuses regarding the effect of foreign labor: those of papers funded as part of

---

[1]     Available at https://www.epi.org/publication/h-1b-visas-and-prevailing-wage-levels/.

[2]     Available at https://www.nber.org/papers/w20668.

5

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

lobbying efforts for more foreign labor and all other papers. Plaintiffs rely entirely on the former and ignore the existence of the latter.

Plaintiffs argue that Proclamation 10,052 is flawed because, as they claim, unemployment among computer workers "actually *decreased* from 3.0% in January 2020 to 2.8% in April 2020, and 2.5% in May 2020." Pls.' Memo.12. Because of this decreased unemployment, one is supposed to conclude that a suspension of H-1B visas (that primarily go to computer workers) is unnecessary. For these figures Plaintiffs cite work by the National Foundation for American Policy that purports to be using the Bureau of Labor Statistics' Current Population Survey. Pls.' Memo. 12 n.8. The following, however, is a table produced by the Bureau of Labor from that very survey:

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Data extracted on: August 11, 2020 (1:06:18 PM)

## LABOR FORCE STATISTICS FROM THE CURRENT POPULATION SURVEY

**Series Id:**          LNU04034021
Not Seasonally Adjusted
**Series title:**         (Unadj) Unemployment Rate - Computer and Mathematical Occupations
**Labor force status:**    Unemployment rate
**Type of data:**         Percent or rate
**Age:**             16 years and over
**Labor force experience:** Experienced
**Occupation:**          Computer and mathematical occupations

**Download:**

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 2.5 | 2.3 | 2.1 | 1.9 | 2.3 | 1.7 | 2.1 | 1.8 | 1.9 | 2.9 | 2.5 | 2.4 | 2.2 |
| 2001 | 2.5 | 2.9 | 2.7 | 2.2 | 2.9 | 3.4 | 3.2 | 4.7 | 5.3 | 4.7 | 5.0 | 3.8 | 3.6 |
| 2002 | 4.9 | 4.5 | 4.1 | 4.8 | 5.7 | 5.7 | 4.4 | 4.7 | 4.9 | 4.8 | 5.0 | 5.1 | 4.9 |
| 2003 | 5.6 | 5.7 | 6.5 | 6.0 | 5.3 | 5.0 | 5.6 | 5.2 | 5.5 | 5.3 | 4.6 | 5.1 | 5.5 |
| 2004 | 6.0 | 5.7 | 5.6 | 5.1 | 4.5 | 4.0 | 3.6 | 2.9 | 3.3 | 3.3 | 3.1 | 3.0 | 4.2 |
| 2005 | 3.5 | 3.8 | 3.8 | 3.6 | 4.0 | 2.8 | 2.6 | 2.0 | 2.0 | 2.5 | 2.0 | 1.9 | 2.9 |
| 2006 | 2.2 | 2.2 | 2.9 | 2.3 | 2.7 | 2.5 | 2.3 | 2.0 | 2.5 | 2.6 | 2.4 | 2.4 | 2.4 |
| 2007 | 2.6 | 2.0 | 1.9 | 1.4 | 2.1 | 1.9 | 2.5 | 2.1 | 2.2 | 2.8 | 1.7 | 2.5 | 2.1 |
| 2008 | 2.5 | 2.8 | 2.5 | 2.2 | 2.3 | 1.9 | 2.2 | 2.2 | 2.6 | 3.5 | 3.0 | 3.4 | 2.6 |
| 2009 | 4.8 | 5.4 | 5.7 | 5.6 | 4.9 | 5.4 | 5.6 | 5.6 | 6.2 | 4.6 | 4.2 | 4.5 | 5.2 |
| 2010 | 5.9 | 5.9 | 6.5 | 5.3 | 5.5 | 5.1 | 4.7 | 4.3 | 4.3 | 4.8 | 5.2 | 5.3 | 5.2 |
| 2011 | 5.3 | 4.7 | 4.0 | 3.7 | 3.8 | 3.3 | 4.7 | 3.7 | 4.2 | 4.6 | 4.1 | 3.6 | 4.1 |
| 2012 | 3.8 | 4.9 | 4.6 | 4.3 | 3.5 | 3.1 | 3.1 | 3.4 | 3.5 | 3.2 | 2.8 | 3.8 | 3.6 |
| 2013 | 3.9 | 3.5 | 3.2 | 3.0 | 3.5 | 4.2 | 3.8 | 3.3 | 4.5 | 3.6 | 3.3 | 3.7 | 3.6 |
| 2014 | 2.3 | 2.9 | 2.8 | 2.8 | 2.6 | 3.6 | 2.3 | 3.1 | 2.8 | 3.0 | 2.0 | 2.4 | 2.7 |
| 2015 | 2.5 | 2.4 | 2.0 | 1.9 | 1.5 | 2.5 | 3.4 | 2.9 | 2.8 | 2.8 | 3.4 | 2.6 | 2.6 |
| 2016 | 2.4 | 2.5 | 2.4 | 2.0 | 2.0 | 2.2 | 2.9 | 2.4 | 3.0 | 3.1 | 2.9 | 2.6 | 2.5 |
| 2017 | 2.8 | 2.7 | 2.1 | 2.5 | 1.9 | 2.3 | 2.1 | 2.4 | 2.8 | 2.5 | 2.5 | 2.4 | 2.4 |
| 2018 | 2.8 | 2.5 | 1.4 | 1.7 | 2.3 | 1.9 | 1.9 | 2.5 | 2.0 | 2.1 | 2.4 | 2.1 | 2.1 |
| 2019 | 2.4 | 2.3 | 1.6 | 2.4 | 1.3 | 1.5 | 1.3 | 1.5 | 2.4 | 2.2 | 2.4 | 2.3 | 2.0 |
| 2020 | 3.0 | 2.4 | 2.4 | 4.3 | 3.7 | 4.3 | 4.4 | | | | | | |

According to this table, unemployment among computer workers has risen to 4.4%, and in May had risen to 3.7%. *Id.* Yet when that same data is filtered through lobbying materials, that increase in unemployment to 3.7% in May becomes a decrease to 2.5%. Pls.' Memo. 12. Plaintiffs' arguments that computer workers now have "low unemployment," *id.*, are not in accord the unfiltered government data.

Plaintiffs also compare the computer unemployment rate to the theoretical lowest overall employment rate the economy can sustain (3.5%–4.5%) to assert that computer unemployment is low. Pls.' Memo. 12 & n.9. This argument is highly misleading because professional unemployment is not comparable with the overall unemployment rate and professional unemployment rates rarely approach the overall unemployment rates. For example, between 2000 and 2019, the annual unemployment rate for lawyers has ranged from 1.2% to 3.4% (the latter occurring in 2009 when the overall unemployment rate was 9.6%) with an overall average of 2.1% (with an average overall unemployment rate of 5.9% over the same period).[3]

Ironically, Plaintiffs lament that their computer unemployment "information was also presented to the Administration—but the Proclamation failed to consider it." Pls.' Memo. 12–13. Yet why should the Administration consider such information when the unemployment figures they cite are obviously wrong?

Next, and again relying on industry lobbying materials as the source, Plaintiffs, conflating *immigrants* with *non-immigrants* (*that is*, H-1B and H-1B), Pls.' Memo. 14, claim that "'*there is no evidence that immigrants take jobs from US-born workers*.' To the contrary, 'the results give clear evidence that both the H-1B and H-2B programs for temporary workers correspond to *greater*

---

[3] https://data.bls.gov/cgi-bin/srgate, series ID LNU04034025 and LNU04000000.

8

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

job opportunities for US-born workers.'" *Id.* (citing lobbying materials from the American Enterprise Institute and the Partnership for a New American Economy). Yet the evidence is indisputable that H-1B *non-immigrants* routinely take jobs from U.S. workers. Americans working at employers such as Disney,[4] Molina Healthcare,[5] Southern California Edison,[6] and the University of California[7] have found themselves training their H-1B non-immigrant replacements before they joined the unemployment rolls. Even the global pandemic has not stopped this process of employers using non-immigrants to replace American workers. The Tennessee Valley Authority was replacing Americans with H-1B workers in the midst of the pandemic until the President intervened.[8] Dave Flessner, *TVA outsources more IT jobs*, Chattanooga Times Free Press, June 30,

---

[4]   Julia Preston, *Pink Slips at Disney. But First, Training Foreign Replacements,* New York Times, June 4, 2015 (available at http://www.nytimes.com/2015/06/04/us/last-task-after-layoff-at-disney-train-foreign-replacements.html).

[5]   Patrick Thibodeaux, *Fired IT workers file lawsuit claiming H-1B workers replaced them*, ComputerWorld, July 12, 2011 (available at https://www.computerworld.com/article/2510279/fired-it-workers-file-lawsuit-claiming-h-1b-workers-replaced-them.html).

[6]   Patrick Thibodeaux, *Southern California Edison layoffs get U.S. Senate attention*, ComputerWorld, Feb. 6, 2015 (available at https://www.computerworld.com/article/2881315/southern-california-edison-layoffs-gets-us-senate-attention.html).

[7]   Michael Hiltzik, *How the University of California exploited a visa loophole to move tech jobs to India*, Los Angeles Times, Jan 6, 2017 (available at https://www.latimes.com/business/hiltzik/la-fi-hiltzik-uc-visas-20170108-story.html).

[8]   In response to these replacements, on August 3, 2020, President Trump removed two board members of the TVA and the TVA management announced it was halting the replacement of Americans. Steven Mufson, *TVA backtracks after Trump's demand that it rehire some of its dismissed tech workers*, Washington Post, Aug. 6 2020 (Available at https://www.washingtonpost.com/climate-environment/2020/08/06/tva-backtracks-after-president-trumps-demand-that-it-rehire-some-its-dismissed-tech-workers/). The fate of those Americans who already lost their jobs at the TVA is still unknown.

9

**U.S. TECH WORKERS' *AMICUS CURIAE* BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

2020.[9] The situation at the TVA provides a clear illustration of the necessity for and effectiveness of Presidential action to protect Americans from displacement by foreign workers during the pandemic.

Plaintiffs go on to cite an industry lobbying report that uses a regression model that found that each H-1B guestworker creates (more precisely, *is associated with*) 1.83 jobs for Americans. Pls.' Memo. 14 n.15; *contra* Kirk Doran et al., *The Effects of High-Skilled Immigration Policy on Firms: Evidence from Visa Lotteries*, at 3 (finding "new H-1Bs cause no significant increase in firm employment.").[10] The regression model used in that document, however, produces widely different results depending upon the date range of the input data. Reed Davis, *Analysis of "Immigration and American Jobs,"* Table 4 (showing job creation per 100 H-1B workers ranging from -354.0 to 182.5, depending upon the dates used).[11] Changing the date range of the data put into the regression model can cause it to show that each H-1B visa destroys (more precisely, *is associated with the destruction of*) jobs. *Id*. Thus, the model is equally good (or equally bad) for making the political argument that the H-1B program creates jobs and for arguing that the H-1B program destroys jobs. Such a versatile mathematical model is ideal for lobbying, but useless for setting policy.[12]

---

[9] Available at https://www.timesfreepress.com/news/business/aroundregion/story/2020/jun/30/tvoutsources-more-it-jobs/526537/.

[10] Available at https://www.nber.org/papers/w20668.

[11] Available at http://econdataus.com/amerjobs.htm (online-only publication).

[12] While the executive summary of this study claims "Adding 100 H-1B workers results in an additional 183 jobs among US natives," (p. 4) the study body (p. 11) states the more precise result: "100 approved H-1B workers [are] associated with an additional 183 jobs among US natives." There is a key mathematical difference between association and causation. Rooster crowing is associated with the sun rising. Rooster crowing does not cause the sun to rise. Likewise,

Furthermore, Plaintiffs' assertion that adding more competitors improves economic conditions for those already in the market conflicts with the well-established principle in the federal courts that an increase in competitors causes injury. *E.g.*, *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950–51 (9th Cir. 2017); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970). If anyone actually believed that importing foreign labor—especially in a time of massive unemployment—improved working conditions for labor, groups representing American workers would be lined up at courthouse doors filing lawsuits to resume the flow of guestworkers.

### III.  AN INJUNCTION IS OVERWHELMINGLY CONTRARY TO THE PUBLIC INTEREST.

A "primary purpose in restricting immigration is to preserve jobs for American workers." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 893 (1984). Proclamation 10,052 clearly reflects that purpose. 85 Fed. Reg. 38,263 (June 22, 2020). The president noted that "the overall unemployment rate in the United States nearly quadrupled between February and May of 2020." 83 Fed. Reg. at 38,263. The President also found that "American workers compete against foreign nationals for jobs in every sector of our economy, including against millions of aliens who enter the United States to perform temporary work." *Id*. The President found:

> [E]xcess labor supply is particularly harmful to workers at the margin between employment and unemployment—those who are typically "last in" during an economic expansion and "first out" during an economic contraction. In recent years, these workers have been disproportionately represented by historically

---

100 approved H-1B workers may be associated with 183 jobs over a specific date range but such an association does not mean the 100 H-1B workers created those 183 (or that the 100 H-1B workers destroyed jobs by changing the date range). *See generally* TYLER VIGEN, SPURIOUS CORRELATIONS (Hachette Books 2015) (showing correlations without causation) (available at http://www.tylervigen.com/spurious-correlations).

11

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**

>    disadvantaged groups, including African Americans and other minorities, those without a college degree, and Americans with disabilities.

85 Fed. Reg. at 38,264. Clearly, an injunction resuming the flow of non-immigrant labor into the United State during this period of epidemic and high unemployment would injure American workers through increased competition. *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,* 861 F.3d 944, 950-51 (9th Cir. 2017) (holding that increased competition from foreign workers is an injury in fact). Plaintiffs completely ignore the fundamental purpose of Proclamation 10,052—the protection of American workers—while arguing that their motion is in the public interest. Pls.' Memo. 24–25.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: August 25, 2020                     Respectfully submitted,

/s/ Lawrence J. Joseph
Lawrence J. Joseph (SBN 154908)

Law Office of Lawrence J. Joseph
1250 Connecticut Ave, NW, Suite 700-1A
Washington, DC 20036
Tel: 202-355-9452
Fax: 202-318-2254
Email: ljoseph@larryjoseph.com

*Counsel for Amicus Curiae U.S. Tech Workers*

12

**U.S. TECH WORKERS'** *AMICUS CURIAE* **BRIEF,**
*Nat'l Ass'n of Mfrs. v U.S. Dep't of Homeland Sec.,* **No. 4:20-cv-04887-JSW**