MCDERMOTT WILL & EMERY LLP
Paul W. Hughes (*Pro Hac Vice*)
phughes@mwe.com
Michael B. Kimberly (*Pro Hac Vice*)
mkimberly@mwe.com
Sarah P. Hogarth (*Pro Hac Vice*)
shogarth@mwe.com
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

MCDERMOTT WILL & EMERY LLP
William G. Gaede, III (136184)
wgaede@mwe.com
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

*Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, NATIONAL RETAIL FEDERATION, TECHNET, and INTRAX, INC., | Case No. 4:20-cv-4887-JSW<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | Date:      September 11, 2020<br>Time:      9:00 a.m.<br>Judge:     Hon. Jeffrey S. White<br>Ctrm.:     5 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF STATE; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; and, MICHAEL R. POMPEO, in his official capacity as Secretary of State, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2   Table of Authorities ...................................................................................................ii

3   Introduction ............................................................................................................... 1

4   Argument ................................................................................................................... 1

5   I.     Plaintiffs have standing. ..................................................................................... 1

6   II.    Plaintiffs are likely to prevail on the merits. ..................................................... 2

7         A.    The Proclamation is beyond the President's lawful authority. ...................... 2

8         B.    Defendants' implementation of the Proclamation violates the APA. ............ 8

9   III.   The Proclamation causes direct and irreparable injuries. .................................. 11

10  IV.   The equities and the public interest favor an injunction. .................................. 15

11  V.    The scope of Plaintiffs' requested injunction is appropriate................................ 15

12  Conclusion ............................................................................................................... 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REPLY ISO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(NO. 4:20-CV-4887-JSW)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) ...................................................................................................3

*Barrick Goldstrike Mines Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000) ....................................................................................9

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................................9

*Chamber of Commerce of United States of Am.* v. *United States Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) ...................................................................................13

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ...................................................................................................8

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ..............................................................................................6

*DHS v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ..............................................................................................6

*Doe #1 v. Trump*,
   418 F. Supp. 3d 573 (D. Or. 2019) ...........................................................................8

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ........................................................................3, 4, 5, 6

*Durning v. Citibank, N.A.*,
   950 F.2d 1419 (9th Cir. 1991) ...................................................................................7

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) .............................................................................9, 14

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ...............................................................................................6, 7

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893) ...............................................................................................7, 8

*Galvan v. Press*,
   347 U.S. 522 (1954) ...................................................................................................6

*Gill v. U.S. Dep't of Justice*,
   913 F.3d 1179 (9th Cir. 2019) ...................................................................................9

*Gomez v. Trump*,
   No. 20-cv-1419 (D.D.C.) .........................................................................................10

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ..............................................................................................6

*Hawaii v. Trump*,
   859 F.3d 741 (9th Cir. 2017) (*Hawaii I*) ................................................................11

*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017) (*Hawaii II*) ....................................................... *passim*

*INS v. Chadha*,
   462 U.S. 919 (1983) ...............................................................................................6, 7

1

**Cases—continued**

2   *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Brock,*
     477 U.S. 274 (1986) ...................................................................................15

3   *Kendall v. United States,*
     37 U.S. (12 Pet.) 524 (1838) ........................................................................8
4

*United States ex rel. Knauff v. Shaughnessy,*
5     338 U.S. 537 (1950) ...........................................................................6, 7, 8

6   *Medellin v. Texas,*
     552 U.S. 491 (2008) ....................................................................................7

7   *Motaghedhi v. Pompeo,*
     436 F. Supp. 3d 1345 (E.D. Cal. 2020) ....................................................11

8   *N.Y. Cent. Sec. Corp. v. United States,*
     287 U.S. 12 (1932) ......................................................................................6
9

*Nat'l Broadcasting Co. v. United States,*
10     319 U.S. 190 (1943) ....................................................................................6

11   *Newdow v. Rio Linda Union Sch. Dist.,*
     597 F.3d 1007 (9th Cir. 2010) ....................................................................7

12   *Nine Iraqi Allies v. Kerry,*
     168 F. Supp. 3d 268 (D.D.C. 2016) .........................................................11
13

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
14     465 F.3d 977 (9th Cir. 2006) ....................................................................10

15   *P.K. v. Tillerson,*
     302 F. Supp. 3d 1 (D.D.C. 2017) .............................................................11

16   *In re Polycom, Inc.,*
     78 F. Supp. 3d 1006 (N.D. Cal. 2015) .......................................................5

17   *Senate of the State of Cal. v. Mosbacher,*
     968 F.2d 974 (9th Cir. 1992) ....................................................................15
18

*Sierra Club v. Trump,*
19     963 F.3d 874 (9th Cir. 2020) .................................................................2, 3

20   *Trudeau v. Fed. Trade Comm'n,*
     456 F.3d 178 (D.C. Cir. 2006) ...................................................................3

21   *Trump v. Hawaii,*
     138 S. Ct. 2392 (2018) (*Hawaii III*)................................................. *passim*

22   *Vulupala v. Barr,*
     438 F. Supp. 3d 93 (D.D.C. 2020) ...........................................................11
23

*Youngstown Sheet & Tube Co. v. Sawyer,*
24     343 U.S. 579 (1952) ................................................................................7, 8

25   *Zivotofsky ex rel. Zivotofsky v. Kerry,*
     576 U.S. 1 (2015) ........................................................................................7

26

27

28

**Statutes**

5 U.S.C. § 705 ........................................................................................................................15

8 U.S.C.
    § 1101(a)(47)(H)(i)(b) ....................................................................................................3
    § 1101(a)(47)(J) ...............................................................................................................3
    § 1101(a)(47)(*l*) ..............................................................................................................9
    § 1182(a) ...................................................................................................................10, 11
    § 1182(a)(1)(A) ................................................................................................................4
    § 1182(b)(3) ....................................................................................................................11
    § 1182(f)..............................................................................................................4, 10, 11
    § 1184(i)(3) .....................................................................................................................10
    § 1184(n)(1)(A) ..............................................................................................................10
    § 1201(g) .........................................................................................................................11
    § 1231(c)(1).....................................................................................................................11
    § 1231(d)(1) ....................................................................................................................11
Pub. L. No. 87-256, 75 Stat. 527 ...........................................................................................3

**INTRODUCTION**

By design, Proclamation 10052 fundamentally reorders the labor markets, precluding American businesses from hiring hundreds of thousands of workers from abroad in the third and fourth quarters of 2020. That policy irreparably injures plaintiffs, which include associations that represent a broad cross-section of the American economy. The Proclamation exceeds the President's powers under Section 212(f) because it directly conflicts with congressional judgments embedded in the INA: Congress specified that certain guest worker programs are in the national interest, but, for more than six months, the Proclamation nullifies those statutes. And, in so doing, the Proclamation fails to make a reasonable finding, which the Ninth Circuit holds is requisite for the use of Section 212(f) to address a domestic problem. These limitations are essential to ensure that Section 212(f) effects a bounded—and thus constitutional—delegation of authority to the Executive. Further, in implementing the Proclamation, the State Department has crafted two new policies: It has imposed substantial new visa eligibility requirements in its August 12 Guidance, and it has suspended visa processing. These policies, which reflect decisionmaking independent of the Proclamation, violate the APA. For all these reasons, an injunction is imperative.

**ARGUMENT**

**I.   PLAINTIFFS HAVE STANDING.**

As explained in our opening motion (at 20-24), and as substantiated by nine declarations (*see* Dkt. 31), the Proclamation's implementation imposes redressable injuries on Plaintiffs and members of the Plaintiff associations. The government's rejoinders each fail.

As to the Plaintiff associations, the government asserts (at 7) that they "have failed to provide any sort of declaration regarding the vague descriptions of member-harm alleged in the Complaint." [1] That conclusory contention is inscrutable given that the U.S. Chamber and the NAM each submitted its own declaration (Baselice Decl.; Hall Decl.), along with seven declarations from individual member companies describing their harms in detail.

The government next makes (at 7) a single-sentence argument regarding germaneness,

---

[1]   The government curiously disputes (at 6-7) whether the associations have organizational standing. Although they have diverted resources to address member harms caused by the Proclamation (*see, e.g.*, Baselice Decl. ¶ 8), our motion (at 20) focused on associational standing.

1  contending that the associations have not "alleged that they have any organizational interest relat-

2  ed to immigration." But the declaration from Jonathan Baselice, Executive Director of *Immigra-*

3  *tion Policy* for plaintiff U.S. Chamber, identifies that "[p]art of the U.S. Chamber's mission is

4  advocating for its members' abilities to bring the world's best and brightest to America to foster

5  innovation and economic growth," which businesses do via the L, H, and J visa programs.

6  Baselice Decl. ¶¶ 1, 4-7. Likewise, "[p]art of the NAM's mission is advocating for its members'

7  abilities to access global talent." Hall Decl. ¶ 5; *see also* Compl. ¶¶ 18-22.

8       *Third*, the government argues (at 7) that plaintiff Intrax has "merely alleged a generalized

9  economic harm that is not specifically tied to the Proclamation." That assertion too is impossible

10  to square with the 43-paragraph declaration Intrax submitted, which explains in detail how "the

11  Proclamation is the sole reason that thousands of participants in cultural exchange programs

12  sponsored by Intrax cannot enter the country." *See* Schneider Decl. ¶ 8. The immediate harm to

13  Intrax—total economic devastation caused by the shuttering of five of its six J-1 programs (*id.*

14  ¶¶ 6, 29-30)—is evidenced by Intrax having to furlough 30 to 50% of its staff and impose steep

15  pay cuts on those who remain. *Id.* ¶ 31. This is a specific harm, not some "generalized" grievance.

16  **II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.**

17       **A.    The Proclamation is beyond the President's lawful authority.**

18       The Proclamation is unlawful because it "nullif[ies] Congress's considered judgments"

19  enacted in the INA (*Hawaii v. Trump*, 878 F.3d 662, 685 (9th Cir. 2017) (*Hawaii II*)) (*see* Mot. 6-

20  11); it fails Section 212(f)'s "find[ing]" requirement (Mot. 11-15); and, absent the meaningful

21  limitations Plaintiffs assert, Section 212(f) would present serious constitutional questions about

22  whether it is an invalid delegation of legislative power to the Executive (Mot. 15-17).

23       The government begins (at 8-13) by attacking the validity of our APA cause of action. *See*

24  Opp. 8-13. Although these objections fail (*see* pages 8-11, *infra*), our first claim is independent of

25  the APA in any event: It is a freestanding, equitable cause of action to enjoin unlawful govern-

26  ment behavior. Compl. ¶¶ 164-171 ("Count I . . . Ultra Vires Conduct"). It is black-letter law that

27  "[e]quitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a

28  statutory cause of action." *Sierra Club v. Trump*, 963 F.3d 874, 890-891 (9th Cir. 2020) (quoting

**REPLY ISO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(NO. 4:20-CV-4887-JSW)**

1   *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015)); *see also id.* at 891

2   ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his

3   authority," and "[t]he passage of the APA has not altered this presumption."); *Trudeau v. Fed.*

4   *Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) ("[J]udicial review is available when an

5   agency acts *ultra vires*, even if a statutory cause of action is lacking.") (quotation marks omitted).

6       **1.** The Proclamation exceeds the powers granted by Section 212(f) because it attempts to

7   "expressly override particular provisions of the INA." *Trump v. Hawaii*, 138 S. Ct. 2392, 2411

8   (2018) (*Hawaii III*). Notably, the government does not dispute our showing (Mot. 6-11) that the

9   Proclamation would "nullify numerous specific provisions" of the INA. *Hawaii II*, 878 F.3d at

10  687. *Cf.* Opp. 14-16. Nor could it: Congress has unmistakably determined that the H-1B, H-2B,

11  L-1, and J-1 visa programs, with all their finely titrated protections for American workers, are in

12  the national interest. The Proclamation, however, effectively abrogates these programs and the

13  statutes that authorize them. The Proclamation thus declares, in conflict with congressional judg-

14  ment, that these very programs are adverse to the national interest.[2] But, as the Ninth Circuit has

15  held (and the Supreme Court has assumed), Section 212(f) does not permit the President to take a

16  red pen to the U.S. Code, displacing Congress's considered policy judgments. *See Hawaii II*, 878

17  F.3d at 685 ("[T]he Executive may not exercise [its Section 212(f)] power in a manner that con-

18  flicts with the INA."); *Doe #1 v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020) ("reliance on

19  § 1182(f)" would be misplaced if "the President has effectively rewritten provisions of the INA").

20      Rather than take issue with our showing that the Proclamation conflicts with the INA, the

21  government insists instead (at 14) that the Supreme Court in *Hawaii* "rejected this same argu-

22  ment," and that the President's power is unbounded. But, quite to the contrary, the Court "as-

23  sume[d] that [Section] 1182(f) does *not* allow the President to expressly override particular provi-

24  sions of the INA." *Hawaii III*, 138 S. Ct. at 2411 (emphasis added); *id.* at 2412 (accepting that the

---

25  [2]   In the INA, Congress extended the H-1B visa program to "fashion model[s]." 8 U.S.C.

26  § 1101(a)(47)(H)(i)(b). In light of the statute, the President could not deem fashions models ad-
    verse to the national interest and bar their entry pursuant to Section 212(f). But the Proclamation

27  does precisely that for the visa categories. For example, although the Fulbright-Hays Act of 1961
    (Pub. L. No. 87-256, 75 Stat. 527), determined that specific cultural exchange programs, includ-

28  ing for "trainee[s]" (8 U.S.C. § 1101(a)(47)(J)), are in the national interest, the Proclamation re-
    jects that conclusion and nullifies that statute.

President would "exceed[] his authority under § 1182(f)" if he were to impose an entry restriction that "contradict[s] . . . another provision of the INA."). That is our argument here as well.

*Hawaii III* rested on the Court's determination that there was no "conflict between the statute and the Proclamation." 138 S. Ct. at 2411. At issue was the Visa Waiver Program which established entry criteria for nationals of some low-risk countries; that program "did not implicitly foreclose the Executive from imposing tighter restrictions on nationals of certain high-risk countries." *Id*. at 2412; *id.* at 2421 n.6 (same). Rather, the Proclamation was either consistent with the INA, or it filled in gaps where the INA was silent. *Id*. at 2411-2412.

Here, however, there is just such a "contradiction with another provision of the INA" that renders the Proclamation unlawful. *Hawaii III*, 138 S. Ct. at 2411. Through affirmative and comprehensive visa programs, Congress declared that certain categories of nonimmigrant workers are in the national interest and *may* enter the United States. The Proclamation, by contrast, would undo this judgment and abolish large swaths of the programs established by Congress.[3]

This answers the government's straw-man characterization of our argument: "that a President is not permitted to restrict the entry of foreign temporary workers under § 1182(f) simply because they might be otherwise admissible." Opp. 14-15. By its nature, Section 212(f) authorizes the President to bar the entry of a noncitizen who would "be otherwise admissible." But use of that power must either be consistent with statute—or, at most, span a statutory gap. What the President may not do is "eviscerate[] the statutory scheme" by reversing legislatively enacted policy. *Doe #1*, 957 F.3d at 1064. *See Hawaii III*, 138 S. Ct. at 2411; *Hawaii II*, 878 F.3d at 685.

**2.** Further, the Proclamation flunks the statutory requirement that the President must "find[]" that the entry of individuals "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). As we showed (Mot. 11 n.7), the text obligates the President to connect evidence with a conclusion regarding the national interest. Here, however, the Proclamation lacks a reasonable relationship between the stated problem and the action taken: It bars entry to individu-

---

[3]   The government identifies (at 15 n.2) Section 212(f) proclamations that were *consistent* with statute, and not diametrically opposed. Similarly, the President's authority to "suspend entry from particular foreign states in response to an epidemic confined to a single region" (*Hawaii III*, 138 S. Ct. at 2415; *cf.* Opp. 16), does not conflict with any statute. *See* 8 U.S.C. § 1182(a)(1)(A) (inadmissibility ground relating to "a communicable disease of public health significance").

1    als who are either already prohibited from working, or who work in occupations—especially

2    computer occupations—for which unemployment remains low; it fails to rebut the economic evi-

3    dence presented during consideration of the Proclamation that nonimmigrant workers are a net

4    positive to both the economy and to the employment prospects of American workers; and it does

5    not consider the important reliance interests undercut by the abrupt entry ban. *See* Mot. 11-15.

6        As to the first of these points, the government offers not a word in defense: It does not

7    make *any* contention that the bans are a reasonable means for advancing the national interest. *See*

8    Opp. 16-17. The government has therefore waived any argument as to the merits of this point.

9    *See, e.g.*, *In re Polycom, Inc.*, 78 F. Supp. 3d 1006, 1014 n.6 (N.D. Cal. 2015) (waiver).

10       Instead, the government simply asserts that "[t]hese arguments are doomed by *Hawaii*,"

11   suggesting that "litigants are not permitted to 'challenge' a Presidential entry-suspension order

12   'based on their perception of its effectiveness and wisdom.'" Opp. 16 (quoting *Hawaii III*, 138 S.

13   Ct. at 2421). But, as we already explained, the Ninth Circuit has held that this unquestioning def-

14   erence to the President does not extend beyond matters of national security and foreign relations:

15   "[W]hile the 'President may adopt a preventive measure in the context of international affairs and

16   national security,' and he is then 'not required to conclusively link all of the pieces in the puzzle

17   before courts grant weight to his empirical conclusions,' his power is more circumscribed when

18   he addresses a purely domestic economic issue." *Doe #1*, 957 F.3d at 1067 (quoting *Hawaii III*,

19   138 S. Ct. at 2409) (citations omitted; alterations incorporated). That is so even when the means

20   chosen to effectuate a domestic policy result—here, reduced unemployment—is a restriction on

21   immigration. *See id.* ("We reject the government's argument that the Proclamation implicates the

22   President's foreign affairs powers simply because the Proclamation affects immigrants.").[4]

23       We therefore explained that "[i]t is . . . the law of this Circuit that Section 212(f) requires

24   'find[ings] that support the conclusion that admission of the excluded aliens would be detri-

25   mental,' and that courts are competent to adjudicate" this issue. Mot. 11 (quoting *Hawaii II*, 878

26   _____

27   [4]   The analysis in *Doe #1* is not, as the government suggests (Opp. 16 n.4), dicta. There, the
     Court performed the multi-factor *Nken* analysis, of which "[t]he second most important . . . fac-

28   tor" is the likelihood of success on the merits. *Doe #1*, 957 F.3d at 1062. The Ninth Circuit's legal
     analysis regarding the merits is, at least, an alternative holding. *Id.* at 1064.

REPLY ISO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
(NO. 4:20-CV-4887-JSW)

F.3d at 693); *see Doe #1*, 957 F.3d at 1067. The government has no response.

The government's objections to our demonstration that the Proclamation fails to grapple with economic evidence and reliance interests are in the same vein: The government does not rebut our claims; rather, it asserts that it should be exempted from scrutiny. *See* Opp. 18. But if Section 212(f)'s "find[ings]" requirement necessitates reasoned decisionmaking—and the Ninth Circuit holds that it does (*see Hawaii II*, 878 F.3d at 693; *Doe #1*, 957 F.3d at 1066-1067)—then these fundamental elements of reasonable governmental action apply. Mot. 14-15.[5]

**3.** The Court should identify these meaningful limitations on the scope of Section 212(f) authority to ensure that it constitutionally delegates authority to the Executive. Mot. 15-16.[6]

In response, the government makes the expansive assertion that the President has the inherent power to exclude noncitizens as he sees fit, *independent* of Congress's delegation of authority in Section 212(f). *See* Opp. 13, 19-20 (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). But the Ninth Circuit has already rejected this broad reading of *Knauff*: "We conclude that the President lacks independent constitutional authority to issue the Proclamation, as control over the entry of aliens is a power within the exclusive province of Congress." *Hawaii II*, 878 F.3d at 697; *see also id.* at 698 ("While the Supreme Court's earlier jurisprudence contained some ambiguities on the division of power between Congress and the Executive on immigration, the Court has more recently repeatedly recognized congressional control over immigration policies.") (citing *Chadha, Fiallo,* and *Galvan*).[7] Far from overruling this hold-

---

[5] *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (when the government "changes course, as DHS did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (reasoned decisionmaking requires "a rational connection between the facts found and the choice made").

[6] Although the Court's plurality opinion in *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019), identified other seemingly broad grants of authority that have been upheld against nondelegation challenges, those cases turned on just such a limiting construction based on the statutory context and purpose. *See N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932) ("It is a mistaken assumption that [the statutory 'public interest' standard] is a mere general reference to the public welfare without any standard to guide determinations."); *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943) (statutory "public interest" standard "is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power").

[7] The Supreme Court has repeatedly held that the President's role in immigration is to implement the policies that *Congress* has established through statute—not to be a law unto himself. *See Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formation of [immigration] policies is en-

ing in *Hawaii III*, the Supreme Court engaged in painstaking analysis of whether the President's action was in fact authorized by Section 212(f) (*Hawaii III*, 138 S. Ct. at 2407-2415)—all of which would have been unnecessary if, as Justice Thomas alone would have held, the President holds exclusion power independent of congressional authorization (*id.* at 2424 (Thomas, J., concurring) (citing *Knauff*)). The Ninth Circuit's *Hawaii II* holding continues to bind the Court.[8]

Even if *Knauff* were as broad as the government claims, it still does not authorize the Proclamation, which contradicts Congress's policy judgments embedded in statutes. *See* pages 3-4, *supra*. As Justice Jackson's seminal *Youngstown* opinion makes clear, there is a critical difference between a presidential action that is either authorized by, or at least compatible with, Congressional enactments, on the one hand; and "measures incompatible with the expressed or implied will of Congress," on the other. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-638 (1952) (Jackson, J., concurring); *see, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 524 (2008) ("Justice Jackson's familiar tripartite scheme [from *Youngstown*] provides the accepted framework for evaluating executive action in this area."); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). When the President's actions fall into this latter category, "his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637; *see also id.* at 637-638 ("Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject.").

Indeed, Justice Jackson's *Youngstown* opinion explicitly rejected the *Curtiss-Wright* line of cases—of which *Knauff* is a part[9]—as authority for a presidential power to override congres-

---

trusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *INS v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens."); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens . . . is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established.").

8   *See, e.g.*, *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1041 (9th Cir. 2010) (explaining that "reversal on one merits ground may leave the decisions reached on other grounds intact" as binding precedent); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) (distinguishing "[a] decision . . . *reversed* on other grounds" from "a decision that has been *vacated*[,] [which] has no precedential authority"). At the very least, *Hawaii II* is entitled to strong persuasive authority as the Ninth Circuit's most recent, uncontradicted statement.

9   *Knauff*, 338 U.S. at 542, cited *Curtiss-Wright* for the assertion that "[t]he exclusion of aliens . . . is inherent in the executive power to control the foreign affairs of the nation." *Knauff*'s other

sional statutes in the area of foreign affairs. The *Curtiss-Wright* case, Justice Jackson explained, "intimated that the President might act in external affairs *without* congressional authority, but not that he might act *contrary* to an Act of Congress." *Youngstown*, 343 U.S. at 635 n.2 (Jackson, J., concurring) (emphases added). That is, the foreign affairs context is no exception to the fundamental principle that the President has no constitutional power to simply set aside statutes as he sees fit. *See*, *e.g.*, *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 525 (1838) ("[V]esting in the President a dispensing power"—that is, "clothing the President with a power to control the legislation of Congress"—"has no countenance for its support in any part of the constitution.").

*Knauff* therefore provides no authority for the government's claim of inherent presidential power to enact the Proclamation at issue here, which simply sets aside duly enacted sections of the INA. *See* pages 2-4, *supra*. For the same reasons, it fails to support the government's claim that foreign-affairs statutes are immune from non-delegation challenge: Whatever the continued relevance of *Knauff*'s statements on this point generally,[10] it is clear that *no* act of Congress may constitutionally "give[] the President the unilateral power to change the text of duly enacted statutes." *Clinton v. City of New York*, 524 U.S. 417, 447 (1998); *see also id.* at 465 (Scalia, J., dissenting) (agreeing that "the doctrine of unconstitutional delegation . . . may [impose] much more severe" "limits" upon statutes that purport to authorize the Executive to set aside laws than upon run-of-the-mill delegations of power to "augment[]" existing statutes). But that is just what Section 212(f) *must* do, if it is to provide any support for the Proclamation here.

## B.   Defendants' implementation of the Proclamation violates the APA.

The Court should also preliminarily enjoin the Defendants' implementation of the Proclamation because their actions violate the APA. The government responds (at 10-11) that the agencies are immune from APA scrutiny when they "merely [carry] out directives of the President," who is not an "agency" subject to the APA. Opp. 10-11. Here, however, the agencies have done far more than "carry out his decision." Opp. 11. In putative service of the Proclamation, they

---

citation for this proposition was *Fong Yue Ting*, which held no such thing. *See* page 7 n.7, *supra*.
[10]   *But cf. Doe #1 v. Trump*, 418 F. Supp. 3d 573, 589-593 (D. Or. 2019) (discussing *Knauff* at length, distinguishing it, and holding that Section 212(f)—unlike the "much narrower delegation of authority" at issue in *Knauff*—is an unconstitutional delegation of legislative power).

1    have created two new policies that reflect decisionmaking by the agency, not the President. Both

2    policies are final agency actions, and both violate the APA.

3        **1.** In the Guidance issued on August 12, 2020—relied on by the government (*see* Opp. 21-

4    22)—the State Department has adopted substantial new eligibility criteria through the implemen-

5    tation of the national-interest exceptions identified in Proclamation 10052. 2d Hughes Decl. Ex.

6    1. From the Proclamation's use of the term "national interest," the State Department has created a

7    detailed, multipart policy exceeding 3,000 words in length.[11]

8        Ninth Circuit precedent establishes that *this* policy is reviewable pursuant to the APA be-

9    cause it creates, along with the Proclamation, the "operative rule of decision." *E. Bay Sanctuary*

10    *Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020). This new policy does not reflect *presi-*

11    *dential* decisionmaking; nothing in the Proclamation provides for the dozens of policy judgments

12    embedded within this new policy. This agency action, moreover, is "final," because it "mark[s]

13    the consummation of the agency's decisionmaking process" and is "one by which rights or obli-

14    gations have been determined, or from which legal consequences will flow." *Bennett v. Spear*,

15    520 U.S. 154, 177-178 (1997). This inquiry is "pragmatic and flexible," looking to the decision's

16    "actual effects." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019). Self-claimed

17    "informal guideline[s]" often constitutes final agency action. *Barrick Goldstrike Mines Inc. v.*

18    *Browner*, 215 F.3d 45, 47-48 (D.C. Cir. 2000) (collecting cases). That is the case here: The Au-

19    gust 12 Guidance adopts reticulated standards—found nowhere else in immigration law—to gov-

20    ern issuance of the visas in the covered categories, resulting in immediate legal consequences.

21        This policy is contrary to law because it conflicts with the visa requirements adopted by

22    the INA and its implementing regulations, and nothing in Section 212(f) authorizes it. Mot. 6-11.

23    As just one example, the INA obligates an L-1 visa applicant to have worked for her company for

24    one year (8 U.S.C. § 1101(a)(47)(*l*)); the August 12 policy changes that eligibility criterion, set-

25    ting it to two years or more. 2d Hughes Decl., Ex. 1.[12] Because this new policy conflicts with ex-

26    ───────────────

27    [11]  Because the State Department issued this Guidance long after we filed the Complaint, it is not addressed there. *But see* Compl. ¶ 178. In the event that the Court believes necessary, Plaintiffs conditionally request leave to amend the Complaint to conform it to this new development.

28    [12]  The State Department's new eligibility criteria conflict with existing statutes and regulations

1    isting statutory and regulatory regimes (Mot. 6-11)—to say nothing of its failure to make a rea-

2    sonable connection between the stated problem and the policy chosen (*id*. at 12-14), and its de-

3    struction of reliance interests (*id*. at 14-15)—it violates core APA safeguards.

4        **2.** Separately, the State Department has instituted a moratorium on visa *processing* in the

5    banned categories—again, something that the Proclamation does not even purport to authorize.

6    Mot. 19. Because nothing in the Proclamation directs this policy, it is attributable to the agency,

7    not to the President. This agency action is similarly final: The "core question" on finality is not

8    the formality of the medium (*cf*. Opp. 11 (questioning finality of "policy by tweet")), it is "wheth-

9    er the agency has completed its decisionmaking process, and whether the result of that process is

10   one that will directly affect the parties" (*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977,

11   982 (9th Cir. 2006))—and the government makes no suggestion that the decision not to process

12   visas during the pendency of the Proclamation's entry ban is anything other than "complete[]."[13]

13       Moreover, the government is simply wrong that noncitizens subject to a Section 212(f)

14   proclamation are statutorily ineligible for visas. *Cf*. Opp. 11-12. What the statute actually pro-

15   vides, in 8 U.S.C. § 1182(a), is that "aliens who are inadmissible *under the following para-*

16   *graphs*"—that is, the ten numbered paragraphs of subsection 1182(a), which set out various

17   grounds of inadmissibility—"are ineligible to receive visas and ineligible to be admitted to the

18   United States." 8 U.S.C. § 1182(a) (emphasis added). Section 212(f) (8 U.S.C. § 1182(f)) is not a

19   _____

20   in several ways. To name a few: 1) Per the INA, employers must pay H-1B workers a prevailing
     wage (8 U.S.C. § 1184(n)(1)(A)); the Guidance criteria requires salaries at least 15% in excess of

21   the "prevailing wage." 2) The Guidance creates a new "undue financial hardship" criteria for sev-
     eral categories. 3) A factor for an H-1B visa is "unusual expertise," such as a "doctorate or pro-

22   fessional degree" (*id*.) which purposefully differs from the statutory definition of "specialty occu-
     pation." 8 U.S.C. § 1184(i)(3). 4) The Guidance creates a "critical infrastructure need" factor. 5)

23   The Guidance considers whether an H-2B applicant previously worked for the same employer.

         Indeed, the Guidance reflects *legislative* or *regulatory* proposals the administration has long

24   contemplated. *Cf*. Stephen Miller, Briefing on Buy American, Hire American (Apr. 17, 2017), 2d
     Hughes Decl. Ex. 3 (describing proposed "administrative" and "legislative" reforms, including

25   "adjust[ing] the wage scale" and "giv[ing] master's degree holders a better chance of getting
     H1Bs"). The government cannot create a shadow INA by barring everyone under Section 212(f),

26   and then allowing "exceptions" for the applicants it preferred all along.

27   [13]   The government filed an administrative record in parallel litigation, *Gomez v. Trump*, No. 20-
     cv-1419 (D.D.C.). It reveals that the State Department instructed all consular posts that the Proc-

28   lamation "suspended the *issuance* of nonimmigrant visas in the H-1B, H-2B, L, and J-1 catego-
     ries" and that "[p]osts should NOT resume routine processing of these visa classifications," ab-
     sent an exception. 2d Hughes Decl. Ex. 2 at 38. This is a plain State Department policy.

1   "paragraph[]" of subsection 1182(a), it is a separate subsection. *See, e.g.*, *id.* § 1182(b)(3) (refer-

2   encing the inadmissibility grounds in "paragraph[s] (2) or (3) of subsection (a)"). Section 212(f)

3   thus authorizes the President to "suspend the entry" of noncitizens, but it does not make those

4   noncitizens ineligible for visas that can be used once the "suspen[sion]" expires. *Id.* § 1182(f).[14]

5       *Hawaii III* is not to the contrary. *Cf.* Opp. 11. The Supreme Court recognized "the basic

6   distinction between admissibility determinations and visa issuance that runs throughout the INA."

7   138 S. Ct. at 2414. And, in stating that "Section 1182 defines the pool of individuals who are ad-

8   missible to the United States," the Court was discussing Section 1182(a), clear by its reference to

9   "health risks, criminal history, or foreign policy consequences," language the government here

10  omits. *Id.* The Court proceeded to explain that, after an individual is issued a visa, he or she may

11  *separately* be barred from entry by Section 212(f). *Id.* The Court did not address—and certainly

12  did not hold—that the President may override the statutory and regulatory obligation to process

13  and issue visas. Mot. 19. *See Vulupala v. Barr*, 438 F. Supp. 3d 93, 100 (D.D.C. 2020).[15] Unless

14  this policy is enjoined, the Proclamation will cause harms long into 2021. *See* Mot. 24.[16]

15  **III.    THE PROCLAMATION CAUSES DIRECT AND IRREPARABLE INJURIES.**

16      The irreparable harms are clear: The very purpose of the Proclamation is to radically alter

17  U.S. labor markets in the third and fourth quarters of 2020; indeed, senior administration officials

18  trumpeted those effects. Mot. 20-21. The Plaintiff associations represent hundreds of thousands of

19  American businesses; we documented the irreparable harms to seven distinct members across all

20

21  [14]   8 U.S.C. § 1201(g) provides that no visa will issue if a noncitizen "is ineligible to receive a visa . . . under section 1182." Because noncitizens barred under a Section 212(f) proclamation are *not* "ineligible to receive a visa," this separate provision is irrelevant here.

22  [15]   Any noncitizens issued visas but subject to the Proclamation will not actually "travel to the United States and then be denied entry." Opp. 12. Air carriers do not allow individuals ineligible

23  to enter the United States to board their planes, on pain of being obligated to return those individuals to their countries of departure at the airline's own expense. 8 U.S.C. § 1231(c)(1), (d)(1).

24  [16]   The doctrine of consular nonreviewability is inapplicable. *Cf.* Opp. 9-10. That doctrine per-

25  tains only to "*individual* visa denials"; it does nothing to bar challenges to "the President's promulgation of sweeping immigration policy" like the Proclamation at issue here. *Hawaii II*, 878 F.3d

26  at 679 (emphasis altered); *see also Hawaii I*, 859 F.3d at 768-769; *cf. Hawaii III*, 138 S. Ct. at 2407 (declining to disturb these holdings); *see Motaghedhi v. Pompeo*, 436 F. Supp. 3d 1345,

27  1356 (E.D. Cal. 2020) ("*implementation*" of a presidential proclamation "falls outside the doctrine of consular nonreviewability"); *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2017)

28  ("[T]he doctrine of consular non-reviewability does not apply where the government has not made a final visa decision."); *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016).

**REPLY ISO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**
**(NO. 4:20-CV-4887-JSW)**

1    visa categories. *Id.* at 21-24. The government makes three points in response, each unavailing.

2           *First*, the government contends (at 21) that Plaintiffs' injuries are caused by COVID-19

3    related consulate closures, not by the Proclamation. But this assertion contradicts the administra-

4    tion's stated rationale for the Proclamation, which is expressly premised on "[t]he entry of addi-

5    tional workers through the H-1B, H-2B, J, and L nonimmigrant visa programs." Proclamation,

6    Dkt. 1-1. In issuing the Proclamation, administration officials stated that, but for this action, hun-

7    dreds of thousands of individuals *would* enter the United States. *See* Hughes Decl. Exs. 2 & 4.

8    This all occurred well after the March 20, 2020 announcement on which the government (at 21)

9    relies. If, as the government now asserts, the Proclamation has no material effect on the entry of

10   non-immigrants, then the justifications supplied for the Proclamation were pretextual.

11          Because many consulates have reopened—a fact the government seems to admit (Opp. 21

12   n.5)—the Proclamation has substantial impacts on Plaintiffs, just as the government intended. At

13   least 47 U.S. consulates from around the globe have publicly stated that they are now processing

14   non-immigrant visas. 2d Hughes Decl., Ex. 4 .[17] Plaintiff Intrax confirms that, since June 22, par-

15   ticipants in programs unaffected by the Proclamation have obtained non-immigrant visas from

16   U.S. consulates in Brazil, Chile, Colombia, Ecuador, El Salvador, France, Germany, Hong Kong,

17   Iceland, Italy, Japan, Mexico, Netherlands, South Africa, South Korea, Spain, Thailand, and Tur-

18   key. 2d Schneider Decl. ¶¶ 5-6; *see also* Gustafson Decl. ¶ 4. From these countries alone, but for

19   the Proclamation, Intrax demonstrates that it would bring in thousands of participants for its pro-

20   grams in the third and fourth quarters of 2020. 2d Schneider Decl. ¶¶ 8-9, 26. Microsoft has iden-

21   tified a specific individual in France who is barred by the Proclamation from transferring via an

22   L-1 visas. Chen. Decl. ¶¶ 16-18. As intended, the Proclamation is irreparably injuring Plaintiffs.

23          *Second*, the government points (at 21-22) to the State Department's August 12 Guid-

24   ance—issued after we filed this motion for a preliminary injunction—regarding national-interest

25   exceptions. This argument fails right out of the gate: Applying for a national-interest exception

26   imposes substantial costs on businesses, including money and resource diversion. 2d Schneider

27   ───────────────

28   [17]   The *Gomez* Administrative Record contains a July 8 memorandum from the Secretary of State
     to all diplomatic and consular posts directing that, "[b]eginning on July 15, 2020, posts may begin
     a phased approach to the resumption of routine visa services." 2d Hughes Decl. Ex. 2 at 35.

Decl. ¶¶ 15-19, 22-23. But for the Proclamation, Plaintiffs would not be forced to bear these expenses, and these costs are irrecoverable. *Id*. Thus, *even if* the national-interest exceptions wholly gutted the Proclamation, it would still cause irreparable harm and warrant an injunction. *Cf. Chamber of Commerce of United States of Am.* v. *United States Dep't of Labor*, 885 F.3d 360, 383 (5th Cir. 2018) (an unreasonable regulation is not saved by another unreasonable regulation).

What is more, Plaintiffs' injuries stem from the intentional reconfiguration of the whole labor market, denying U.S. companies access to the hundreds of thousands of individuals that, per the administration, would enter the U.S. but for the Proclamation. *See* Mot. 20-21. If the government means to say that the State Department's August 21 Guidance has rendered the Proclamation a paper tiger, mere symbolism with no practical effect, then it should say so with clarity. The government does not so contend, because it cannot. Rather, the irreparable harms remain.

On the face of it, the August 12 Guidance effectuates a new immigration policy, substantially narrowing the range of individuals eligible for visas—all to the detriment of plaintiffs. *See* pages 11-12 & n.17, *supra*. For the businesses that operate J visa programs, the available national-interest exceptions apply to only a miniscule proportion of participants; entire programs are left without recourse to an exception. *See* 2d Schneider Decl. ¶¶ 8-14, 20-22, 24-27. The Proclamation continues to shutter the vast majority of Intrax's business, with devastating consequences. *Id*.

For the businesses that need H-2B workers, the August 12 Guidance has little effect. The only national-interest exception available to private-company H-2B workers is for "[t]ravel necessary to facilitate the immediate and continued economic recovery of the United States (e.g., those working in forestry and conservation, nonfarm animal caretakers, etc.)." *See* August 12 Guidance. Plaintiff associations include members who require H-2B workers for landscaping and moving needs, not the categories identified by the August 12 Guidance. *See* O'Gorman Decl.; Leman Decl.; Brummel Decl. Additionally, the Guidance creates requirements beyond those contained in the statute and regulations, harming businesses whose workers do not qualify.[18]

---

[18]   If these H-2B workers are in fact exempt from the Proclamation, then the government should say so with clarity, rather than offering vague generalities. And, if these workers are exempt, the government has no plausible basis to resist an injunction, because the Proclamation would have no practical effect *other than* to injure businesses through added cost and uncertainty.

Nor does the August 12 Guidance remedy the immediate harms imposed on the businesses that employ H-1B and L workers. To the extent visas are approvable, the Guidance substantially limits eligibility by conjuring new criteria at odds with statute and regulation. *See* pages 9-10 n.12, *supra*. The government addresses (at 22) only the Amazon and Microsoft employees who traveled abroad and were then barred from returning to their American homes. This does not remedy the other harms that the Proclamation imposes on Microsoft and Amazon. Chen Decl. ¶¶ 6-31; Brown Decl. ¶¶ 8-9, 13-15. For example, the government offers no option for the French national employed with Microsoft in France, who Microsoft seeks to transfer to the United States via an L-1A visa in order to lead a new team and hire new employees. Chen Decl. ¶ 16-18. Nor does it provide a remedy for the Indian national that Microsoft hired on June 10, 2020 as a senior program manager working on Azure hardware. *Id.* ¶ 29.

*Third*, the government (at 23) argues that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." Economic losses caused by government policies are generally, as here, not "recoverable." That is why the Ninth Circuit holds that, in cases against the government "where parties cannot typically recover monetary damages flowing from their injury … , economic harm can be considered irreparable" without any need to show imminent bankruptcy. *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020). And, yet further still, plaintiffs *did* establish imminent existential threats to member-businesses. *See* Bell Decl. ¶ 17 ("Unless the Proclamation is lifted within the next few months, Alliance Abroad will likely have to cease operations.").[19]

Finally, the State Department's policy of refusing to process or issue visas causes independent and irreparable harms. For example, if Intrax participants cannot process their J-1 visas in the fall of 2020, Intrax will lose its entire winter work travel season. 2d Schneider Decl. ¶ 26.

---

[19]   Although not required, the government wrongly asserts (at 23) that "Plaintiffs make no mention of any attempt to mitigate their claims of economic loss based on unfilled positions by seeking to employ U.S. workers to fill their needs." For Singing Hills, even with job losses "as a result of the COVID-19 pandemic," it has "not been able to fill many available openings" and "did not even file [its] temporary labor certification with the Department of Labor to secure H-2B workers … until July 2, 2020, well after the COVID-19 pandemic began." Leman Decl. ¶¶ 8-9. So too for Brummel Lawn & Landscape, which, today, remains unable to "fill many available openings." Brummel Decl. ¶ 7. And so too for Gentle Giant, which "still ha[s] not been able to fill many available openings" notwithstanding "the COVID-19 pandemic." O'Gorman Decl. ¶ 12.

1

**IV.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.**

2

3

4

5

6

7

8

9

10

11

12

The balance of the equities and public interest also favor preliminary injunctive relief. Mot. 24-25. The government's responses are unavailing. *First*, the government contends (at 24) that the public interest favors "applying federal law correctly." For reasons we have explained, that strongly favors an injunction. *Second*, our request is not that the Court "micro-manag[e]" an executive agency's administration of a statutory program (Opp. 24), but rather that the Court enjoin executive and agency action that disregards statutory duties and operates *ultra vires*. *Third*, the government complains (at 24) that we seek "relief" "in advance of a full adjudication on the merits." Well, that is the purpose of a preliminary injunction, allowed by Civil Rule 65 and the APA, 5 U.S.C. § 705. Plaintiffs request a restoration of the status quo ante, because the Proclamation is causing immediate, irreparable harm to plaintiffs and their members.[20] For its part, the government has not shown how a stay would cause it harm or be adverse to the public interest.

13

**V.   THE SCOPE OF PLAINTIFFS' REQUESTED INJUNCTION IS APPROPRIATE.**

14

15

16

17

18

19

20

21

22

23

24

Plaintiffs request (Mot. 1) an injunction only "with respect to Plaintiffs and, with respect to the association Plaintiffs, their members." The government responds (at 24-25) that the Court should reject a "universal injunction" reaching beyond "the parties before the court." But we never requested such relief. The government does not dispute that, if the Court grants injunctive relief, it should extend to the Plaintiffs and the members of the Plaintiff associations. Indeed, "the doctrine of associational standing," long established under Article III, "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others," allowing "a single case to vindicate the interests of all" members in the association. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Brock*, 477 U.S. 274, 290 (1986). The injunction requested here—limited to Plaintiffs and their members—is simply not the sort of "universal" injunction the government decries.

25

**CONCLUSION**

26

The Court should grant the motion for a preliminary injunction.

27

28

[20]   *Senate of the State of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) is inapposite; there, the ultimate issue was a release of information. If it was released via an injunction, the case was over. Not so here, where, if defendants ultimately prevail, the Proclamation may be restored.

1    Respectfully submitted,

2                                                    **MCDERMOTT WILL & EMERY LLP**

3
     DATED:    August 28, 2020                       By:        */s/ Paul W. Hughes*
4                                                    Paul W. Hughes (*Pro Hac Vice*)
                                                     phughes@mwe.com
5                                                    Michael B. Kimberly (*Pro Hac Vice*)
                                                     mkimberly@mwe.com
6                                                    Sarah P. Hogarth (*Pro Hac Vice*)
                                                     shogarth@mwe.com
7                                                    500 North Capitol Street NW
                                                     Washington, DC 20001
8                                                    (202) 756-8000

9
                                                     William G. Gaede, III (136184)
10                                                   wgaede@mwe.com
                                                     275 Middlefield Road, Suite 100
11                                                   Menlo Park, CA 94025
                                                     (650) 815-7400
12
                                                     *Counsel for Plaintiffs*
13

14

15   MANUFACTURERS' CENTER FOR LEGAL ACTION
     Linda E. Kelly (*Pro Hac Vice to be filed*)
16   Patrick D. Hedren (*Pro Hac Vice to be filed*)
     Erica T. Klenicki (*Pro Hac Vice to be filed*)
17   733 10th Street NW, Suite 700
     Washington, DC 20001
18   (202) 637-3000

19   *Counsel for the National Association of Manufacturers*

20   U.S. CHAMBER LITIGATION CENTER
     Steven P. Lehotsky (*Pro Hac Vice to be filed*)
21   Michael B. Schon (*Pro Hac Vice to be filed*)
     1615 H Street NW
22   Washington, DC 20062
     (202) 463-5337
23
     *Counsel for the Chamber of Commerce*
     *of the United States of America*
24

25

26

27

28